## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PHUNWARE, INC.,

                    Plaintiff,

          vs.

UBS SECURITIES LLC,

                    Defendant.

Docket No.  1:23-cv-06426

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT
## FOR FAILURE TO STATE A CLAIM

CAHILL GORDON & REINDEL LLP
    Herbert S. Washer
    Tammy L. Roy
    Vishwani Singh
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com
vsingh@cahill.com

*Attorneys for UBS Securities LLC*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

ALLEGATIONS OF THE COMPLAINT.............................................................................. 3

LEGAL STANDARD............................................................................................................. 9

ARGUMENT ....................................................................................................................... 10

I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT ............ 10

      A.      Plaintiff Fails To Adequately Allege A Manipulative Act ................................... 10

      B.      Plaintiff Fails To Adequately Allege a Strong Inference Of Scienter ................. 15

              1.      Plaintiff Has Not Pled Sufficient Facts to Support a Showing of Motive and Opportunity to Commit Fraud............................................................. 15

              2.      Plaintiff Has Not Pled Sufficient Facts to Support a Showing of Conscious Misconduct or Recklessness .................................................... 18

      C.      Plaintiff Fails To Adequately Allege Loss Causation........................................... 23

II.     PLAINTIFF FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD................ 30

CONCLUSION..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)..............................................................................................................9

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)............................................................................... *passim*

*Cartwright* v. *D'Alleva*,
  2018 WL 9343524 (S.D.N.Y. Aug. 27, 2018) (Torres, J.), *aff'd*, 782 F. App'x
  77 (2d Cir. 2019)...............................................................................................................30

*CFTC* v. *Oystracher*,
  203 F.Supp.3d 934 (N.D. Ill. 2016) .............................................................................21

*Cohen* v. *Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010)..................................................................*passim*

*CP Stone Fort Holdings, LLC* v. *John*,
  2016 WL 5934096 (N.D. Ill. Oct. 11, 2016)..............................................................14

*CP Stone Fort Holdings, LLC* v. *Doe(s)*,
  2017 WL 1093166 (N.D. Ill. Mar. 22, 2017)................................................21n, 29

*DiMuro* v. *Clinique Labs., LLC*,
  572 F. App'x 27 (2d Cir. 2014) .....................................................................................11

*In re Duane Reade Inc. Sec. Litig.*
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff* v.
  *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004)............................................17

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...................................................................................15, 16

*Evy Gru* v. *Axsome Therapeutics, Inc.*,
  2023 WL 6214581 (S.D.N.Y. Sept. 25, 2023).......................................................23n

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2nd Cir. 2009)..........................................................................................28

*Gamma Traders - I LLC* v. *Merrill Lynch Commods., Inc.*,
  41 F.4th 71 (2d Cir. 2022) ........................................................................... *passim*

*Ganino* v. *Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)........................................................................................28n

*Harrington Global Opportunity Fund, Ltd* v. *CIBC World Markets Corp.*,
    2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ........................................................................13n

*Harrington Global Opportunity Fund, Ltd* v. *CIBC World Markets Corp.*,
    585 F.Supp. 3d 405 (S.D.N.Y. 2022) ................................................................. *passim*

*Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*,
    309 F. Supp. 3d 100 (S.D.N.Y. 2018) ..........................................................................16

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ..............................................................................16, 18

*Kessev Tov LLC* v. *Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ..................................................................14

*Kessev Tov, LLC* v. *Doe(s)*,
    2023 WL 4825110 (N.D.Ill. July 27, 2023) ....................................................................21

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ....................................................................................29

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ............................................................................8

*In re London Silver Fixing Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ..........................................................................26

*Mod. Settings, Inc.* v. *Prudential-Bache Sec., Inc.*,
    602 F. Supp. 511 (S.D.N.Y. 1984) ..............................................................................11

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) ..........................................................................19

*Rice* v. *Intercept Pharms., Inc.*,
    2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ..................................................................18

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ....................................................................................11

*Stone Family Trust* v. *Credit Suisse AG*,
    2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ..................................................................10

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..........................................................................10

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................15

*United States* v. *Coscia*,
   866 F.3d 782 (7th Cir. 2017) ...........................................................................................20, 22n

Defendant UBS Securities LLC ("UBS") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint ("Compl.") of Plaintiff Phunware, Inc. ("Plaintiff" or "Phunware") for failure to state a claim.[1]

## PRELIMINARY STATEMENT

Phunware alleges that, over a two year period, UBS engaged in a manipulative "spoofing" scheme in which it allegedly "flooded the markets" with "fictitious Baiting Orders" in order to drive Phunware's stock price downward.  (Compl. ¶¶ 37, 40.)  Plaintiff contends that UBS manipulated Phunware's stock price "so that [UBS] could purchase Phunware shares at artificially lower prices"—prices allegedly a penny or two less than the "prevailing best offer prior to entry of the [alleged] Baiting Orders."  (*Id.* ¶¶ 36, 42.)  Phunware alleges it was harmed by this purported scheme when it sold its own shares—often ***months*** after the alleged spoofing "episodes" identified in the Complaint—at allegedly "depressed prices."  (*Id.* ¶ 10.)

One of the many fundamental problems with Plaintiff's allegations, however, is that the "pattern" of allegedly troubling trading it claims is no more than a transparent effort by Plaintiff to cherry pick and combine what, by Plaintiff's own admission, are separate orders by dozens if not hundreds of independent market participants who executed through UBS.  (*See, e.g., id.* ¶ 19 (alleging that the "activity that forms the basis of the claims in this action may have been executed by Defendant for its own account . . . ***or*** for client accounts, for which it acted as a broker"); ¶ 15 ("UBS is a registered broker-dealer that executes securities transactions on various trading venues in the U.S.").)  But combining the orders, trades, and cancellations of independent market participants does not allege a pattern of trading activity by anyone, and it does not adequately plead a manipulative act as required to state a claim for market manipulation under the federal securities

---

[1] Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

laws.  Indeed, if this pleading tactic were acceptable, anyone could state a market manipulation claim against any broker-dealer at any time based on cherry-picked market activity.  (*See* Section I.A.)

But even if this Court were to attribute the trading decisions of UBS's many customers to UBS itself (and it should not), the Complaint provides no plausible explanation as to why UBS would engage in a scheme to drive Phunware's price down.  Indeed, the Complaint acknowledges that a "market-maker," like UBS, "makes its money by profiting from spreads, not from taking a directionally biased position at market risk."  (Compl. ¶ 94.)  The Complaint offers no explanation as to why UBS would have abandoned this role here in order to take positions on Phunware.

Plaintiff's Complaint is even more implausible when one considers the supposed benefits that UBS achieved through the alleged scheme.  Plaintiff offers six specific examples of spoofing in its Complaint, through which UBS supposedly earned a grand total of about $24.  Even if one were to consider, and credit, each of the "1,021 distinct Executing Purchases" referenced in the Complaint (*id.* ¶ 43), the total profit to UBS was less than $10,000 over a two year period.  It is simply implausible to suggest that UBS employees would risk criminal prosecution, civil litigation, and a bar from the securities industry simply to make such a miniscule amount of money.  Instead, the more plausible explanation for the trading activity pled in the Complaint is that UBS was engaged in routine, lawful market activity as a broker-dealer, executing orders, trades and cancellations at the direction of its customers.  Courts have repeatedly dismissed on a motion to dismiss federal securities claims that have rested on modest profit allegations like these, and UBS respectfully suggests that the same result should obtain here.  (*See* Section I.B.)

To state a claim for market manipulation, Phunware is also required to plead loss causation, *i.e.,* some factual basis to connect, on the one hand, its sales of its own Phunware shares at

purportedly "depressed prices," and on the other, the "spoofing" activity alleged in the Complaint. Phunware has not done so.  In fact, one-third of the sales for which Phunware seeks recovery occurred *before* the first alleged act of manipulation and, of those sales that occurred during the alleged Relevant Period, the vast majority were *days, weeks, or even months after* the spoofing episodes alleged in the Complaint.  On this basis, it is impossible to conclude that the alleged spoofing had any lasting effect causing Phunware to sell its shares at artificially depressed prices, as alleged in the Complaint.  Phunware's failure to plead loss causation is yet another independent basis to dismiss Phunware's market manipulation claims.  (*See* Section I.C.)

Finally, because the elements of common law fraud mirror the elements of market manipulation, Phunware's common law fraud claim also fails for each of the reasons its market manipulation claims fail, and should be dismissed.  (*See* Section II.)

## ALLEGATIONS OF THE COMPLAINT

### The Alleged "Spoofing" Scheme

The Complaint alleges that, for more than two years, UBS engaged in a "spoofing" scheme to drive down Phunware's stock price.  Plaintiff claims that the scheme was accomplished through a three-stage "pattern" of trading.

*First*, Plaintiff alleges that UBS (or one or more of its customers) "flooded the markets with large quantities of Baiting Orders to sell" shares of Phunware.  (Compl. ¶ 37.) Plaintiff alleges that these "Baiting Orders led to a substantial sell-side imbalance" that "creat[ed] artificial selling pressure in the market" and drove "down the price of PHUN shares."  (*Id.* ¶ 41.)

*Second*, Plaintiff alleges that UBS (or one or more of its customers) then placed "Executing Purchases" to buy shares of Phunware at the "lower stock prices created by the [alleged] downward manipulation of its Baiting Orders"—typically a penny or two below the "prevailing best offer prior to entry of the Baiting Orders."  (*Id.* ¶¶ 38, 42, 52, 59, 65, 72, 78, 85.)

3

*Third*, Plaintiff alleges that "immediately after the completion of its Executing Purchases," UBS (or one or more of its customers) "cancelled and removed all of its Baiting Orders to sell from the Limit Order Book." (*Id.* ¶ 39.) Plaintiff alleges that these cancellations "eliminat[ed] the artificial sell-side imbalance that it falsely conveyed and injected into the market through its Baiting Orders." (*See, e.g., id*. ¶ 53.)

According to Plaintiff, eliminating the sell-side imbalance allegedly "enabled [UBS or one or more of its customers] to convert profits from its spoofing activity to cash." (*See, e.g., id*. ¶ 55.) Specifically, Plaintiff alleges that, after buying Phunware shares at "artificially depressed" prices, UBS (or one or more of its customers) then sold Phunware shares—generally the same day or the trading day after the purported spoofing episode—at a higher price once the alleged manipulative effects of the purported spoofing had dissipated. (*See, e.g., id.* ¶¶ 55, 61, 68, 74, 81, 88.)

Phunware alleges it was harmed by this purported scheme when it sold "over 34 million shares" at allegedly "manipulated prices as a result of Defendant's actions." (*Id.* ¶ 10.) Phunware does not explain (nor could it) how its sales during the Relevant Period, which occurred ***days, weeks, or months after*** the spoofing "episodes" alleged in the Complaint, were made at allegedly depressed prices when it also alleges that UBS benefited from selling Phunware shares the same or next day after the purported spoofing episodes at prices no longer allegedly artificially depressed. (*Id.* ¶¶ 55, 61, 68, 74, 81, 88 & Ex. 2.) Nor does Phunware explain how its sales of 13.4 million shares before January 5, 2021—*i.e.*, ***before*** the alleged manipulation began—could have possibly been affected by the alleged conduct. (*Id.* Ex. 2.)

**"The Example Episodes"**

While Plaintiff summarily asserts that this "spoofing pattern was repeated . . . multiple times a day and continuously" throughout the over two-year "Relevant Period" (*id.* ¶ 40), it offers

only six "Example Episodes" to plead the alleged spoofing scheme.[2]

In Plaintiff's "Example Episode" No. 1, Plaintiff alleges that on April 27, 2021, during a two-minute window at market open,[3] UBS placed Baiting Orders to sell Phunware shares at prices ranging from $1.70 per share to $4.28 per share. (*Id.* ¶ 50.) Plaintiff alleges that, at that time, the best price at which anyone was willing to sell Phunware shares was $1.64. (*Id.* ¶ 49.) Thus, Plaintiff illogically alleges that UBS attempted to drive Phunware's share price downward by placing multiple orders to sell at amounts ***substantially higher than*** the then-prevailing best offer.

Plaintiff offers no explanation for how and why offers to sell significantly above the current market price—in this example, sometimes more than 160% higher than the current market price— would "bait" other market participants to do anything. Indeed, when Plaintiff provides a hypothetical illustration of how spoofing might drive down a stock's price, it posits a scenario where the fake sell order is for a price ***lower*** than the current best offer price.[4] That makes sense. But when moving from the hypothetical to the supposed real world, Plaintiff does not offer a single example in which UBS (or one of its customers) actually does this. Rather, in each example in the Complaint, the supposedly manipulative offers to sell include offers to sell at prices materially ***higher*** than the best sell offer price. Plaintiff makes no attempt to reconcile its hypothetical

---

[2] The Complaint, including its exhibits, identifies only 90 days of the over 550 trading days of the Relevant Period in which spoofing allegedly occurred. (Compl. Ex. 1.)

[3] Interestingly, all six of the Example Episodes—and 62% of the 1,021 "spoofing" incidents listed in Exhibit 1 of the Complaint—are alleged to have occurred in the first half an hour of the trading day—*i.e.,* during the ***most liquid half hour time period***, on average, of the trading day. Yet, even Plaintiff recognizes that "highly liquid securities . . . are not amenable to the sort of [spoofing] manipulation" alleged in the Complaint. (Compl. ¶ 95.)

[4] *Cf.* Compl. ¶ 33 (alleging that "manipulative spoofing" is "high-speed bluffing" where, "[f]or example, a spoofer could place Baiting Orders to sell a big block of shares at $10, when the last sale was at $10.03" and "[a]fter other sellers rush to match the lower price, the spoofer would quickly pivot, cancel their order, and then place Executing Purchases at the $10 price they generated with the Baiting Order").

scenario with the very different examples provided in the Complaint leaving one to wonder why someone who is willing to sell a share of Phunware at $1.64 would decide to lower their price to $1.63 just because they learn that someone else (or even many others) might be willing to sell at $4.28.  Such allegations, on their face, make no sense, and need not be credited on a motion to dismiss.  (*See* Section I, *infra*.)

Ignoring this fundamental problem, Plaintiff presses on to allege that UBS "then took advantage of the artificially depressed price of PHUN shares it created by placing Executing Purchases . . . below the prevailing best offer prior to entry of the Baiting Orders, pocketing the difference."  (Compl. ¶ 42.)  Specifically, in Example Episode No. 1, Plaintiff alleges that UBS "took advantage" of its alleged scheme by purchasing "a total of 100 shares" of Phunware at $1.63 per share (for a total purchase price of $163), a price allegedly ***one cent below*** the "prevailing best offer of $1.64 per share."  (*Id.* ¶ 52.)  In other words, Plaintiff alleges that UBS's "spoofing" efforts allowed it to save ***$1*** on April 27, 2021.

Having allegedly reaped this reward, Plaintiff contends that UBS then "immediately" cancelled "***all of its Baiting Orders***" within ***two minutes*** of its Executing Purchase.  (*Id.* ¶ 53.)  But Plaintiff's allegation is a circular, self-fulfilling prophecy, since it defines Baiting Orders as ***all*** sell-side orders cancelled within "two minutes after [an] Executing Purchase."  (*See id.* at 14 n.10.)  In essence, Plaintiff alleges that all sell-orders that were cancelled within two minutes of the Executing Purchase (and thus fit within the definition of Baiting Orders) were cancelled within two minutes of the Executing Purchase.  This demonstrates nothing.

Plaintiff then makes fatally contradictory claims regarding the supposed effect of the Baiting Orders.  On one hand, Plaintiff claims that the impact of the spoofing almost immediately dissipated, alleging that UBS's cancellations of Baiting Orders "eliminat[ed] the artificial sell-side

6

imbalance" "injected into the market through its Baiting Orders," and that the price of Phunware shares then increased.  (*Id.* ¶ 53.)  Plaintiff speculates that UBS (or one of its customers) then benefited from this almost immediate increase in stock price by, for example, selling shares the next day at $1.65 per share, two cents per share higher than the best available offer on the prior day, before the alleged spoofing occurred.[5]  (*Id.* ¶ 55.)

But on the other hand, Plaintiff alleges that it was harmed when Phunware itself next sold shares ***two months later*** on June 28, 2021.  (*Id.* Ex. 2, at 3.)  Plaintiff does not and cannot explain how this Court could possibly reconcile, or give credit to, the inherently contradictory allegations that just one day after the April 27th spoofing incident, UBS could sell stock unaffected by that incident, but Phunware somehow still felt the artificial effects more than two months later.

Plaintiff's other five "Example Episodes" (*see id.* ¶¶ 56–88) are equally far-fetched:

| Ex. | Date | Alleged "Prevailing Best Offer to Sell" | Alleged UBS "Baiting Orders" to Sell | Alleged "Executing Purchase" | Amount Allegedly "Pocketed" By UBS | Phunware's Next Alleged "Depressed" Stock Sale |
|---|---|---|---|---|---|---|
| 2 | 10/26/21 | **$6.26**/share | Orders at ***higher*** prices from $6.40 to $22.00 | 50 shares at **$6.25**/share | $0.50 | ***Over 9 months later*** on August 17, 2022 |
| 3 | 10/27/21 | **$4.87**/share | Orders at ***higher*** prices from $4.99 to $100 | 824 shares at **$4.85**/share | $16.48 | ***Over 9 months later*** on August 17, 2022 |
| 4 | 10/28/21 | **$4.72**/share | Orders at ***higher*** prices from $4.95 to $300 | 100 shares at **$4.70**/share | $2.00 | ***Over 9 months later*** on August 17, 2022 |
| 5 | 11/8/21 | **$4.11**/share | Orders at ***higher*** prices from $4.16 to $500 | 440 shares at **$4.10**/share | $4.40 | ***Over 9 months later*** on August 17, 2022 |

---

[5] Alternatively, Plaintiff speculates that UBS (or one of its customers) may have "convert[ed] profits from its spoofing activity to cash" "***if***" a sale by UBS (or one of its customers) more than ***2 weeks earlier*** on April 9, 2021 at a price at $1.90 had been a "short position that was closed out by the Executing Purchase" made on April 27, 2021.  (*Id.* ¶ 55.)  Plaintiff provides no basis to assume the April 9, 2021 trade was a short position.

| 6 | 3/5/23 | **$0.771**/share | Orders at *the same or higher* prices from $0.771 to $2.50 | 167 shares at **$0.77**/share | $0.167 | ***Over 1 month later*** on April 19, 2023 |

Plaintiff also includes an "Exhibit 1" to its Complaint which is wholly unreliable and misleading.  Plaintiff claims that this Exhibit "demonstrate[s] that Defendant placed tens of millions of Baiting Orders," or "***over 82 million Baiting Orders***," during the Relevant Period. (Compl. ¶¶ 9, 36.)  Exhibit 1 does nothing of the sort.  In fact, the "82 million" number from Exhibit 1 (p. 55) does not even purport to be the total number of ***orders*** at issue at all but rather the ***aggregate number of shares*** across some unknown number of alleged "Baiting Orders."[6]  And even this total number of shares is grossly inflated because—throughout Exhibit 1—Plaintiff often repeats the same information across multiple rows.  It is only by adding up these duplicative rows that Plaintiff purports to arrive at its "82 million" number.  As just one example, Plaintiff lists the same "1,320,203" shares of "Baiting Orders" for 23 different purported "Executing Purchases" on October 28, 2021 (Compl. Ex. 1, at 44–45)—inflating its "over 82 million" final "total" of shares by ***more than 28 million*** through this double-counting example alone.  (*Id.* at 55.)

Allegations based on flawed numbers like these need not, and should not, be credited on a motion to dismiss.  *See, e.g., In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of

---

[6] Exhibit 1 appears to be organized by the "1,021 Executing Purchases" alleged in the Complaint. As an example, in Row 1 of Exhibit 1, Plaintiff lists information regarding purported "Baiting Orders" associated with an "Executing Purchase" made on January 5, 2021 at 9:31:05 a.m. Plaintiff does not list the number of "Baiting Orders" allegedly associated with this "Executing Purchase." Rather, it lists a "volume" of "268,319" which clearly refers to "268,319" shares across some unknown number of orders, not "268,319" orders involving 1 share each.

which the court may take judicial notice."). This is particularly true here where it is clear that Plaintiff has the underlying Nasdaq data it purports to summarize but chose to omit or mischaracterize certain data points.

Moreover, Plaintiff's Exhibit 1 does not even attempt to plead the very elements that Plaintiff itself claims are essential to the purported spoofing scheme. Most notably, Plaintiff does not plead facts supporting any claim that *any* of the orders listed in Exhibit 1 were cancelled, let alone immediately cancelled, nor does it attempt to plead any of the indicia discussed in Section I.B, *infra*, that might, in certain circumstances, be suggestive of "spoofing." Because Plaintiff does not even attempt to explain how any of the orders or trades listed in Exhibit 1 constitute "spoofing," these additional purported incidents cannot possibly satisfy the requirements of Rule 9(b), and should be disregarded.

## LEGAL STANDARD

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Securities fraud claims are subject to the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), which require plaintiffs to set forth "with particularity the circumstances constituting [the] fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).").

## ARGUMENT

## I.  PLAINTIFF FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT

Plaintiff brings claims under Sections 10(b) and 9(a)(2) of the Exchange Act of 1934 (the "Exchange Act").  To plead market manipulation under Section 10(b), Plaintiff must allege, *inter alia*, a manipulative act, scienter, and a sufficiently close causal connection between a defendant's conduct and a plaintiff's alleged damages.  *ATSI*, 493 F.3d at 101.  Similarly, to plead a claim under Section 9(a)(2), Plaintiff must "identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors."  *Cohen* v. *Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010).  "The analysis of claims under Section 9(a) 'closely parallels' the analysis of claims under Section 10(b)." *Stone Family Trust* v. *Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).

Plaintiff's Exchange Act claims should be dismissed for at least three independent reasons: (i) Plaintiff fails to adequately plead a manipulative act; (ii) Plaintiff fails to adequately plead a strong inference of scienter; and (iii) Plaintiff fails to adequately plead a causal connection between its purported losses and any alleged act by UBS.

### A.  Plaintiff Fails To Adequately Allege A Manipulative Act

To state a claim for market manipulation, a plaintiff must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *ATSI*, 493 F.3d at 102.  "General allegations not tied to the defendants or resting upon speculation are insufficient."  *Id.*  The Complaint fails to meet these requirements.

Plaintiff's theory of market manipulation is largely based on labelling certain cancelled orders placed through UBS as "Baiting Orders" and asserting—without supporting factual

allegations—that these orders were never "intended to be executed." (Compl. ¶ 37.) Merely labelling an order a "Baiting Order," however, is insufficient. Indeed, as a matter of law, conclusory labels do not meet Rule 9(b)'s pleading standards. *See, e.g., Shields* v. *Citytrust Bancorp, Inc*., 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of federal securities claims where plaintiff's "pleading technique [was] to couple a factual statement with a conclusory allegation of fraudulent intent"); *Mod. Settings, Inc*. v. *Prudential-Bache Sec., Inc*., 602 F. Supp. 511, 514 (S.D.N.Y. 1984) (dismissing market manipulation claim as "speculative" where allegations "read more like factual hypotheses than like factual descriptions of events which have transpired"). *See also DiMuro* v. *Clinique Labs., LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (affirming dismissal of complaint that was "riddled with repeated conclusory labels," which "are not facts, and certainly not facts sufficient for Rule 9(b)").

Moreover, the conduct on which Plaintiff bases its claims—various orders, purchases, and cancellations of orders—are routine market activities. Routine market activity "is not, by itself, manipulative." *ATSI*, 493 F.3d at 101. As the Second Circuit has explained, "[t]o be actionable as a manipulative act, [the routine activity] must be willfully combined with something more to create a false impression of how market participants value a security." *Id.*

Plaintiff attempts to plead the requisite "something more" by purporting to identify specific orders, purchases and cancellations that, Plaintiff claims, demonstrates a suspicious "pattern" of trading activity. As pled by Plaintiff, "[o]ne of the tell-tale signs of a manipulative spoofer is a rapid reversal of trading direction—a lot of sell orders, followed by buy orders, followed by the cancellation of sell orders—which suggests that the original sell orders were not intended to be executed[.]" (Compl. ¶ 31.) But where, as here, ***different actors—i.e., UBS and its many broker-dealer customers—***are doing the selling, buying and cancelling, their aggregate trading activity

11

suggests nothing about anyone's actions or intent.

A simple example illustrates the problem with Plaintiff's pleading tactic.  Assume UBS has three customers who seek to transact in Phunware shares.  Customer A places an order to sell 100 shares for $2.00 per share at 9:15 a.m.; it is not accepted by anyone and Customer A ultimately cancels his sell order 15 minutes later at 9:30 a.m.  Assume further that Customer B also places an order to sell 100 shares but offers a lower price, $1.00 per share, and does so at 9:25 a.m.  Customer C, who seeks to buy, opts for the lower price offered by Customer B and buys his 100 shares at $1.00 per share at 9:28 a.m.  In this example, each customer is acting independently and in their own best interest.  It shows nothing more than routine, legitimate market activity.  Yet, Plaintiff would aggregate the trading of all three UBS customers and dub it "spoofing" simply because Customer A cancelled his sell order within two minutes of Customer C's "Executing Purchase."

Throughout the Complaint, and its Exhibit 1, Plaintiff uses the trading of different market participants *interchangeably*.[7]  Thus, Plaintiff's theory necessarily asks this Court to make the speculative and unreasonable assumption that *all* market activity identified in the Complaint is attributable to a single decision-maker.  It is only by assuming that the same entity made the decisions to make "a lot of sell orders, followed by buy orders, followed by the cancellation of sell orders" (Compl. ¶ 31) that one could even attempt to plead that the trading in the Complaint presents a "pattern" that is potentially suggestive of spoofing.  *See Gamma Traders - I LLC* v. *Merrill Lynch Commods*., *Inc*., 41 F.4th 71, 75 (2d Cir. 2022) (observing that "spoofing" involves "suspicious trading activity of *one trader* placing both buy- and sell-side orders in the same

---

[7] *See* Compl. ¶ 19 (alleging that the "activity that forms the basis of the claims in this action may have been executed by Defendant for its own account . . . *or* for client accounts, for which it acted as a broker"); *id*. at 14 n.10 (acknowledging that Plaintiff labels orders "Baiting Orders" "regardless of whether Defendant cancelled that specific Baiting Order or an equivalent order placed by Defendant on Nasdaq").

market").

Yet, here, Plaintiff openly acknowledges that the trading activity at issue may have been executed on behalf of UBS *or* it may have been executed at the direction of one or more of its many customers.  (Compl. ¶ 19.)[8]  In such circumstances, Plaintiff simply has not identified, as it must, "what manipulative acts were performed" or "which defendants performed them."  All that Plaintiff has alleged is that *someone* cancelled an order to sell after *someone* purchased stock.  Such allegations plead nothing.  And asking this Court to just assume, without any supporting factual basis, that all of these trades were made by UBS for its own account—when the Complaint also acknowledges UBS is a registered broker-dealer which executes trades for its customers— "relies, at best, on speculative inferences."  *ATSI*, 493 F.3d at 103.  The Second Circuit has made clear that "speculative inferences" do not properly plead a market manipulation claim.  *Id.*[9]

Moreover, even if the Court were to attribute all cancellations to UBS (and it should not), the mere fact of cancellations—even a cancellation made shortly after an order is placed—is not sufficient to plead a manipulative act.  *See CP Stone Fort Holdings, LLC* v. *John*, 2016 WL

---

[8] Plaintiff's acknowledgement that the trading activity alleged in the Complaint "may have been" executed on behalf of UBS's broker-dealer clients is a gross understatement.  (Compl. ¶ 19.)  The *vast majority* of the trading activity alleged across Plaintiff's six "Example Episodes" was executed on behalf of UBS clients, which include other broker-dealers trading on behalf of their own customers.  This would be plainly evident to Plaintiff and anyone else from the "complete stream of deanonymized" Nasdaq data on which Plaintiff bases the Complaint.  (*Id.* at 10 n.8.)  This fact confirms that Plaintiff cannot possibly claim in good faith that any alleged  "pattern" of trading activity was undertaken by UBS, or indeed by any single market participant.

[9] UBS acknowledges that, in *Harrington Global Opportunity Fund, Ltd* v. *CIBC World Markets Corp.*, 585 F.Supp. 3d 405 (S.D.N.Y. 2022) ("*Harrington I*") and *Harrington Global Opportunity Fund, Ltd* v. *CIBC World Markets Corp.*, 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*"), Judge Schofield found a manipulative act was pled in a different "spoofing" case filed against other broker-dealers, rejecting an argument based on the fact that these broker-dealers were alleged to have traded for both their own accounts and the accounts of their customers.  UBS respectfully submits that, on this issue, the *Harrington* opinions are inconsistent with *ATSI* and similar cases requiring more than speculative inferences to state a market manipulation claim.

5934096 (N.D. Ill. Oct. 11, 2016) ("*CP Stone I*") (granting motion to dismiss for failure to allege a manipulative act where "plaintiff's theory boils down to an allegation that 'if a subset of orders was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed'"); *Kessev Tov LLC* v. *Doe(s)*, 2022 WL 2356626 (N.D. Ill. June 30, 2022) (granting motion to dismiss for failure to allege a manipulative act even where plaintiffs' theory went "one small step further" than the complaint in *CP Stone* and alleged that "if Defendants' orders were *quickly* cancelled, they must never have been intended to be executed") (emphasis in original).

Here, Plaintiff's Complaint rests on even less because it has not pled that anyone "quickly cancelled" anything.  Again, without matching a specific order to a specific cancellation, there is simply no basis to assume that any order was cancelled "quickly."  Thus, in the example of Customers A, B and C discussed above, because Plaintiff aggregates the trading activity of multiple market participants, it would deem Customer A's cancelled order a "Baiting Order" even though it was cancelled *15 minutes* after it was placed—a time period which Plaintiff concedes in its Complaint is "consistent with market making activity and demonstrat[es] the *bona fide* nature of [the] sell order."  (*See, e.g.,* Compl. ¶ 54 (pleading that a cancellation that occurred "nearly 15 minutes" after order was placed demonstrated the "*bona fide* nature of [the] sell order").)  Without distinguishing among market participants, Plaintiff has not pled a timeline for the cancellation of any order, let alone pled a factual basis to assert an order was cancelled "quickly."

Equally deficient are Plaintiff's repeated allegations that UBS "rapidly cancelled *all of its* Baiting Orders after purchasing PHUN shares at an artificially depressed price."  (*See, e.g.,* Compl. ¶ 54.)  Plaintiff's Complaint is based on a theory that a purported "spoofing cycle" is "complete[d]" when the "spoofer cancels all of [its] Baiting Orders to sell" and alleges that is the case here.  (*Id.* ¶ 32.)  But, as noted above, Plaintiff characterizes *any* order cancelled within two minutes of an

14

Executing Purchase to be a "Baiting Order."[10]  Thus, it is circular when Plaintiff then alleges that UBS cancelled "all of its Baiting Orders" within two minutes of an Executing Purchase.  In other words, one cannot properly plead a manipulative act by labelling *all* cancelled orders as "Baiting Orders" and then emphasizing that *all* "Baiting Orders" were cancelled.

In short, simply combining the routine market activity of separate market participants and labelling it "spoofing" does not meet Plaintiff's obligations under Rule 9(b) to plead manipulative conduct by UBS.

### B.    Plaintiff Fails To Adequately Allege a Strong Inference Of Scienter

The PSLRA requires plaintiffs to "plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors."  *ATSI*, 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)).  To qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  To satisfy this requirement, a plaintiff must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  The Complaint fails to do either.

### 1.    Plaintiff Has Not Pled Sufficient Facts to Support a Showing of Motive and Opportunity to Commit Fraud

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff must allege the defendant "'benefitted in some concrete and personal way from the purported fraud.'"  *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Kalnit* v. *Eichler*, 264 F.3d 131, 140–41 (2d Cir.

---

[10] (*See* Compl. at 14 n.10.)

2001).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA*, 553 F.3d at 198.

Plaintiff attempts to allege "motive" by asserting that "Defendant was able to make at least hundreds of millions in aggregate profits by purchasing tens of millions of shares of PHUN at artificially depressed prices."  (Compl. ¶ 116.)  Again, for the reasons stated above, because Plaintiff has not alleged that it was UBS itself (and not one or more of its customers) that purchased the "tens of millions of shares of PHUN," Plaintiff has not alleged any benefit—let alone a "concrete and personal" benefit—***to UBS***.

Even ignoring this fundamental issue with Plaintiff's allegations, a purported motive to purchase shares at lower prices is exactly the type of generalized business motive that courts have found insufficient to plead a strong inference of scienter.  *See, e.g., Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) (allegations that defendant manipulated stock price "to access additional shares . . . at lower prices" "fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit."); *Cohen*, 722 F. Supp. at 428–29 ("[A] generalized motive to earn 'profits' is insufficient to allege scienter.").

Finally, and perhaps most tellingly, Plaintiff's unsupported statement that UBS made "hundreds of millions" by purchasing "tens of millions" of Phunware shares at "depressed prices" makes no sense.  Simple math tells us that to make ***hundreds*** of millions of dollars on the purchase of ***tens*** of millions of shares, UBS would have needed to purchase shares at a price that was artificially depressed by at least ***$10 per share***.  This would have been impossible to do, since Phunware generally traded at less than $2 per share both before and after the alleged Relevant

Period (*see* Section I.C, *infra*), and one cannot artificially depress prices to below zero.[11]

Indeed, Plaintiff itself alleges that UBS was only able to shave a *penny or two* per share, at most, off the best offer price by allegedly engaging in spoofing.  (Compl. ¶¶ 52, 59, 65, 72, 78, 85.)  Therefore, across the six "Example Episodes" pled in the Complaint (summarized again below), the total amount allegedly "pocketed" by UBS in connection with the "Executing Purchases" was approximately $24, or $4.09 per alleged spoofing episode.  And even if the Court were to credit the "1,021 distinct Executing Purchases" listed in Exhibit 1 (though none of these alleged incidents, other than the six discussed above, are explained in any way in the Complaint), Plaintiff claims that UBS saved *less than $10,000* over two years.

| Ex. | Date | Alleged "Prevailing Best Offer to Sell" | Alleged "Executing Purchase" | Amount Allegedly "Pocketed" By UBS |
|---|---|---|---|---|
| 1 | 4/27/21 | **$1.64** per share | 100 shares at **$1.63**/share | $1.00 |
| 2 | 10/26/21 | **$6.26** per share | 50 shares at **$6.25**/share | $0.50 |
| 3 | 10/27/21 | **$4.87** per share | 824 shares at **$4.85**/share | $16.48 |
| 4 | 10/28/21 | **$4.72** per share | 100 shares at **$4.70**/share | $2.00 |
| 5 | 11/8/21 | **$4.11** per share | 440 shares at **$4.10**/share | $4.40 |
| 6 | 3/5/23 | **$0.771** per share | 167 shares at **$0.77**/share | $0.167 |

It "defies economic reason" to suggest that UBS would have been motivated by such modest profits to commit what would amount to a criminal act, and thus allegations relating to this purported motive do "not yield a reasonable inference of fraudulent intent."  *Kalnit*, 264 F.3d at 140–41; *see also In re Duane Reade Inc. Sec. Litig*. 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003) (holding that "[w]here a plaintiff's theory of motive is 'belied by logic,' it must be

---

[11] To the extent that Plaintiff seeks to boost its calculation of UBS's alleged profit by arguing that some shares were sold later by someone for more than the price at which UBS (or, more likely, a customer) purchased, such speculative arguments cannot be credited.  *ATSI*, 493 F.3d at 103.

rejected" and granting motion to dismiss where "it would have been illogical to commit fraud to save money on acquisitions totaling $4.7 million"), *aff'd sub nom.* *Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *Rice* v. *Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022) (holding that profits of just under $4.5 million "in context . . . is not a sum sufficient to give rise to an inference of scienter").

### 2.    Plaintiff Has Not Pled Sufficient Facts to Support a Showing of Conscious Misconduct or Recklessness

Where, as here, Plaintiff has failed to allege sufficient "motive and opportunity," "it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, ***though the strength of the circumstantial allegations must be correspondingly greater***." *Kalnit*, 264 F.3d at 142.

Plaintiff attempts to distract the Court from the fact that UBS had no reason or motive to manipulate the price of Phunware shares by citing sixteen additional alleged "facts" that purportedly demonstrate UBS's scienter.  (Compl. ¶¶ 100–15.)  But Plaintiff's profligate use of words cannot hide the reality, which is that Plaintiff does not offer ***any*** facts that would provide the requisite strong circumstantial allegations that UBS intentionally or recklessly manipulated Phunware's stock price.  First, as discussed above, the Complaint does not adequately allege that a manipulation took place.  But even if it had, Plaintiff's allegations largely consists of nothing more than facts that apply to every broker-dealer—things like the use of algorithms, the fact that UBS is registered as a broker-dealer, the authorization of trading activities by corporate officials, the obligation to make certifications to FINRA, and the placement, execution and cancellation of a significant volume of customer orders.  (*See* Compl. ¶¶ 100–115.)  As detailed below, none of these facts, either individually or collectively, sufficiently plead scienter.

First, Plaintiff cites a number of alleged facts that—at best—establish that UBS is a broker-

dealer with legal obligations.  (*See* Compl. ¶ 101 (alleging that "Defendant's trading activities were approved by corporate officials"); ¶ 102 (alleging that, "as a registered broker-dealer, Defendant knew and/or was required to know that it was unlawful" to engage in market manipulation); ¶ 103 (alleging that, "as a registered broker-dealer," Defendant was obligated to follow FINRA rules, including rules relating to the maintenance of internal controls).)  Plaintiff does not and cannot explain how any of these facts—which can be said of every law-abiding broker-dealer—pleads scienter.  In fact, they suggest the opposite.

Second, Plaintiff proffers various ratios or other measurements of trading and order activity with no explanation as to how it arrived at those calculations or why such measurements would support a showing that whoever placed the purported "Baiting Order" never intended to execute it.  (*See, e.g.,* Compl. ¶¶ 104, 106, 108, 109, 110, 113–115.)  Again, as explained above, none of these calculations can demonstrate anything because they are admittedly based on the combined trading activity of multiple independent actors.  Moreover, many suffer from the same circular reasoning described above, in which Plaintiff first labels certain orders as "Baiting Orders" (*i.e.,* orders never intended to be executed), or "spoofed Executing Purchases," and then pleads that the existence and extent of such "Baiting Orders" or spoofed purchases is indicative of scienter.[12]  But an allegation that first assumes manipulative intent does not properly plead manipulative intent.  Circular allegations like these are generally insufficient to plead scienter.  *See, e.g., In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) (finding scienter insufficiently pled where allegations were based on "circular" argument that defendants "committed fraud by concealing their intent to commit fraud").

---

[12] (*See, e.g.,* Compl. ¶ 113 (asserting "that Defendant placed tens of millions of ***Baiting Orders*** and purchased hundreds of thousands of PHUN shares at spoofed prices during the Relevant Period . . . is indicative of Defendant's scienter").)

Third, Plaintiff attempts to plead certain factors that some courts have found may be suggestive of an intent not to execute an order, namely, (1) immediate order cancellations; (2) "parked" orders; and (3) algorithms specifically designed to create "the illusion of market movement." But the contrast between Plaintiff's pleading and the allegations in those cases only demonstrates how far short Plaintiff's allegations fall.

For example, Plaintiff asserts that the "short time period between the placement and cancellation" of purported "Baiting Orders" is "indicative of Defendant's scienter." (Compl. ¶ 107.) It is true that some courts have considered ***immediate*** cancellations relevant (though not determinative) to an analysis of whether a trader lacked an intent to execute. As one court explained, for example, a spoofing trader who wants to buy at a lower price would place "[l]arge orders . . . at prices designed to shift the market toward" the lower price; "***if [those orders] were executed***, [the spoofing trader] ***would risk extremely large amounts of money*** by selling at suboptimal prices." *United States* v. *Coscia*, 866 F.3d 782, 787 (7th Cir. 2017). To avoid this risk, a spoofing trader will not leave a "baiting" order on the market long enough to be executed; rather, the spoofing trader generally will cancel it "within milliseconds." *See, e.g., id.* ("In practice, spoofing . . . utilizes extremely fast trading strategies. . . . [where, for example, a large order] will be on the market for incredibly short periods of time (***fractions of a second***)[.]").

Here, because Plaintiff has not matched orders and cancellations, they have not actually pled the length of time between the placement and cancellation of any particular order. But, even attributing all orders and cancellations to UBS, the time period between the placement and the completion of cancellations of the alleged "Baiting Orders" in all six "Example Episodes" was not within "milliseconds" but rather as much as ***two minutes*** later.[13] The fact that many of these orders

---

[13] (*See* Compl. ¶¶ 50, 53, 57, 60, 63, 66, 70, 73, 76, 79, 83, 86.) As discussed above, it is not a

were open for such relatively extended time periods belies the notion that the customer who placed the orders did not intend for them to be executed.[14]

Moreover, even those courts that have considered the speed of cancellation as a relevant factor in analyzing intent have not relied **solely** on that factor.  *See, e.g., CFTC* v. *Oystracher*, 203 F.Supp.3d 934, 945 (N.D. Ill. 2016) (finding CTFC adequately alleged lack of intent to execute where trader's alleged "trading behavior in the aggregate"—*e.g.,* a "pattern of passive spoof order placement at or near the best bid or offer price shielded by existing orders, flips, aggressive order placement, 'avoid orders that cross' tool usage, iceberg order usage, larger order size" *etc.*—made "it clear that the CFTC relies on much more than 'solely . . . fast cancellations of large orders'"); *Kessev Tov, LLC* v. *Doe(s)*, 2023 WL 4825110 (N.D.Ill. July 27, 2023) ("*Kessev Tov II*") (holding manipulative act pled where complaint alleged that defendants "entered irrationally high bids that lasted for only milliseconds, thereby rendering them inexecutable" and "provided numerous exhibits plausibly suggesting that Defendants' actions were irrational and contradictory to ordinary market making behavior").  Plaintiff has not properly pled any such additional indicia that might suggest a lack of intent to execute.

Plaintiff also attempts to plead scienter by alleging that "Defendant 'parked' its Baiting Orders behind *bona fide* sell orders."[15]  (Compl. ¶ 105.)  It makes this allegation with respect to

---

coincidence that the cancellation of all "Baiting Orders" ended within two minutes because Plaintiff labels all orders cancelled within two minutes of an Executing Purchase as "Baiting Orders."  (Compl. at 14 n.10.)

[14] Even in *Harrington I*, the Court found scienter pled where defendants had cancelled their "last baiting order[s]" within nine milliseconds and 278 milliseconds respectively after "the execution of [a] purchase order." 585 F.Supp. 3d at 417–18.

[15] *See Harrington I*, 585 F.Supp.3d at 418 (finding manipulative act pled where complaint alleged that defendants placed baiting orders to sell at higher prices than "legitimate orders placed by other traders"); *CP Stone Fort Holdings, LLC* v. *Doe(s)*, 2017 WL 1093166, at *3 (N.D. Ill. Mar. 22, 2017) ("*CP Stone II*") (finding manipulative act pled where, *inter alia*, the complaint alleged "that

only four of its six "Example Episodes" (Nos. 1, 3, 5, 6).  Yet, in each of these four examples, the alleged "Baiting Orders" include offered prices that were in some instances **lower than** the alleged "*bona fide*" orders to sell by other market participants.[16]  Plaintiff offers no explanation as to how orders to sell at prices **equal to or lower than** the legitimate order to sell could be said to be "parked" behind that legitimate order.  Nor could it.  The fact that some of the orders that Plaintiff labels "Baiting Orders" were to sell at prices lower than alleged "*bona fide*" orders to sell suggest that they were **more likely** to be executed than the "*bona fide*" orders, not "less likely" as alleged by Plaintiff.  (Compl. ¶ 105.)  Such examples simply do not support, and in fact contradict, Plaintiff's conclusory statement that "[b]y parking the Baiting Orders, Defendant ensured that those Baiting Orders were extraordinarily unlikely to be executed."  (*Id.*)

Finally, Plaintiff makes the assertion that "Defendant specifically designed and implemented algorithmic trading programs to execute its spoofing schemes." (*Id.* ¶ 100.)[17]  But, Plaintiff offers no factual allegations to support the conclusory statement that any algorithmic

---

defendants placed their Deceptive Orders in the queue behind, on average, $27 million in existing orders").

[16] *See, e.g.,* Compl. ¶ 67 (Example 3 alleges that UBS (or one or more of its customers) "parked" "Baiting Orders" to sell behind a "*bona fide*" order to sell 100 shares at **$6.01 per share** placed by Wall Street Access—notwithstanding that the alleged "Baiting Orders" at that time included orders to sell **as low as $4.99 per share**); Compl. ¶ 80 (Example 5 alleges that UBS (or one or more of its customers) "parked" "Baiting Orders" to sell behind a "*bona fide*" order to sell 100 shares at **$5.28 per share** placed by Two Sigma Securities, LLC—notwithstanding that the alleged "Baiting Orders" at that time included orders to sell **as low as $4.16** per share).

[17] Plaintiff appears to be attempting to mirror the "spoofing" allegations in *United States* v. *Coscia*, a case that resulted in the conviction of a trader under the anti-spoofing provision of the Commodity Exchange Act where he was alleged (and proven) to have designed a program with "specific parameters . . . to cancel orders (1) based on the passage of time (usually measured in milliseconds), (2) following the partial filling of the large orders, or (3) following the complete filling of the small orders."  866 F.3d 782, 797 (7th Cir. 2017).  Here, by contrast, Plaintiff offers no allegations as to any "parameter" of the allegedly fraudulently-designed programs or any other detail that might suggest such programs were not legitimate.

trading program used by UBS was designed to "spoof" trades, *e.g.,* no factual allegation as to how any program was designed to "spoof" trades, how it operated to do so, who designed it, or what motivated that person to do so, *etc.*  If simply alleging that a broker-dealer used "trading programs" and/or "algorithms" designed to manipulate the market—without any supporting facts or details—were sufficient to plead a strong inference of scienter, the heightened pleading requirements of the PSLRA would be rendered meaningless, as the same could be said of the hundreds or thousands of broker-dealers and other market participants who use computer programs to trade.[18]

Plaintiff's allegations simply do not plausibly plead the requisite strong inference of scienter.  Viewed holistically, the far more plausible explanation for the trading activity pled in the Complaint is that UBS was engaged in routine, lawful market activity as a broker-dealer, executing orders, trades and cancellations at the direction of its customers.

### C.    Plaintiff Fails To Adequately Allege Loss Causation

To state a claim for market manipulation, Plaintiff is also required to plead "facts supporting [a] legally cognizable loss" as well as a "'causal connection between the [alleged manipulation] and the loss.'" *Cohen*, 722 F. Supp. 2d at 430 (quoting *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005)).[19]  "[B]efore proceeding to discovery, it is the plaintiff's burden 'to

---

[18] As noted above, Exhibit 1 to Plaintiff's Complaint summarily purports to list certain other alleged incidents of spoofing without pleading any of the indicia discussed above that courts have sometimes recognized as indicative of a lack of intent to execute, *e.g.,* the "virtually simultaneous" placement and cancellation of orders, the parking of large orders behind better-priced legitimate orders, or any other factor that would distinguish the orders and purchases identified in Exhibit 1 from normal, legitimate trading activity.  As such, they fail to meet the pleading requirements of Rule 9(b) and the PSLRA and should be disregarded.

[19] "The Second Circuit has not resolved which pleading standard applies to the issue of loss causation —the heightened pleading requirements of Rule 9(b) or the short and plain statement of the claim standard of Rule 8(a)(2)." *Evy Gru* v. *Axsome Therapeutics, Inc.*, 2023 WL 6214581, at *4 (S.D.N.Y. Sept. 25, 2023).  Here, for the reasons explained above, the Complaint does not meet either standard.

provide facts sufficient to allege a plausible connection between their trading and [a defendant's alleged spoofing], and that they were harmed as a result of Defendants' spoofing."  *Gamma Traders*, 41 F.4d at 81.  *See also Cohen*, 722 F. Supp. 2d at 430 (dismissing market manipulation claim where plaintiff failed to plead facts supporting any legally cognizable loss or causally connecting the loss to the alleged manipulation).  Plaintiff's Complaint fails to meet these requirements for three primary reasons.

 *First*, while Plaintiff alleges in its Complaint that it "sold over 34 million shares of PHUN stock in hundreds of distinct transactions at share prices artificially depressed by Defendant's [alleged] manipulative spoofing" (Compl. ¶ 117), it fails to mention that more than ***one-third*** of these sales—or approximately ***13.4 million shares***—as pled in its own "Exhibit 2" occurred ***before*** the alleged manipulation began, *i.e.,* before January 5, 2021.  Plaintiff cannot possibly claim recovery for any loss allegedly suffered with respect to sales that pre-date the alleged wrongdoing. *See Gamma Traders*, 41 F.4th at 80 ("[I]f [plaintiff] traded *before* Defendants spoofed, the spoofing could not have affected the price at which [plaintiff] traded.") (emphasis in original).

 *Second*, as to the remaining 20.6 million shares, Plaintiff still fails to allege facts supporting either a legally cognizable loss or one causally connected to the alleged manipulation.  The Second Circuit's decision in *Gamma Traders - I LLC* v. *Merrill Lynch Commodities*, Inc., 41 F.4th 71 (2d Cir. 2022) is instructive on this issue.

 In *Gamma Traders*, the Second Circuit found that an alleged spoofing manipulation claim failed to state a claim where plaintiff failed "to allege *some* facts that support an inference of actual injury" notwithstanding the plaintiff's allegation that "it traded on the same day that Defendants spoofed" on "nine occasions."  41 F.4th at 80.  The Second Circuit found that, even as to these nine days—and even assuming that plaintiff made the trades after the alleged spoofing on these

days—plaintiff failed to plead a "factual basis that would justify an inference that the market price was still artificial by the time [plaintiff] traded." *Id.* The Second Circuit found that, in the absence of such factual allegations, it could not "reasonably infer that spoofing's effects last throughout the day." *Id.* ("Even pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day."). Nor could the Second Circuit accept plaintiff's allegations, like those made here, that a defendant's alleged manipulation "'caused prices to be artificial throughout'" the relevant time period, finding that this was "precisely the sort of 'merely conclusory statement' that [courts] need not credit, even on a motion to dismiss." *Id.* Finally, the Second Circuit found that plaintiff failed to plead "that its trades occurred so close in time to Defendants' spoofing as to permit" an inference that the market prices were artificial, where plaintiff never actually alleged the time "when its own trades took place." *Id.* at 80-81.

The Complaint here suffers from the same defects. In addition to relying on conclusory (and non-creditable) statements that Phunware's share price was "artificially depressed . . . during and following the Relevant Time Period" (Compl. ¶ 117), Plaintiff also fails to plead how long the alleged spoofing effects purportedly lasted or to provide any factual basis that would justify an inference that Phunware's stock price was still artificial by the time its alleged sales occurred. Indeed, the Complaint suggests that—at most—the effects lasted very brief periods of time.

Specifically, in each of the six alleged "Example Episodes," in an attempt to plead "motive," Plaintiff alleges that UBS (or one of its customers) "convert[ed]" its "spoofing activity to cash" by allegedly turning around and selling Phunware shares at higher prices *later in the day* of the alleged spoofing or the ***following trading day*** after the purported "artificial" "imbalance" caused by the alleged manipulation was "eliminat[ed]." (*See, e.g.,* Compl. ¶ 53.) Such allegations

implicitly acknowledge that "[m]anipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief." *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018). They also contradict any blanket statement—like those in the Complaint—that the effects of any alleged spoofing activity was "persistent and long-lasting." (Compl. ¶ 119.)

Similarly, like in *Gamma Traders*, Plaintiff here fails to plead that any of its trades occurred so close in time to the alleged spoofing activity as to permit an inference that its alleged sales were affected. Indeed, in each of its six "Example Episodes," Plaintiff alleges it traded ***months*** after the alleged spoofing activity. For example, Phunware's next alleged "depressed" stock sale after Example Episode 1 on April 27, 2021 occurred ***2 months later*** on June 28, 2021. Phunware's next alleged "depressed" stock sale after Example Episodes 2–5 (on October 26, 2021, October 27, 2021, October 28, 2021, and November 8, 2021, respectively) occurred ***9 months later*** on August 17, 2022. And Phunware's next alleged "depressed" stock sale after Example Episode 6 on March 15, 2023 occurred ***1 month later*** on April 19, 2023.

Even if the Court were to consider (and it should not) Plaintiff's Exhibit 1, which purports to include other "Baiting Orders" allegedly placed by UBS, Plaintiff's allegations still fall short. During the January 5, 2021 to March 15, 2023 Relevant Period, there were over 550 trading days. Plaintiff alleges in its Exhibit 1 that "spoofing" occurred on 90 of these days (or approximately 16% of the trading days during the Relevant Period).[20] Such allegations simply do not support Plaintiff's conclusory assertion that "spoofing" occurred "continuously throughout the Relevant

---

[20] By contrast, even in *Harrington I*, Judge Schofield found loss causation adequately pled where the complaint alleged that "spoofing occurred on 193 of 205 trading days during the Relevant Period [*i.e.,* 94% of the trading days], that Plaintiff traded on twenty-seven of those days and that spoofing depressed the price for up to fifteen minutes." 585 F. Supp. 3d at 419.

Period." (Compl. ¶ 40.) This is particularly true where the purported "spoofing" scheme alleged here relies on the cancellation of all "Baiting Orders" within minutes, "eliminating the artificial sell-side imbalance" and allowing UBS (or one of its customers) to make more profitable sales at higher prices later that day or the next day. (*See, e.g., id.* ¶ 53.)

Moreover, there are very few days on which Plaintiff even claims to have sold on the same day as an alleged spoofing incident, which is the outer limit of what the *Gamma Traders* ruling would seem to allow in the absence of specific allegations establishing that the impact of a spoofing incident persisted for longer. In fact, at most, it appears there was only ***one*** day where Phunware sold shares on the same day as a spoofing incident: October 21, 2021.[21] Yet, Phunware's sales on this date allegedly occurred 108.04, 107.37, and 106.84 minutes, respectively, after the alleged "spoof time." (Compl. ¶ 118.) As in *Gamma Traders*, Plaintiff offers no basis to suggest that the purported effects of the alleged spoofing that day lasted throughout such extended time periods. And these rather long time gaps are inconsistent with Plaintiff's unsubstantiated allegation that their sales "occurred seconds and minutes after Defendant's unlawful spoofing activity." (*Id.*)

***Finally***, while Plaintiff asks this Court to accept its allegation that UBS "repeatedly drove

---

[21] Plaintiff's allegations as to its ***own*** sales are internally conflicting. Plaintiff asserts that it sold shares of PHUN "in intraday executions" on "***numerous occasions***" and provides a chart that purports to include executions that are "subsumed within the blocks of sales of shares listed in Exhibit 2." (Compl. ¶ 118.) The chart in Paragraph 118 of the Complaint lists three dates on which it alleges both an incident of spoofing and that Phunware sold shares: October 21, 2021, October 26, 2021 and October 27, 2021. Yet, Exhibit 2, which purportedly includes the dates of ***all*** sales by Plaintiff, does ***not*** list two of these three dates as a date on which any sale occurred at all (Oct. 26 and Oct. 27). Exhibit 2 itself also suggests that Phunware sold shares on three days on which spoofing activity allegedly occurred ***but*** it suggests different dates: January 26, 2021, October 21, 2021, and October 22, 2021. The only date that appears in ***both*** Paragraph 118 and Exhibit 2 is October 21, 2021, which is addressed above. It is hard to see how these conflicting allegations could possibly meet even the "notice" standards of Rule 8(a) and, because such information—as to the dates on which Plaintiff sold its own stock—are entirely within the knowledge of Plaintiff, such a conflict is even more inexcusable.

PHUN's share price downward" (Compl. ¶ 1), Plaintiff fails to account for the many legitimate micro and macro forces that would have impacted Phunware's stock price during this time. Without disaggregating the impact of these other legitimate forces, Plaintiff cannot adequately establish that UBS's conduct in fact affected Phunware's stock price. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2nd Cir. 2009) (holding that a plaintiff must disaggregate losses "caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" to establish loss causation). Indeed, as shown in the stock price chart below,[22] Phunware's stock price fluctuated significantly during the Relevant Period, including spiking to over $24 in October 2021—an increase over 15 times the price at the beginning of the Relevant Period.



Plaintiff's failure to account for other unrelated factors has a significant impact on

---

[22] A court may take judicial notice of public stock prices on a motion to dismiss. *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

Plaintiff's ability to satisfy the loss causation element of its securities fraud claims. For example, Plaintiff asks this Court to infer that its sales in October 2021 were negatively affected by Defendant's purported conduct, but it is plain from the chart above that Phunware shares were being pushed much higher (and then dramatically lower) by forces having nothing to do with UBS,[23] and presumably resulting in significant profits for Phunware. The inference Plaintiff asks this Court to draw is thus unreasonable. *See Gamma Traders,* 41 F.4th at 78 ("The standard of review requires us to draw all reasonable inferences in [plaintiff's] favor, but the inference that [plaintiff] urges us to draw is unreasonable.").

Without pleading facts to show that it was UBS's alleged conduct that was the proximate cause of Plaintiff's purported losses, and not other legitimate market forces, Plaintiff has not properly alleged loss causation. *See CP Stone II*, 2017 WL 1093166, at *6 (spoofing complaint failed to plead loss causation because plaintiff did not allege that the less favorable prices at which it allegedly transacted were "the result of the cancellation of the Deceptive Orders, rather than legitimate market forces"); *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 158 (2d Cir. 2007) (holding "plaintiffs have not alleged loss causation" where they failed to allege "facts to show that [the alleged fraud, among other causes] much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to

---

[23] According to news reports, in October 2021, the price of Phunware stock rose over 1,000% after Digital Worldwide Acquisition Corp. announced plans to acquire Trump Media & Technology Group. *See Phunware stock surges over 1,000% early Friday as a Trump-linked SPAC heads for a 1,345% weekly gain*, MARKETWATCH (Oct. 22, 2021, 10:10 AM), https://www.marketwatch.com/story/phunware-stock-surges-over-800-early-friday-as-a-trump-spac-heads-for-a-1224-weekly-gain-2021-10-22. The price of Phunware stock then sharply declined after it was revealed that Phunware would not be involved in the merger. *See Stocks linked to Trump — DWAC and Phunware — sink after ex-president touts social media plans*, CNBC (Oct. 26, 2021, 11:31 AM), https://www.cnbc.com/2021/10/26/stocks-linked-to-donald-trump-dwac-and-phunware-sink-in-trading.html.

ascribe some rough proportion of the whole loss to [the alleged fraud]").

For each of these reasons, Plaintiff has not properly alleged loss causation.

## II.   PLAINTIFF FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD

The "elements of common-law fraud are essentially the same as those for a violation of Section 10(b) of the Exchange Act[]." *Cohen*, 722 F. Supp. 2d at 436.  Here, because Plaintiff's common law fraud claim "essentially track[s]" its Exchange Act claims, Plaintiff's claim for common law fraud fails for all the same reasons its Exchange Act claims fail.  *See, e.g., Cartwright* v. *D'Alleva*, 2018 WL 9343524, at *6 (S.D.N.Y. Aug. 27, 2018) (Torres, J.) (dismissing common law fraud claims that "essentially track[ed] [plaintiff's] Section 10(b) claims"), *aff'd*, 782 F. App'x 77 (2d Cir. 2019).

## <u>CONCLUSION</u>

Defendant respectfully requests that this Court dismiss the Complaint in its entirety.

Dated: October 6, 2023
       New York, New York

CAHILL GORDON & REINDEL LLP

By: /s/ Herbert S. Washer
    Herbert S. Washer
    Tammy L. Roy
    Vishwani Singh
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com
vsingh@cahill.com

*Attorneys for UBS Securities LLC*