**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PHUNWARE, INC.,

                Plaintiff,

    -against-

UBS SECURITIES LLC,

             Defendant.

Docket No. 1:23-cv-06426

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND ....................................................................................................... 5

      A.    Spoofing Is A Form Of Market Manipulation .............................................. 5

      B.    UBS Intentionally Or Recklessly Engaged In The Manipulative Spoofing Of
            Phunware ..................................................................................................... 6

III.  LEGAL STANDARD ............................................................................................ 10

IV.   PLAINTIFF ADEQUATELY ALLEGES EXCHANGE ACT CLAIMS UNDER
      SECTION 10(b) AND SECTION 9 ...................................................................... 10

      A.    Plaintiff's Allegations Are More Specific And Persuasive Than The Complaints In
            *Harrington* And *Kessev Tov*, Which Are Factually And Legally On Point Cases Where
            Courts Recently Denied Similar Motions To Dismiss .................................... 11

      B.    Plaintiff Adequately Alleges Manipulative Conduct With Particularity ....... 14

      C.    The Complaint Pleads A Strong Inference Of Scienter ................................. 21

V.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION .............................. 27

VI.   CONCLUSION ...................................................................................................... 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
93 F.Supp.2d 424 (S.D.N.Y. 2000) ..................................................................9

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) ................................................................15, 18

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
390 F. Supp. 3d 432 .....................................................................................27

*Brown v. China Integrated Energy, Inc.*,
875 F.Supp.2d 1096 (C.D. Cal. 2012) ...........................................................7

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .....................................................................28

*CFTC v. Banoczay et al.*,
No. 20-cv-05777, ECF 1 (N.D. Ill. Sept. 29, 2020)......................................16

*CFTC v. Flotron*,
No. 3:18-cv-00158, ECF 1 (D. Conn. Jan. 26, 2018) ...........................8, 16

*CFTC v. Mohan*,
No. 4:18-cv-00260, ECF 1 (S.D. Tex. Jan. 28, 2018) ...................7, 9, 16

*CFTC v. Nowak et al.*,
No. 19-cv-06163, ECF 1 (N.D. Ill. Sept. 16, 2019).......................8, 9, 16

*CFTC v. Oystacher et al.*,
203 F.Supp.3d 934 (N.D. Ill. 2016) ................................................. *passim*

*CFTC v. Oystacher et al*,
No. 15-cv-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) ...........8, 9

*CFTC v. Skudder*,
No. 22-cv-1925, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022)........... *passim*

*CFTC v. Thakkar et al.*,
No. 18-cv-00619, ECF 1 (N.D. Ill. Jan. 28, 2018)........................8, 23

*CFTC v. Zhao*,
No. 18-cv-00620, ECF 1 (N.D. Ill. Jan. 28, 2018)........................9, 16

*Chill v. Gen. Elect. Co.*,
   101 F. 3d 236 (2d Cir. 1996) ...................................................................................29

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)......................................................................25

*Cohen v. Stevanovich*,
   722 F. Supp. 416 (S.D.N.Y. 2010) ...........................................................................26

*CP Stone Fort Holdings, LLC v. Doe(s)*,
   No. 16-cv-4991, 2016 WL 1093166 (N.D. Ill. Mar. 22, 2017) ...........................7, 29

*CP Stone Fort Holdings, LLC v. Doe(s)*,
   No. 16-cv-4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) .................................18

*CP Stone Fort Holdings, LLC v. Doe(s)*,
   No. 16-cv-4991, 2017 WL 1093166 ..........................................................................16

*CP Stone Fort Holdings, LLC v. Doe(s)*,
   No. 1:16-cv-04991, ECF 67 (N.D. Ill. Oct. 3, 2017) .........................................17, 29

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
   413 F. Supp. 3d 187 (S.D.N.Y. Sept. 23, 2019) .......................................................27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F. 3d 29 (2d Cir. 2009)........................................................................................29

*Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*,
   41 F.4th 71 (2d Cir. 2022) .....................................................................................4, 28

*Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.*,
   585 F. Supp.3d 405 (S.D.N.Y. 2022)................................................................. *passim*

*Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.*,
   No. 21-cv-761, 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ....................... *passim*

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018)........................................................................26

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007)........................................................................................29

*Kessev Tov v. Doe(s)*,
   No. 20-cv-04947, 2023 WL 4825110 (N.D. Ill. July 27, 2023) ..................... *passim*

*Myun-Uk Choi v. Tower Research Capital LLC*,
   890 F.3d 60 (2d Cir. 2018)...................................................................................10, 20

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC,*
   No. 02-cv-0767-LBS, 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002) ...................................15

*Pathfinder Mgmt. v. Mayne Pharma PTY,*
   No. 06-cv-2204, 2008 WL 3192563 (D.N.J. Aug. 5, 2008) ...........................................................7

*Pozniak v. Imperial Chem. Indus. PLC,*
   No. 03-cv-2457, 2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004) ..............................................7

*In re Scotts EZ Seed Litig.,*
   304 F.R.D. 397 (S.D.N.Y. 2015) ...........................................................................................28

*SEC v. Lek Sec.,*
   370 F. Supp. 3d 384 (S.D.N.Y. 2019)......................................................................................8

*SEC v. Martino,*
   255 F. Supp. 2d 268 (S.D.N.Y. 2003)....................................................................................15

*Set Capital LLC v. Credit Suisse Group AG,*
   996 F.3d 64 (2d Cir. 2021).......................................................................................... *passim*

*Sharette v. Credit Suisse Int'l.,*
   127 F.Supp.3d 60 (S.D.N.Y. 2015) ..............................................................................26, 27

*Stone Family Trust v. Credit Suisse AG,*
   No. 19-cv-5192, 2022 WL 954743 (S.D.N.Y. Mar. 30, 2022).........................................10, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 .....................................................................................................21, 22, 25

*In re Tufin Software Technologies Ltd. Sec. Litig.,*
   No. 20-cv-5646, 2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) .............................................29

*United States v. Chanu,*
   40 F.4th 528 (7th Cir. 2022) ...................................................................................................8

*U.S. v. Coscia,*
   866 F.3d 782 (7th Cir. 2017) .........................................................................................16, 23

**Statutes**

15 U.S.C. § 78c(a)(38)...........................................................................................................19

Plaintiff Phunware, Inc. ("Phunware" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendant UBS Securities LLC's ("UBS" or "Defendant") motion to dismiss the Complaint (ECF 22).[1]

## I.    **INTRODUCTION**

This case arises from Defendant UBS's scheme to manipulate Phunware's share price from January 5, 2021 to March 15, 2023 (the "Relevant Period"). Throughout the Relevant Period, UBS deliberately engaged in repeated spoofing that interfered with the natural forces of supply and demand, and repeatedly drove Phunware's share price downward. (¶ 1.) Defendant's actions significantly harmed Phunware, which sold tens of millions of its shares at artificially depressed prices. (¶ 10.)

Phunware focuses on one of the largest and most strategic opportunities in information technology: providing enterprises with a comprehensive software program that engages, manages, and monetizes customer experiences over mobile devices, in order to directly improve business results and revenues for these companies. (¶ 2.) Since going public, Phunware has grown dramatically. At scale, Phunware has managed over 2 billion Phunware IDs, created to identify unique mobile devices visible on its network of applications, across more than 5,000 mobile application portfolios for more than 1 billion monthly active devices across more than 1 trillion database events. Phunware's products and services have been used by many of the world's leading brands in virtually every industry, including PwC, Intel, AT&T, Cisco, CBS, Mount Sinai, NYU Langone Health, VHC Health, Marriott, Lowe's, Oprah, NFL, and NASCAR. (¶ 4.)

---

[1] Citations to Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint for Failure to State a Claim (ECF 22) are set forth as "Def. Br."  Citations to "¶__" are to paragraphs of the Complaint (ECF 1) (the "Complaint").  Unless otherwise indicated, quotation marks and citations are omitted, and alterations are adopted.

Market analysts consistently recommend Phunware as a "Buy" to investors, with price targets that are considerably higher than the actual prices at which Phunware trades. This discrepancy is the result, in significant part, of UBS's manipulative conduct. (¶ 6.) Specifically, during the Relevant Period, UBS engaged in spoofing to manipulate the price of Phunware shares on Nasdaq, creating an imbalance in the market for Phunware shares and inducing other market participants to buy or sell its shares at artificial prices.

In order to carry out its manipulative spoofing scheme, UBS placed Baiting Orders for over 82 million shares and purchased over 640,000 Phunware shares in over 1,000 executed orders at manipulated prices during the Relevant Period. (¶ 9.) The Complaint contains particularized factual allegations and quantitative analyses of UBS's repeated suspicious patterns of trading activity in Phunware stock including, among other things, detailed analyses of the timing of UBS's orders, the placement of those orders in the Limit Order Book, the percentage of orders executed within certain time periods, the ratio of those orders and executions to orders and executions in other contexts, and the cancellation of orders immediately following executed purchases.  These well-settled indicia of manipulative spoofing make plain that UBS was not – as it improperly asserts – acting as an innocent broker-dealer and/or market maker.

Because these very same indicia of manipulative spoofing are regularly found by courts – including courts in this District – to be sufficient to allege manipulative spoofing, UBS largely ignores the detailed allegations in the Complaint. *See, e.g., Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp., et al.*, No. 21-cv-761, 2023 WL 6316252, at *5 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*"), at *7 (finding allegations of false baiting orders, executions on the other side of the market, and cancellation of baiting orders sufficient to allege manipulative spoofing). Instead, UBS argues that it cannot be held responsible for its own trading activity

because its spoofing orders may have been entered on behalf of one or more clients. (Def. Br. at 11-13.) But, UBS cites no evidence to support this improper factual assertion – which is legally impermissible at the motion to dismiss stage. Indeed, market makers like UBS do not trade "on behalf of" clients. Rather, they trade in proprietary accounts only. (¶¶ 91-98.)

Moreover, even if it was factually accurate or legally permissible, which it is not, UBS also cites no caselaw to support its sweeping legal proposition. That is because its proposition flies in the face of both Circuit and District precedent directly to the contrary. In *S.E.C. v. U.S. Environmental, Inc.*, the Second Circuit held that a broker is liable under the securities laws for entering manipulative trading orders on behalf of clients as long as the broker acts with scienter, noting that the broker's "personal motivation for manipulating the market [wa]s irrelevant." 155 F.3d 107, 112. And, in *Harrington*, Judge Schofield has twice rejected the very same faulty broker immunity defense UBS repeats here in a nearly identical spoofing case. Specifically, relying on *U.S. Environmental*, Judge Schofield denied the defendants' motion to dismiss, finding irrelevant that the defendants were alleged to have traded for both "their own proprietary accounts and the accounts of their customers" because such allegations did "not undercut the complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed." 585 F.Supp.3d at 416. *See also, Harrington II*, 2023 WL 6316252 at *7 (rejecting again the broker immunity defense, noting that *U.S. Environmental* "gives teeth to the [complaint's] theory of liability.").

UBS then argues that the Complaint fails to sufficiently allege motive, suggesting that it derives no material benefit from acquiring shares of Phunware at below-market prices. This argument also fails, as courts, including courts in this District, have regularly found that a trader spoofing to purchase below-market shares for itself (and even for clients) has a direct and concrete financial benefit sufficient to allege motive. *See, e.g., Harrington II*, 2023 WL 6316252 at *8;

*Harrington Global Opportunity Fund, Limited v. CIBC World Markets Corp.,* 585 F. Supp. 3d 405, 416 (*Harrington I*)("Of note, the Complaint alleges that the spoofing enabled Defendants to purchase Concordia shares at manipulated prices for either client or proprietary accounts.") Moreover, UBS's factual assertions as to the amount of its profits from its scheme are incorrect, contrary to the Complaint's allegation, and improper at the motion to dismiss stage. The full extent of how much UBS profited from its spoofing scheme can only be calculated after discovery and with the assistance of expert testimony. *See Harrington II*, 2023 WL 6316252 at *8 ("Whether Defendants' alleged [spoofing] was ultimately economically rational is a matter to be explored at summary judgment or trial.").

UBS's next argument that the Complaint fails to plead conscious misconduct or recklessness fares no better and lacks *any* support in the caselaw (Def. Br. at 18-23). This same argument has been repeatedly rejected by courts who hold the very type of allegations made here establishes a strong inference of scienter.  *See, e.g., Harrington II*, 2023 WL 6316252, at *6. Notably, instead of offering their own caselaw support, UBS instead asserts that *Harrington II* was wrongly decided and fruitlessly attempts to distinguish a few other spoofing cases that undermine their position.

Lastly, UBS argues that the Complaint fails to properly allege loss causation, even though the specific allegations regarding its spoofing episodes and their close proximity to Plaintiff's sales satisfy the Second Circuit's standard in *Gamma Traders* that the plaintiff allege "its trades occurred so close in time to Defendants' spoofing as to permit [the Court] to infer as a matter of common sense that the market prices were artificial when [it] traded." *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022); ¶¶ 117-123.

Accordingly, UBS's motion to dismiss should be denied in its entirety.

## II.    BACKGROUND

### A.  Spoofing Is A Form Of Market Manipulation

Spoofing undermines the integrity and stability of securities markets by artificially and illegally moving the market price of a security either upwards or downwards, in contradiction of true supply and demand. (¶ 29.) As the SEC's "Staff Report on Algorithmic Trading in U.S. Capital Markets" describes, spoofing is a "harmful strategy" in which some high-frequency traders engage in "the submission and cancellation of buy and sell orders without the intention to trade in order to manipulate other traders." (¶ 34.)

Specifically, a market participant, often utilizing high-frequency algorithmic trading programs, creates a false illusion of excess supply or demand by placing Baiting Orders that are not intended to be executed and have no legitimate economic purpose. These Baiting Orders create an illusion of market interest intended to generate a response from other market participants to follow the artificial selling or buying trend that the Baiting Orders created. (¶ 30.)

A legitimate trader buys when it thinks the price of a security is likely to increase and sells when it thinks the price of a security will decrease. One of the tell-tale signs of a manipulative spoofer is a rapid reversal of trading direction – a lot of sell orders, followed by buy orders, followed by the cancellation of sell orders – which suggests that the original sell orders were not intended to be executed, but were merely a ploy to drive the price down to "buy low." Defendant UBS engaged in this distinctive manipulative spoofing pattern repeatedly. (¶ 31.)

Thus, if the spoofer's goal is to drive the price down, the spoofer enters Baiting Orders to sell, which are intended to "bait" or "trick" investors into entering their own sell orders to minimize or avoid suffering losses in a downward trending market. Shortly after the spoofer places the Baiting Orders to sell, and after those Baiting Orders have lured unsuspecting traders into placing their own orders, the spoofer places orders to buy, or "Executing Purchases," on the opposite side

of the Limit Order Book. These Executing Purchases to buy are intended to be executed at the artificially low prices generated by the Baiting Orders to sell. Immediately thereafter, the spoofer then cancels its orders to sell, which completes the spoofing cycle. (¶ 32.)

### B. UBS Intentionally Or Recklessly Engaged In The Manipulative Spoofing Of Phunware

UBS placed tens of millions of shares of Baiting Orders to sell Phunware during the Relevant Period. (¶ 43; Ex. 1.) The spoofing scheme perpetrated by UBS was intended to, and did, drive Phunware's market price downward so that UBS could purchase Phunware shares at artificially lower prices. (¶ 36.) This scheme was accomplished through the following three stages:

First, UBS flooded the markets with Baiting Orders to sell during the "Baiting Period." These orders had no legitimate purpose and were not intended to be executed when placed. Their sole purpose was to mislead market participants into believing that the market price of Phunware's stock was moving downward. (¶ 37.)

Second, shortly after the Baiting Orders to sell were placed in the Limit Order Book, UBS placed Executing Purchases on the opposite side of the Limit Order Book so that it could purchase Phunware shares at the lower stock prices its manipulative Baiting Orders created. (¶ 38.)

Third, immediately after the completion of its Executing Purchases to buy Phunware shares at the lower prices, UBS cancelled its orders.[2]

UBS engaged in this distinctive spoofing pattern, each individually a "Spoofing Episode," repeatedly and continuously throughout the Relevant Period – and at many multiples of the average trader – resulting in large profits. Specifically, during the Relevant Period, UBS submitted at least

---

[2] The terms "cancel" or "cancellation" in the Complaint refer to the deletion of an order from a Limit Order Book, as well as a modification of an order or quote on a Limit Order Book which results in reduction in the volume of shares displayed in that order or quote. (¶ 39.)

82,717,302 shares of fictitious Baiting Orders on Nasdaq. (¶ 40.) UBS knew or was reckless in not knowing that this conduct was illegal because:

- UBS regularly and intentionally "parked" fictitious Baiting Orders behind orders placed by other unsuspecting traders – which meant they were extraordinarily unlikely to be executed – in order to hide[3] its spoofing activities. *See Harrington I*, 585 F. Supp. 3d at 417 (parking common indicium of spoofing); *Harrington II*, 2023 WL 6316252, at *6 (same); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16-cv-4991, 2016 WL 1093166, at *1, 4 (N.D. Ill. Mar. 22, 2017) (same); *CFTC v. Oystacher et al.*, 203 F.Supp.3d 934, 942 (N.D. Ill. 2016) (same); *CFTC v. Mohan*, No. 4:18-cv-00260, ECF 1, at ¶¶ 39, 43 (S.D. Tex. Jan. 28, 2018) (same). While "parking" Baiting Orders need not always accompany Spoofing Episodes (*Kessev Tov*, No. 20-cv-04947, 2023 WL 4825110, at *4 (N.D. Ill. July 27, 2023)("*Kessev Tov II*") (while "'parking' bids may be one way of proving spoofing, there is no caselaw that holds it is the only way to do so."); *CFTC v. Skudder*, No. 22-cv-1925, 2022 WL 17752392, at *8 (N.D. Ill. Dec. 19, 2022) (not necessary to allege parking)), parking such Baiting Orders is further evidence that Defendant did not intend for its orders to be filled and were not engaging in legitimate market activity. (¶ 105.)

- UBS's Baiting Orders frequently left it with an imbalanced order book position favoring the sell side – something that should not happen if it was truly a neutral market maker. *See Harrington II*, 2023 WL 6316252, at *7 (baiting orders highly imbalanced to the sell-side indicative of spoofing); *Harrington I*, 585 F. Supp. 3d at 417 (indicia of spoofing included "large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer"); *Kessev Tov*, 2023 WL 4825110 at *4 ("Defendants' actions were irrational and contradictory to ordinary market making behavior"); *CFTC v. Skudder*, No. 22-cv-1925, 2022 WL 17752392 at *6 (N.D. Ill. Dec. 19, 2022)("by placing spoof orders that were larger than the visible genuine orders" the defendant "created imbalance in the market and put pressure in the direction of his genuine orders"). Despite these imbalanced positions, UBS often did not sell any shares of Phunware after posting Baiting Orders, indicating that it placed the Baiting Orders in order to create artificial selling pressure and induce other market participants to submit additional sell orders, and thus artificially drive down the price of Phunware shares. (¶ 106.)

- There was a short time period (seconds and at times microseconds) between UBS's Executing Purchases and cancellation of its Baiting Orders, (¶¶ 53, 60, 66, 73, 79, 86), indicating that it never intended to execute the Baiting Orders *see*, e.g., *Harrington I*, 585 F. Supp. 3d at 417 (indicia of spoofing include "the passage of time between placement and canceling of orders (usually in milliseconds)"); *Harrington II*, 2023 WL 6316252, at

---

[3] Efforts to conceal fraud support a strong inference of scienter. *See Pozniak v. Imperial Chem. Indus. PLC*, No. 03-cv-2457, 2004 WL 2186546, at *7 (S.D.N.Y. Sept. 28, 2004) (defendants' concealment of facts indicative of scienter); *Pathfinder Mgmt. v. Mayne Pharma PTY*, No. 06-cv-2204, 2008 WL 3192563, at *12 (D.N.J. Aug. 5, 2008) ("acts of concealment" indicative of scienter); *Brown v. China Integrated Energy, Inc*., 875 F.Supp.2d 1096, 1124 (C.D. Cal. 2012) (same).

*6 (same); *Skudder*, 2022 WL 17752392, at *7 (cancellation within thirty seconds); *CFTC v. Thakkar et al.*, No. 18-cv-00619, ECF. 1, at ¶¶ 37–39 (N.D. Ill. Jan. 28, 2018) (cancellation within two minutes).

- There was a high concentration of cancelled Baiting Orders after an Executing Purchase during the limited period when each spoofing event occurred. *See, e.g., Harrington I*, 585 F. Supp. 3d at 417 (indicia of spoofing included "cancellation of orders when … legitimate small orders are completely filled"); *Harrington II*, at *6 (same); *Kessev Tov II*, 2023 WL 4825110, at *5 (Defendants were "placing and canceling irrationally high bids"); *CFTC v. Nowak et al.*, No. 19-cv-06163, ECF 1, at ¶¶ 53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (spoof orders canceled immediately after receiving a fill on genuine orders); *CFTC v. Flotron*, No. 3:18-cv-00158, ECF 1, at ¶¶ 29–30 (D. Conn. Jan. 26, 2018) (spoof orders canceled as soon as the market moved close to those orders). During each Spoofing Episode, UBS cancelled its sell orders, sometimes amounting to millions of sell-side shares in a matter of seconds and sometimes milliseconds after an Executing Purchase, all of which had been placed by UBS seconds, or at most, a mere 2 minutes earlier. (¶ 108.)[4]

- The stark contrast between the share volume of Baiting Orders and executed sell-side orders during each Spoofing Episode is additional indication that UBS was manipulating the market rather than making a genuine attempt to sell Phunware shares. (¶ 109.) In the median Spoofing Episode, UBS placed and subsequently cancelled 9,862 sell-side shares orders while, according to data available to Plaintiff, it executed a median of 3 sell-side orders. An extremely high sell-side cancellation rate, such as the 99.97% here, is a strong indication that UBS never intended to execute those Baiting Orders. (¶ 110.) *See, e.g., Skudder*, 2022 WL 17752392, at *3 ("median futures spoof order was 100 times the size of his genuine futures orders" and defendant "canceled more than ninety-nine percent of all of the spoof order contracts that he placed"); *CFTC v. Oystacher et al*, No. 15-cv-9196, 2016 WL 3693429, at *31 (N.D. Ill. July 12, 2016) (defendant's "execution rates were much higher on the trade side than on the cancel side"); *Harrington II*, 2023 WL 6316252, at *6 (sell-side baiting orders placed in "vastly greater quantities" than buy-side orders).

- The stark contrast between the share volume of UBS's Executing Purchases and its sell-side orders is further indication that it was manipulating the market by using Baiting Orders as tools to generate artificial prices at which to execute Executing Purchases at favorable prices. UBS executed a median of 100 shares in Executing Purchases, while it executed a median of 3 shares in sell-side orders. (¶ 111.) This lopsided ratio is additional indication that Defendant never intended to execute its Baiting Orders. (¶ 112.) *See, e.g., SEC v. Lek Sec.*, 370 F. Supp. 3d 384, 391 (S.D.N.Y. 2019) (ratio of executed shares on the genuine side to spoofed side of the market of 3-to-1 indicia of spoofing).

---

[4] *See Skudder*, 2022 WL 17752392, at *7 n.19 ("[t]here are times when a trader may cancel an order for 'totally legitimate reasons,'" but "evidence of a series of cancelations made in close connection to orders placed on the opposite side of the market still provides a factual basis to infer an intent to cancel") (quoting *United States v. Chanu*, 40 F.4th 528, 534 (7th Cir. 2022)).

- UBS placed tens of millions of shares of Baiting Orders and purchased hundreds of thousands of Phunware shares at spoofed prices during the Relevant Period, and often engaged in multiple episodes of spoofing per trading day. The repetition of this pattern of placing fictitious Baiting Orders which create an artificial price, transacting Executing Purchases at the artificial price, and then cancelling its sell-side orders, is indicative of scienter. (¶ 113.)[5] *See, e.g., Harrington II*, at *8 (rejecting defendants' argument that plaintiff only alleged ordinary market activity as "implausible against the frequent pattern of spoofing alleged in the [complaint].")*; Oystacher*, 203 F.Supp.3d at 941 ("the CFTC illustrates this unlawful intent by detailing Defendant Oystacher's trading patterns"); *Skudder*, 2022 WL 17752392, at *3 (alleging more than 500 spoof events over five-year period).[6]

- UBS's behavior was inconsistent with *bona fide* market making, which involves purchases and sales in roughly comparable amounts to provide liquidity while remaining roughly market neutral. *See, e.g.*, 73 Fed. Reg. 61,699 (Oct 17, 2008); 69 Fed. Reg. 48,015 (Aug. 6, 2004). Over Cancellation Periods, on average, UBS cancelled 81% of the sell-side orders created during Baiting Periods, but only 64% of the buy-side orders created during Baiting Periods. (¶ 114.) *Cf. Skudder*, 2022 WL 17752392, at *3 (spoofed futures orders were cancelled 99.78% of the time while genuine orders were cancelled 78.9% of the time).

- UBS designed and implemented algorithmic trading programs to execute its spoofing activities. Moreover, UBS closely monitored, modeled, and analyzed the performance, impact, and effects of its algorithmic trading program throughout the Relevant Period, including the spoofing pattern at issue here. (¶ 100.) *See, e.g., Oystacher*, 203 F.Supp.3d at *942 (spoofing conducted through automated tools); *Harrington I*, 585 F.Supp.3d at 416 ("The Complaint alleges that the spoofing scheme operated through algorithmic trading programs designed and implemented by each of the …Defendants.")

- As a registered broker-dealer, UBS knew and/or was required to know that it was unlawful to place Baiting Orders to sell in a Limit Order Book that were never intended to be executed in order to trick market participants into selling shares of Phunware stock. (¶ 102.) Pursuant to FINRA Rule 2020, it was required to have internal policies, procedures and systems that detected and prohibited manipulative or fraudulent trading devices or

---

[5] *See, e.g., In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 447 (S.D.N.Y. 2000) (length of time that fraud occurred was indicative of scienter).

[6] Defendant spoofed Phunware on at least 90 of the 550 trading days (16%) during the Relevant Period. This frequency is above that typically found sufficient in spoofing complaints. *See, e.g., CFTC v. Nowak et al.*, No. 19-cv-06163, ECF 1, at ¶¶ 53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (3 days out of a Relevant Period of 8 years); *CFTC v. Zhao*, No. 18-cv-00620, ECF 1, at ¶¶ 36–38 (N.D. Ill. Jan. 28, 2018) (3 days out of a Relevant Period of nearly 5 years); *CFTC v. Mohan*, No. 4:18-cv-00260, ECF. 1, at ¶¶ 39, 43 (S.D. Tex. Jan. 28, 2018) (4 days out of a Relevant Period of 21 trading days, or 19%); *Oystacher*, 2016 WL 3693429 (51 trading days over two years, or 10%).

schemes. And pursuant to FINRA Rule 5210, it was required to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of its firm. Indeed, during the Relevant Period, UBS filed an "Annual Certification of Compliance and Supervisory Processes," pursuant to FINRA Report 3130. (¶ 103.), that attested that it followed such requirements. *See Harrington II*, 2023 WL 6316252, at *7 ("The SAC alleges legal duties on the part of broker-dealers serving as gatekeepers of trading on security exchanges.")

- There is an extremely low statistical likelihood that the price variations for each of the Spoofing Episodes occurred naturally. (¶ 115.)[7]

Further, by manipulating down the share price of Phunware, UBS was able to make at least hundreds of millions of dollars in ill-gotten gains by purchasing shares of Phunware at artificially depressed prices that it would not have been able to obtain absent its spoofing. (¶ 116.)[8]

## III.   LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Stone Family Trust v. Credit Suisse AG*, No. 19-cv-5192, 2022 WL 954743, at *5 (S.D.N.Y. Mar. 30, 2022) (Torres, J.). While Plaintiff's claims must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, even under the PSLRA, the facts in the complaint "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Id*. at *1 n.1.

## IV.   PLAINTIFF ADEQUATELY ALLEGES EXCHANGE ACT CLAIMS UNDER SECTION 10(b) AND SECTION 9

---

[7] *See, e.g., Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64,  71 (2d Cir. 2021) (defendant knew that its conduct would cause the security's price "to spike over and above what would have been expected based on market volatility alone" based on statistics); *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 70 (2d Cir. 2018) (crediting allegation that it was a "near statistical certainty" that plaintiffs traded directly with defendants).

[8] *See Harrington I*, 585 F. Supp. 3d at 416; *Oystacher*, 203 F. Supp. 3d at 944 ("Indeed, the Complaint explicitly spells out how Defendant Oystacher would profit from this trading strategy," citing allegations that "This strategy allowed Defendants to buy or sell futures contracts in quantities and/or at price levels that would not have otherwise been available to them in the market, absent the spoofing conduct").

**A. Plaintiff's Allegations Are More Specific And Persuasive Than The Complaints In** *Harrington* **And** *Kessev Tov***, Which Are Factually And Legally On Point Cases Where Courts Recently Denied Similar Motions To Dismiss**

Recent spoofing decisions, including two in this District in the same case, *Harrington* and *Kessev Tov*, make clear that UBS's motion should be denied. In *Harrington*, Judge Schofield recently denied a motion to dismiss, rejecting (for the second time) the same arguments that UBS raises here. ***First,*** *Harrington II* confirms a pattern of trading conduct involving the placement of a large volume of "baiting orders," the execution of a small volume of trades on the opposite side of the market, and the cancellation of the outstanding baiting orders – exactly what is pled here (*see, e.g.,* ¶¶ 37-47) – is sufficient to plead manipulative conduct in a spoofing case:

> The SAC alleges that Defendants 'injected false and misleading information into the marketplace' by placing baiting orders of at least 138,678,121 Concordia shares that 'had no legitimate financial purpose and were never intended to be executed' and were intended to 'drive Concordia's share price downward in order to permit Defendants and/or their customers to purchase Concordia shares at lower prices.' …. Defendants executed 578,530 executing orders of Concordia shares, purchasing them at depressed prices induced by the flood of baiting orders. The outstanding baiting orders were then cancelled immediately. The SAC also alleges that each Defendant 'designed and implemented algorithmic trading programs that executed the spoofing schemes.' These allegations are sufficient to plead the 'manipulative acts' prong of a Section 10(b) claim for market manipulation.

*Harrington II*, 2023 WL 6316252, at *5.[9]  *See also id*. at *6 ("Harrington distinguishes baiting orders from other sell orders by the fact that none of the sell orders in the illustrative examples were ever executed, and instead functioned to manipulate the market to enable Defendants' purchase of Concordia securities at lower prices."); *see also Harrington I*, 585 F. Supp. 3d at 415-416 (same).

---

[9] The Court approved of the *Harrington* plaintiff's definition of "baiting order"—a definition similar to that used by Plaintiff here and which UBS challenges. *Harrington II,* 2023 WL 6316252, at *6.

**Second**, *Harrington II* held that the plaintiff sufficiently pled scienter, relying on the standard four factors – all pled sufficiently here (*see e.g.,* ¶¶ 105-114) – that courts regularly examine to distinguish spoofing from legitimate market activity: "(1) the passage of time between placement and cancelling of orders (usually in milliseconds), (2) cancellation of orders when large baiting orders are partially filled or legitimate small orders are completely filled, (3) parking baiting orders behind smaller legitimate orders placed by other traders and (4) large disparities in the volume of baiting orders on one side of the market and legitimate orders placed by the spoofer." 2023 WL 6316252, at *6; *see also Harrington I*, 585 F. Supp. 3d at 417 (same).

**Third,** *Harrington II* held that a defendant broker-dealer can be liable for spoofing conduct regardless of whether that conduct involves trading for that defendant's own account or for its clients. Indeed, in rejecting the *Harrington* defendants' assertion (that Defendant here repeats at length) that spoofing claims must specify which orders and executions were placed for a broker-dealer's own account and which were placed for client accounts, Judge Schofield explained that allegations that such trades were for a defendant's own account "and/or" for its clients' accounts "does not cause it to fall short of Rule 9(b)'s particularity requirement, but instead functions to demonstrate the breadth of Defendants alleged conduct," regardless of whether it was "on behalf of either themselves or their customers, with the objective of manipulating the price of Concordia securities." *Id*. at *5.

**Fourth,** *Harrington II* directly rejected the defendants' argument (identical to that raised by Defendant here) that a spoofing complaint must contain more detail than the presentation of "illustrative examples" and a chart with information regarding an additional thirty spoofing episodes. *Id*. at *6 ("It would be both unwieldly and unreasonable to require Plaintiff to proffer

detailed descriptions of each alleged episode in order to plead a sufficient claim."); *see also Harrington I*, 585 F. Supp. 3d at 416 (finding six examples of spoofing sufficient).

**Fifth,** *Harrington II* held the complaint sufficiently pled a "plausible economic rationale for the alleged misconduct" – the same economic rationale pled here (¶ 116) – because it "alleges that Defendants derived economic gain from the spoofing scheme through 'paid transaction fees for completed customer trades,' hundreds of thousands of dollars in saved execution costs for the baiting orders that were cancelled and 'at least millions of dollars in ill-gotten gains.'" 2023 WL 6316252, at *8. *Harrington II* further held that "[w]hether Defendants' alleged misconduct was ultimately economically rational is a matter to be explored at summary judgment or trial." *Id; see also Harrington I*, 585 F. Supp. 3d at 418.

**Lastly,** *Harrington II* held that the plaintiff's "burden in alleging loss causation 'is not a heavy one'" and that "[t]he complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." 2023 WL 6316252, at *8 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)). The *Harrington II* complaint satisfied this liberal standard by alleging – just like Plaintiff does here (¶¶ 117-123) – that "spoofing episodes took place on 111 of 188 trading days during the Relevant Period, and that Plaintiff traded on thirty-four of those days, experiencing losses as a result of the artificially depressed market price of Concordia shares," and that when "spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the spoofing events." 2023 WL 6316252, at *8; *see also Harrington I*, 585 F. Supp. 3d at 419 ("It would not be proper to draw the inference sought by

defendants – that individual spoofing events cannot have a long-term cumulative effect on the price of a stock – at the motion to dismiss stage.")

*Kessev Tov*, 2023 WL 4825110, is also directly on point. In *Kessev Tov,* the court found that even a complaint that <u>lacked</u> many of the detailed elements in *Harrington* (and here) still sufficed to state a claim for spoofing under Section 10(b), rejecting a number of the very same arguments raised by UBS here. For example, the Court held that "[w]hile "layering" or "parking" bids may be one way of proving spoofing, there is no caselaw that holds it is the only way to do so." *Compare Kessev Tov II*, 2023 WL 4825110, at *4 *with* Def. Br. at 21-22. And the Court held that it was irrelevant at the pleading stage that the plaintiff did not identify who specifically benefitted from the spoofing scheme and how much profit they made (*id.* at *5), and that stock prices may have moved in the opposite direction as the Baiting Orders during a spoofing episode. *Compare id.* at *6 *with* Def. Br. at 16-18.

In the face of these on-point and well-reasoned decisions, UBS suggests in a footnote that *Harrington* is wrongly decided and references "*Kessev Tov II"* only to argue that cancelled orders alone cannot prove spoofing, which is an irrelevant strawman since the Complaint contains extensive allegations going far beyond "mere cancellation" of orders. The inability of UBS to distinguish these decisions highlights their applicability to this case and makes clear that UBS's motion to dismiss should likewise be denied.

### B.  <u>Plaintiff Adequately Alleges Manipulative Conduct With Particularity</u>

To state a claim for market manipulation under Section 10(b)-5(a) and (c) and Section 9[10], a plaintiff must plausibly allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an

---

[10] UBS does not offer any unique arguments for dismissal of Plaintiff's Section 9 claim (Def. Br. at 10) or common law claims. (Def. Br. at 30.)

assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). Such a claim is adequately pled when "the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc.*, 493 F.3d 87, 102 (2d Cir. 2007). Because manipulation "can involve facts solely within the defendant's knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id. See also Harrington I,* 585 F. Supp. 3d at 418 (same).  Rather, the plaintiff need only "lay out the nature, purpose, and effect of the fraudulent conduct and the roles of the defendant without requiring specific instances of the conduct." *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC,* No. 02-cv-0767-LBS, 2002 WL 31819207 at *5 (S.D.N.Y. Oct. 10, 2002).

Market manipulation is "intended to mislead investors by artificially affecting market activity," or "controlling or artificially affecting the price of securities." *Set Capital,* 996 F.3d at 76. Transactions that are otherwise legal "may constitute manipulative activity when accompanied by manipulative intent." *Id.* at 77. "[S]ufficient proof of manipulation [exists] if the manipulator caused **either** actual **or** apparent activity **or** caused a rise in the market price." *SEC v. Martino,* 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003) (emphasis added). "For market activity to 'artificially' affect a security's price, we generally ask whether the transaction or series of transactions 'sends a false pricing signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded." *Set Capital,* 996 F. 3d at 76.

### 1.    Plaintiff Adequately Pleads UBS's Manipulative Conduct

UBS argues that the Complaint fails to plead manipulative conduct because (a) simply calling orders "Baiting Orders" is insufficient; (b) the allegations amount to "routine market activity"; and (c) UBS was purportedly trading on behalf of clients.  Each of these arguments is incorrect, irrelevant or both.

First, Plaintiff does far more than simply calling an order a "Baiting Order." Plaintiff utilizes multiple criteria well-established in the caselaw, including the volume of UBS's Baiting Orders, the timing of UBS's Baiting Orders relative to UBS's Executing Purchases, the impact of UBS's Baiting Orders on its order flow, and other well-defined characteristics, to identify UBS's Baiting Orders.  *See, e.g.*, ¶ 41 (substantial sell-side imbalance in UBS's order flow), ¶ 43 (shares of Baiting Orders relative to shares in Executing Purchases), ¶ 44 (volume of sell-side orders during Spoofing Episodes contrasted with non-Spoofing Episodes), ¶ 45 (cancellation of more sell-side orders during Spoofing Episodes contrasted with non-Spoofing Episodes). *See also supra at* 7- 9. Such allegations are routinely held sufficient to allege manipulative spoofing. *See Harrington I*, 585 F. Supp. 3d at 417 (collecting cases).[11]

---

[11] *See also CFTC v. Skudder*, 2022 WL 17752392, at *8 (upholding complaint when alleged spoof orders were placed to move the market in favor of genuine orders and cancelled after genuine orders were executed even without alleging that spoof orders were placed near best bid/ask price or parked behind existing orders); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16-cv-4991, 2017 WL 1093166, at *1, 4 (baiting orders placed at best available price and parked behind other orders to minimize the possibility that baiting orders would be executed); *U.S. v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (relative size and timing of canceled orders indicative of manipulation); *CFTC v. Oystacher*, 203 F.Supp.3d at 942 (spoof orders placed at or near the best bid or offer behind existing orders); *CFTC v. Nowak et al.*, No. 19-cv-06163, ECF 1, at ¶¶ 53–64, 72–83 (N.D. Ill. Sept. 16, 2019) (spoof orders placed close to the best bid or ask and canceled immediately after receiving a fill on genuine orders on opposite side of limit order book); *CFTC v. Zhao*, No. 18-cv-00620, ECF 1, at ¶¶ 36–38 (N.D. Ill. Jan. 28, 2018) *CFTC v. Mohan*, No. 4:18-cv-00260, ECF. 1, at ¶¶ 39, 43 (S.D. Tex. Jan. 28, 2018) (spoof orders placed behind existing orders close to the best bid or ask); *CFTC v. Banoczay et al.*, No. 20-cv-05777, ECF 1, at ¶¶ 51–75 (N.D. Ill. Sept. 29, 2020) (spoof orders placed near the best bid or ask); *CFTC v. Flotron*, No. 3:18-cv-00158, ECF 1,

UBS ignores most of these detailed indicia of spoofing, as well as the caselaw that supports them. Instead, it makes a strawman argument focused on just one assertion: "the mere fact of cancellations – even a cancellation made shortly after an order is placed – is not sufficient to plead a manipulative act." Def. Br. at 13.[12] But, courts routinely look to the speed of a defendant's cancellations as an indicia of spoofing. *Harrington II*, at *6 ("when looking to distinguish spoofing from legitimate market activity, courts tend to examine [] the passage of time between placement and canceling of orders…").[13] And regardless, as set forth above, the Complaint alleges far more than quick cancellations alone.[14]

UBS's next argument, that the Complaint's allegations amount to nothing more than "routine market activity," is at odds with the plain language of the Complaint, the caselaw, and its own words. Courts routinely find that such activity is not lawful market making. *See, e.g., Harrington I* at 418 ("Defendants also argue that the large volume of placed and cancelled orders does not support an inference of scienter because more than 95% of all placed orders are cancelled

---

at ¶¶29–30 (D. Conn. Jan. 26, 2018) (spoof orders canceled when market moved close to those orders).

[12] Notably, in both those cases, the plaintiff subsequently amended its complaint to include the types of allegations made here, and the motions to dismiss were subsequently denied. *See CP Stone Fort Holdings, LLC v. John Doe*, No. 1:16-cv-04991, ECF 67 (N.D. Ill. Oct. 3, 2017); *Kessev Tov II,* 2023 WL 4825110.

[13] *See also Skudder*, 2022 WL 17752392, at *7 ("the CFTC alleged that Skudder cancelled a large number of orders within seconds, a subsidiary fact that suggests the CFTC can prove Skudder's intent to deceive and cancel."); *Oystacher*, 203 F. Supp. 3d at 935 (quickly cancelling orders is evidence of intent because "Defendants did not merely change their mind as to the direction of the market so quickly, so often, and with such precision, …").

[14] UBS's attempt to manufacture a dispute over whether it placed 82 million fraudulent orders or placed fraudulent orders for 82 million (or 56 million) shares is entirely irrelevant, and in any event the Complaint plainly alleges that "Specifically, Defendant submitted 82,717,302 **shares of Baiting Orders** to sell…." (*see* ¶ 43.)

before execution. Even if it were permissible to consider that fact on a motion to dismiss, it does nothing to explain the frequent pattern of spoofing alleged in the Complaint. That 95% of placed orders are cancelled in the market does not mean spoofing was absent here."); *Kessev Tov, LLC*, 2023 WL 4825110, at *4 ("[m]arket manipulation can be accomplished through otherwise legal means."); *CP Stone Fort Holdings, LLC v. Doe(s),* No. 16-cv-4991, 2016 WL 5934096, at *5 (N.D. Ill. Oct. 11, 2016) (same); *Skudder*, 2022 WL 17752392, at *8 (rejecting argument that "the complaint merely alleges lawful trading activity" and finding sufficient allegations that the Defendant's "spoof orders sent false market signals" even if the "pattern of trading alleged in this complaint is different than that at issue in other cases"). *See also Set Capital LLC*, 996 F.3d at 77 (2d Cir. 2021) (holding that market manipulation claims can be based on otherwise open, lawful conduct). Moreover, UBS itself has admitted that if a market maker was engaging in "legitimate market-making," it "tends to stay 'flat' whenever possible because it makes its money by profiting from spreads, not from taking a directionally biased position at market risk." (¶94.) Here, the Complaint alleges in detail how UBS was anything but "flat" in Phunware (¶¶ 97-98; 106, 108-112), and even contrasts that against how UBS does stay "flat" when engaging in legal market making in other securities. (¶ 95.)[15]

UBS's assertion that it cannot be held responsible for the spoofing transactions detailed in the Complaint because they may have been at the behest of UBS's "many broker-dealer customers" – fares no better. Contrary to UBS's assertion that Plaintiff "asks this Court to make the speculative

---

[15] UBS cites only to *ATSI* in support of its argument, but *ATSI* involved claims against a market maker that did not allege any specific manipulative acts other than transacting *against* the other defendants that were alleged to have manipulative intent. *ATSI Communications, Inc.*, 493 F.3d at 104-105 (2d Cir. 2007) ("The complaint is plainly insufficient in alleging that Trimark engaged in market manipulation. It only alleges that Trimark was the principal market maker in ATSI's stock, that Trimark knew or should have known of the manipulation, and that ATSI "believes" that Trimark was a cooperating broker-dealer.")

and unreasonable assumption that all market activity identified in the Complaint is attributable to a single decision-maker," no such assumption is needed. The Complaint – which this Court must accept as true (*Stone Family Trust,* 2022 WL 954742, at *1 n.1) – pleads that the trading at issue was done **by UBS for UBS's own proprietary account**, not at the direction of some unidentified (and non-pleaded) "broker-dealer customers."[16]

While the Complaint acknowledges that customer orders could provide UBS with a *motive* to spoof (¶ 19), market makers like UBS are not acting "on behalf of" clients when placing orders on Nasdaq.[17]  Rather, as the Complaint describes in detail, market makers trade in their own proprietary accounts for their own benefit. (¶¶ 91-98).[18] And the Complaint alleged that UBS was acting as a market maker here because the deanonymized data at issue is **only** available to the public when the entity is acting as a market maker. (¶¶ 91, 96.) (explaining that Nasdaq trading data is anonymous except that, under Nasdaq rules, orders placed by a market maker like UBS trading "for its own account" must be deanonymized and attributable to the market maker). As such, the Complaint is clear, and the Court must accept as true, that that the transactions at issue

---

[16] UBS's assertion that "All that Plaintiff has alleged is that **someone** cancelled an order to sell after **someone** purchased stock" is plainly false. Def. Br. at 13. The Complaint clearly alleges that UBS placed and then cancelled the Baiting Orders on its behalf.

[17] For example, a customer order to purchase shares at a price of $2.00 per share provides a motive for a market maker like UBS to buy shares on Nasdaq in a proprietary capacity at an artificially depressed price of $1.90 per share, and then resell those shares to the customer to obtain a profit of $0.10 per share – further motive of fraud.

[18] *See also* 15 U.S.C. § 78c(a)(38) ("The term "market maker" means any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.").

were not done at the behest of some hypothetical "broker-dealer customers," but by and for UBS itself.[19]

Furthermore, even if UBS's assertion that the order flow identified in the Complaint was submitted on behalf of clients was factually accurate (or even alleged), which it is not, both *U.S. Environmental* and *Harrington* hold directly that brokers are liable for their own trades regardless of the specific motivations of their clients on whose behalf the trades were entered.[20]  In *S.E.C. v. U.S. Environmental, Inc.*, the Second Circuit held that a broker was liable under the securities laws for knowingly entering clients' manipulative orders and that its "personal motivation for manipulating the market is irrelevant." 155 F.3d at 112.  Specifically, it held "[e]ven if [defendant broker] was motivated by a desire to obtain compensation rather than by a desire to change [the spoofed company's] market price, as [its client] was, [defendant broker] is liable under § 10(b) if, with scienter, he effected the manipulative trades." *Id.*

*Harrington* then relied on *U.S. Environmental* in rejecting this same broker immunity defense, noting that *U.S. Environmental* "gives teeth to the [complaint's] theory of liability." *Harrington II,* 2023 WL 6316252, at *7. The *Harrington* court had previously rejected this same

---

[19] Moreover, Defendant's argument that it was trading on behalf of multiple, unrelated clients is even more obviously implausible.  It is a near statistical impossibility that the data would show the type of consistent imbalance toward the sell side, with all pressure pushing Phunware downward, and then the immediate cancellation of all sell side orders, if the trading was done at the request of a random assortment of unrelated customers who were not engaged in spoofing, as UBS posits. *See Tower Research Capital*, 890 F.3d at 69 (crediting allegation that it was a "near statistical certainty" that plaintiffs traded directly with defendants); *Set Capital*, 996 F.3d at 71 (defendant knew that its conduct would cause the security's price "to spike over and above what would have been expected based on market volatility alone" based on statistics).

[20] Notably, even UBS tacitly concedes that at least some of the trading at issue in the Complaint was on its own behalf.  Def. Br. at 13 n.8 (claiming only that the "vast majority" of the trading activity in the Complaint's six spoofing examples was for clients, and saying nothing about the thousands of spoofing transactions in Exhibit 1).

argument in an earlier decision, stating "[t]hat the Complaint mentions that Defendants trade for their own proprietary accounts and the accounts of their customers does not undercut the complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed …. Of note, the Complaint alleges that the spoofing enabled Defendants to purchase [spoofed shares] at manipulated prices for either client or proprietary accounts." 585 F.Supp.3d at 416.

### C.  The Complaint Pleads A Strong Inference Of Scienter

To establish scienter, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Capital,* 996 F.3d at 78. The question is whether "all of the facts alleged, taken *collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323(2007) (emphasis in original).[21]

### 1.     The Complaint Alleges Conscious Misbehavior Or Recklessness

The Complaint sufficiently alleges scienter through conscious misbehavior or recklessness by alleging, among other things, that UBS designed and operated algorithmic trading programs (¶ 100) that executed spoofing activities that UBS approved (¶ 101) despite knowing that spoofing is illegal (¶¶ 102-103), which conduct involved thousands of repeated instances (¶ 113) of parking Baiting Orders (¶ 105) for short periods of time (¶ 107) before executing purchases at lower prices and then cancelling the Baiting Orders (¶ 107). The Complaint also alleges that UBS's Baiting Orders were far larger than *bona fide* sell-side orders (¶ 109), that the ratio of cancelled Baiting

---

[21] Under the PSLRA, the strong inference of scienter may be inferred even where each individual component is not "independently sufficient" if those facts "bolster the inference of manipulative intent." *Set Capital LLC*, 996 F. 3d at 81.

Orders to executed *bona fide* orders was extremely high (¶ 110), that the share volume of executed sell-side orders was far lower than the volume of Executed Purchases (¶ 111), that the ratio of executed sell-side orders to Executing Purchases was very low (¶ 112), and that the asymmetry in the posting and cancellation of UBS's orders was inconsistent with *bona fide* market making (¶ 114). This is more than sufficient to adequately allege scienter. *See, e.g., Harrington I*, 585 F. Supp. at 417-418; *Kessev Tov II*, 2023 WL 4825110, at *4-5 (allegations "plausibly suggesting that Defendants' actions were irrational and contradictory to ordinary market making behavior *alongside* their allegations that Defendants quickly entered and canceled the orders" was adequate); *Oystacher*, 203 F.Supp.3d at 942 (defendant's "aggregate trading patterns" adequate); *Skudder*, 2022 WL 17752392,  at *3 (allegations that baiting orders were larger than genuine orders, cancelled quickly, and executed less frequently adequate).

UBS ignores these facts and caselaw, as well as the Supreme Court's admonition that the pleadings must be considered as a whole. *Tellabs, Inc.*, 551 U.S. at 323 (2007). Instead, it first argues that the Complaint's allegations "largely consist[] of nothing more than facts that apply to every broker-dealer." Def. Br. at 18. This ignores the allegations that specifically allege facts that distinguish UBS's trading conduct in Phunware from that of other law-abiding market participants (and even UBS itself in other securities), including those mentioned above, and which courts routinely find are sufficient to allege manipulative spoofing. *See supra* at 7-9. UBS also ignores that the Complaint alleges how it had obligations as a registered broker-dealer – which it attested to during the Relevant Period – requiring it to act as a gatekeeper to the markets, precisely the type

of allegations that were found sufficient in *Harrington* to overcome the defendants' arguments that they could not be held liable for trades in customer accounts.[22]

UBS next argues that the Complaint's allegations are insufficient because the Complaint does not explain "how it arrived at those calculations or why such measurements would support a showing" of scienter. Def. Br. at 19. But, the Complaint does both of these things. The allegations of scienter, *e.g.*, ¶¶ 104-115, specifically identify aspects of UBS's trading activity that are indicative of manipulative intent and are contrary to the behavior of law-abiding traders. These allegations describe not only the quantitative metrics applied, but how those metrics demonstrate that UBS's trading activity is contrary to legitimate trading activity. Courts routinely find that the very same economic analyses are sufficient to allege manipulative spoofing. *See supra* at 7-9.

Lastly, UBS attempts to distinguish certain facts pled in the Complaint from those in a just a few of the other cases in which the same type of allegations were held sufficient to plead spoofing claims. However, this attempt fails because it both ignores the vast majority of the caselaw and because in those few cases that UBS does address, all UBS can identify are details in these cases irrelevant to the courts' holdings. The court in *Coscia* did not hold (and no case of which Plaintiff is aware has held), for instance, that all baiting orders must be cancelled within milliseconds (Def. Br. at 20), and in any event, the examples in the Complaint include instances of cancellations within milliseconds and microseconds.[23] ¶ 53 (cancellations within 365 microseconds), ¶ 73

---

[22] *Harrington II*, 2023 WL 6316252, at *7 ("The SAC alleges legal duties on the part of broker-dealers serving as 'gate-keepers' of trading on security exchanges. These duties, known and accepted by Defendants, involve a 'continuing responsibility to ensure that the customers' order flow … is in compliance with all applicable rules, regulations and laws' and 'detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of the firm.'")

[23] UBS's reference to cancellations "as much as two minutes later," Def. Br. at 20, misrepresents the methodology of Plaintiff's analysis. Plaintiff analyzed the two minutes following an Executing Purchase to specify a window for measuring the cancellation of Baiting Orders, but the allegations

(within 399 microseconds), ¶ 79 (within 167 microseconds).[24] Similarly, no court has held that "parking" must be alleged in every spoofing instance (Def. Br. at 22), or even at all – it is a factor that is indicative of scienter when present but not required in every spoofing case.[25] The Complaint's allegations regarding parking are that UBS often, but not always, placed its Baiting Orders further away from the market than other orders (*see e.g.,* ¶ 54 (other trader's order to sell was at a better [lower] price "than many of the Baiting Orders placed by Defendant")), a fact that UBS acknowledges elsewhere in its brief (Def. Br. at 5-6) when it inexplicably argues – without any case support – that placing Baiting Orders to sell that are worse [higher] than other legitimate offers cannot support spoofing claims. These are exactly the type of "parking" allegations that *Harrington* and other courts have held demonstrate manipulative intent.[26]  And no court has held that a spoofing plaintiff must allege who designed an algorithmic trading program or what motivated such a person to do so. Indeed, this very argument was directly rejected in *Harrington*.[27]

---

show that the cancellations were within seconds of the Executing Purchases.  Regardless, Courts have held that up to 2 minutes is more than sufficient. *See, e.g., Thakkar,* No. 18-cv-00619, ECF 1 (N.D. Ill. Jan. 28, 2018).

[24] UBS incorrectly asserts that "because Plaintiff has not matched orders and cancellations, they [sp] have not actually pled the length of time between the placement and cancellation of any particular order." (Def. Br. at 20). First, plaintiff need not "match" specific orders to cancellations as shares are fungible and it is irrelevant which shares are cancelled – what matters is the effect of the cancellations on the market. Second, to the extent this is an attempt to reference UBS's argument that a spoofing complaint must identify the clients on whose behalf a broker-dealer defendant claims to have been trading, this is refuted by *Harrington, U.S. Environmental,* and other cases as explained herein.

[25] *Kessev Tov II,* 2023 WL 4825110, at *4 ("[w]hile "layering" or "parking" bids may be one way of proving spoofing, there is no caselaw that holds it is the only way to do so."); *Skudder,* 2022 WL 17752392, at *8 (parking need not be alleged).

[26] *See supra at* 7.

[27] *Harrington I,* 585 F.Supp.3d at 418 ("Defendants argue that the Complaint needs to plead additional facts regarding Defendants' algorithmic trading programs and the corporate officials who designed or oversaw those programs. Defendants' argument is unfounded because a claim of

### 2.     The Complaint Alleges That Defendant Had A Motive To Spoof Phunware Shares

Pleading scienter does not require evidence of personal financial incentives. *Tellabs*, 551 U.S. at 325. The absence of financial gain "does not make the fraud illogical; indeed, if that were the case, motive and opportunity would be the sole test for pleading scienter, not just an alternative test." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012). Although not required, in addition to the robust evidence above, UBS had a pecuniary motive to defraud Phunware. ¶ 116.  *See, e.g, Harrington II*, 2023 WL 6316252, at *8 ("The SAC alleges that Defendants derived economic gain from the spoofing scheme through paid transaction fees for completed customer trades, hundreds of thousands of dollars in saved execution costs for the baiting orders that were cancelled and at least millions of dollars in ill-gotten gains.").[28]

UBS argues that the Complaint fails to allege motive because it does not specify which of its spoofed purchases of Phunware were for its own account or for accounts of its clients.  Def. Br. at 16. This is wrong. First, the Complaint alleges that "market makers" like UBS do not trade "on

---

manipulation ... can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim. If Defendants' argument were correct, it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms.")

[28] *See also Oystacher*, 203 F. Supp. 3d at 944-45 ("Indeed, the Complaint explicitly spells out how Defendant Oystacher would profit from this trading conduct on numerous occasions," referencing allegations that "[t]his strategy allowed Defendants to buy or sell futures contracts in quantities and/or at price levels that would not have otherwise been available to them in the market, absent the spoofing conduct," that defendants "placed and cancelled the spoof orders in this manner to maximize their opportunities to trade in quantities and/or at price levels that would not have otherwise been available absent the appearance of false market depth and book pressure, and the resulting joinder by other market participants.")(emphasis omitted).

behalf of" clients, but rather, they trade in their own proprietary accounts for their own benefit. ¶¶ 91-98 (distinguishing UBS's conduct from legitimate market making.)

Second, even if there is some argument that UBS's proprietary trading in its own accounts was motivated by client interest, UBS still has a financial motive to engage in spoofing. As Judge Schofield held in *Harrington I,* 585 F.Supp.3d at 418:[29]

> The Complaint alleges that the Spoofing Defendants engaged in spoofing to purchase shares of Concordia stock at prices lower than what they would otherwise pay. Ostensibly, when a Spoofing Defendant sold that stock, their profits would be increased, or losses decreased, by the difference of the price they paid versus the price they would have paid had they not engaged in spoofing."[30]

Further, it is incorrect and improper for UBS to assert as a factual matter at the pleading stage that its spoofing profits were limited to $10,000 (Def. Br. at 17) – this is not only contrary to what the Complaint alleges and what must be assumed to be true on a motion to dismiss, it ignores the profit that UBS made from selling its Executing Purchases at later periods for gain[31], and also ignores that its spoofing algorithms are not alleged to have been exclusively trained on Phunware

---

[29] *See also Sharette v. Credit Suisse Int'l.*, 127 F.Supp.3d 60, 95 (S.D.N.Y. 2015) (allegation that a bank devised a manipulative scheme in which it drove down the stock of an issuer in order to promote itself to potential clients, was sufficient to allege motive, even though such short-term practices "may strike common sense as uneconomic, counter-intuitive, even irrational.").

[30] *See also Skudder*, 2022 WL 17752392, at *1 (Trader liable for spoofing who "traded commodity interests on behalf of clients, and [who] also traded on his own accounts."). The two cases cited by UBS in purported support for this argument are not spoofing cases and UBS does not address *Harrington* in this regard. *See Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100 (S.D.N.Y. 2018) (borrowing and shorting stock on basis of nonpublic information); *Cohen v. Stevanovich*, 722 F. Supp. 416 (S.D.N.Y. 2010) (naked short selling and distributing false reports).

[31] This is precisely the type of allegation held sufficient to allege motive in *Harrington I,* 585 F.Supp.3d at 418 ("when a Spoofing Defendant sold that stock, their profits would be increases, or losses decreased, by the difference of the price they paid versus the price they would have paid had they not engaged in spoofing.")

stock, but would similarly generate profit for UBS across all securities and markets where they were used. And finally, factual disputes over the exact quantification of a defendant's trading profits and whether that profit constituted sufficient motive to engage in spoofing do not provide a basis to dismiss a complaint, because that quantification is for expert analysis after discovery. *See, e.g., Kessev Tov II*, 2023 WL 4825110, at *5 (holding that claims survived motion to dismiss even if plaintiffs are ultimately unable to prove that defendants profited from spoofing activity); *Harrington II*, 2023 WL 6316252, at *8 ("Whether Defendants' alleged misconduct was ultimately economically rational is a matter to be explored at summary judgment or trial.")

## V.     THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

A plaintiff's burden to plead loss causation is "not a heavy one." *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. Sept. 23, 2019) (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)). "[C]ourts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure." *Sharette*, 127 F. Supp. 3d at 80.

Plaintiff more than meets this standard. Plaintiff alleges exactly how UBS's manipulative spoofing allowed it to depress the price of Phunware stock and how, as a result of UBS's spoofing, it was forced to sell stock at artificially depressed prices.[32] The Complaint and Exhibit 2 contain

---

[32] *Compare* ¶¶ 117-123; Exs. 1 and 2 *with Harrington I*, 585 F.Supp. 3d at 419 (holding that the plaintiff sufficiently pleaded loss causation by alleging that spoofing occurred on a majority of trading days during the Relevant Period, that the plaintiff traded on twenty-seven of those days and that "the spoofing depressed the price for up to fifteen minutes with lingering cumulative effects over the Relevant Period"). *See also Sharette*, 127 F. Supp. 3d at 103 (holding that the plaintiffs "pleaded enough facts evidencing a link between the alleged manipulative scheme and their damages" because they "have shown in some detail exactly how the structure of the Offerings allowed investors to manipulate and depress the price of ECD stock" and "that following the Offerings, short sales of ECD stock skyrocketed while the price of ECD stock plummeted."); *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (holding

detail demonstrating that Phunware sold millions of shares of stock on the same day as Defendant UBS engaged in spoofing (which, even Defendant concedes (Def. Br. at 27) is sufficient), often just seconds and minutes after UBS engaged in spoofing. ¶ 118.

Defendant claims that such allegations are inadequate. (Def. Br. at 24-27.) It is wrong. Exactly as prescribed by the Second Circuit in *Gamma Traders*, Plaintiff alleges how "its trades occurred so close in time to Defendants' spoofing as to permit [the Court] to infer as a matter of common sense that the market prices were artificial when [it] traded." 41 F.4th at 80. The Complaint also alleges, just as the Second Circuit in *Gamma Traders* prescribed, that UBS's spoofing had a persistent negative impact on Phunware's share price throughout the Relevant Period. (¶ 35 (citing Nobel prize-winning economist Paul Milgrom's conclusions that "manipulative trades can lead to permanent price impact.")); (¶¶ 119-123 (alleging both temporary and long-term negative price impact).) Plaintiff here cites numerous specific examples in which it traded after and in close proximity to Defendant's spoofing (*e.g.*, ¶ 118), as well as "facts to support its theory about the length of time that spoofing affect[ed] the market or the timing of any of its trades in relation to the spoofs." *Id.* at 81-82.[33]

UBS then argues that Plaintiff does not sufficiently allege that its share price declines were caused *exclusively* by UBS's manipulative misconduct. Def. Br. at 27-29. But there is no such requirement at the pleading stage, and isolating the harm caused by a misrepresentation or a

---

that the plaintiffs plausibly alleged "that the Exchanges' alleged misconduct was *a* proximate cause of the economic loss they suffered by trading in the manipulated securities market").

[33] *See, e.g.,* ¶ 119 (alleging "both a temporary and a long term adverse effect on the market price of PHUN stock"), ¶ 120 (alleging the "impact of this spoofing activity extended beyond the specific spoofing cycle … because the market neither immediately nor fully rebounded from the manipulated prices once each of the Spoofing Episodes was completed."), ¶ 35 (citing expert analysis that manipulative trades can lead to permanent price impact).

manipulation is reserved for expert analysis at a later stage of the case. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) ("whether plaintiffs will be able to … measure price impact … [is a] question[] that go[es] to the merits"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-414 (S.D.N.Y. 2015) (expert analyses are not required even at the class certification stage).[34] Furthermore, as Plaintiff alleges, whether the prevailing market sentiment towards its stock at any particular moment was trending in a positive or negative direction does not alter the fact that the UBS's spoofing caused a negative impact on the price of its shares, depressing the price from what it would have been in an unmanipulated market. (¶ 119 n.19.)[35]

## VI.    **CONCLUSION**

For these reasons, the Court should deny Defendant's motion to dismiss in its entirety.[36]

---

[34] The only cases relied on by UBS are inapposite. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F. 3d 29 (2d Cir. 2009) is a class certification decision. In a later decision, the court in *CP Stone* held that the plaintiff had adequately pled loss causation based on nearly identical allegations to those at issue here. *CP Stone Fort Holdings LLC v. Doe(s)*, No. 1:16-cv-04991, at ECF 67 (N.D. Ill. Oct. 3, 2017). In *Lattanzio*, the plaintiff failed to even "allege that [defendant] Deloitte's misstatements concealed the risk of Warnaco's bankruptcy," which was the very disclosure that caused the issuer's stock to drop. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

[35] There is nothing contradictory (Def. Br. at 6-7) about the Complaint's allegations that UBS's spoofing had both a temporary and a long-term negative effect on Phunware's stock price. (*See, e.g.*, ¶ 119) This has been held to sufficiently plead loss causation in spoofing cases. *Harrington I*, 585 F.Supp.3d at 419-20 ("It would not be proper to draw the inference sought by Defendants – that individual spoofing events cannot have a long-term cumulative effect on the price of a stock – at the motion to dismiss stage. Whether the effects of the alleged market manipulation dissipated is a question of fact that can be answered only upon a more fully developed record.")

[36] Should the Court dismiss the Complaint, Plaintiff respectfully requests leave to amend. *See Chill v. Gen. Elect. Co.*, 101 F. 3d 236, 271 (2d Cir. 1996) ("In the securities litigation context, leave to amend is particularly appropriate[.]"); *In re Tufin Software Technologies Ltd. Sec. Litig.*, No. 20-cv-5646, 2022 WL 596861, at *11 (S.D.N.Y. Feb. 25, 2022) (in the Second Circuit, *"*[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.")

Dated: December 5, 2023
      New York, New York

Respectfully submitted,

By:  *Laura H. Posner*
   Laura H. Posner
   Michael B. Eisenkraft
   COHEN MILSTEIN SELLERS & TOLL PLLC
   88 Pine Street, 14th Floor
   New York, New York 10005
   Tel: (212) 838-7797
   Fax: (212) 838-7745
   lposner@cohenmilstein.com
   meisenkraft@cohenmilstein.com

   Raymond M. Sarola
   Cohen Milstein Sellers & Toll PLLC
   Two Logan Square
   100-120 N. 18th Street, Suite 1820
   Philadelphia, PA 19103
   Tel: (267) 479-5700
   Fax: (267) 479-5701
   rsarola@cohenmilstein.com

   *Counsel for Plaintiff*