**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

PHUNWARE, INC.,

                         Plaintiff,

            vs.                                               Docket No.  1:23-cv-06426

UBS SECURITIES LLC,

                         Defendant.

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**
**FOR FAILURE TO STATE A CLAIM**

CAHILL GORDON & REINDEL LLP
    Herbert S. Washer
    Tammy L. Roy
    Vishwani Singh
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com
vsingh@cahill.com

*Attorneys for UBS Securities LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

I.      THE COMPLAINT FAILS TO STATE A CLAIM ............................................................. 1

        A.      The Complaint Fails to Adequately Allege a Manipulative Act ............................ 1

        B.      The Complaint Fails to Adequately Allege a Strong Inference Of Scienter ........... 4

                1.      The Complaint Does Not Plead Motive and Opportunity ......................... 4

                2.      The Complaint Does Not Plead Conscious Misconduct or Recklessness .. 6

        C.      Plaintiff Fails To Adequately Allege Loss Causation ........................................... 8

II.     PLAINTIFF'S REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED ............ 10

CONCLUSION ....................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................................................2, 3

*In re Columbia Tuition Refund Action*,
  523 F. Supp. 3d 414 (S.D.N.Y. 2021)........................................................................9n

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd*, 107 F. App'x 250 (2d
  Cir. 2004) ..............................................................................................................5–6

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)......................................................................................6

*F5 Capital, a Cayman Islands Corp.* v. *Pappas*,
  2016 WL 900389 (S.D.N.Y. Feb. 17, 2016)..............................................................10

*Felske* v. *Hirschmann*,
  2012 WL 716632 (S.D.N.Y. Mar. 1, 2012) ...............................................................9

*Gamma Traders - I LLC* v. *Merrill Lynch Commods.*, *Inc.*,
  41 F.4th 71 (2d Cir. 2022) .........................................................................8, 10, 10n

*Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*,
  No. 22-cv-10185 (S.D.N.Y. Dec. 29, 2023) .......................................2n, 5n, 7n, 10n

*O'Brien* v. *Nat'l Prop. Analysts Partners*,
  719 F. Supp. 222 (S.D.N.Y. 1989) ...........................................................................3n

*SEC* v. *US Environmental Inc.*,
  155 F.3d 107 (2d Cir. 1998).......................................................................................4

*United States* v. *Coscia*,
  866 F.3d 782 (7th Cir. 2017) ....................................................................................7

**PRELIMINARY STATEMENT**[1]

As set out in UBS's opening brief, Plaintiff's allegations of a purported scheme by UBS to drive down the stock price of Phunware in order to save, at most, $10,000 over a two-year period provide no plausible basis to infer a manipulative act, a strong inference of scienter, or loss causation. In its Opposition, and notwithstanding that Plaintiff expressly declined the opportunity to amend its Complaint in response to Defendant's motion to dismiss,[2] Plaintiff seeks impermissibly to rewrite the allegations of its Complaint in several fundamental respects. It also fails to respond at all to several of Defendant's primary arguments, including that Plaintiff's market manipulation claim is based on the aggregation of the trading activity of numerous independent market participants who executed through UBS. Plaintiff's refusal to address these arguments effectively concedes them. The Complaint should be dismissed with prejudice.

**ARGUMENT**

**I.    THE COMPLAINT FAILS TO STATE A CLAIM**[3]

**A.    The Complaint Fails to Adequately Allege a Manipulative Act**

Plaintiff's Complaint is premised on its theory that someone engaged in a trading pattern suggestive of spoofing by "flood[ing] the markets with large quantities of Baiting Orders to sell," placing "*its* Executing Purchases" to purchase shares at lower prices, and then quickly cancelling "all of *its* Baiting Orders to sell." (Compl. ¶¶ 37–39.) Plaintiff's aggregation of the trading activity of UBS and its many customers to attempt to plead a manipulative act in furtherance of this

---

[1] Capitalized terms have the meaning ascribed in UBS's opening brief ("Def. Br.") (ECF No. 22). Plaintiff's Opposition (ECF No. 25) is referred to herein as "Opposition" or "Opp." Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

[2] *See* Pl. Oct. 16, 2023 Ltr to Court, ECF No. 23 ("Plaintiff . . . does not intend to amend its Complaint at this time and will rely on that pleading in opposing Defendant's motion to dismiss.").

[3] Plaintiff's failure to properly plead a manipulative act, scienter, and loss causation requires dismissal of Plaintiff's Exchange Act claims and its common law fraud claim. (Def. Br. at 10, 30.)

purported scheme is not only inconsistent with Plaintiff's own theory of the case but it fails to meet

the pleading requirements of this Circuit.  *See* Def. Br. at 11–15; *ATSI Commc'ns, Inc*. v. *Shaar*

*Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007) ("General allegations not tied to the defendants or

resting upon speculation are insufficient" to plead manipulation.).  By combining the trades of

different market participants, Plaintiff simply has not identified, as required, "what manipulative

acts were performed" or "which defendants performed them."  *ATSI*, 493 F.3d at 102.[4]

In its Opposition, Plaintiff fails to engage at all on this fundamental point, and instead just

repeatedly cites to Judge Schofield's decisions in *Harrington*, which allowed—without citation or

much reasoning—spoofing allegations against different broker-dealers to proceed to discovery.[5]

(*See, e.g.,* Opp. at 2–4, 11–13 (citing *Harrington*).)  Yet, neither *Harrington*, nor any other case

cited by Plaintiff, addresses the argument made here that aggregated trading activity across

numerous independent actors says nothing about anyone's trading pattern or intent.  (Def. Br. at

11–15.)  Nor do Plaintiff's cases address the clear conflict between Plaintiff's speculative pleading

---

[4] The scheme Plaintiff asks this Court to infer is all the more implausible given Plaintiff's clarification that the purported scheme was to manipulate the price of Phunware ***exclusively*** on the Nasdaq, (*see* Opp. at 2), notwithstanding the publicly-known fact that Phunware is traded on numerous exchange and off-exchange venues, *e.g.,* NYSE, (https://www.nyse.com/quote/XNCM:PHUN), Cboe (https://www.cboe.com/us/equities/market _statistics/book/phun/), *etc*.  A limited snapshot of trades on the Nasdaq—ignoring trades across other available trading venues—simply says nothing plausible about UBS's overall position in Phunware (*see* Opp. at 18), ratios of orders-to-purchases (*id.* at 21–22), or whether an "imbalance" existed "in the market for Phunware shares" (*id*. at 2).  In this regard, this case differs from other spoofing cases that were based on ***all*** trading by a particular trader or ***all*** trading of a security across most or all venues on which the security trades.  *See, e.g., Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, No. 22-cv-10185 (S.D.N.Y. Dec. 29, 2023) ("*Northwest* Slip Op.").

[5] Plaintiff's over-reliance on *Harrington* is not surprising given that *Harrington* is the only case Plaintiff cites that permitted spoofing claims against a broker-dealer based on the combined trading activity in its own account and the accounts of its customers.  Defendant is aware of only one other decision that has accepted a similar pleading tactic:  Magistrate Judge Stein's report and recommendation in *Northwest.* Respectfully, UBS submits that these decisions—which necessarily rest on speculative assumptions about the trading of the defendant—are inconsistent with the Second Circuit's decision in *ATSI* and should not be followed.

2

tactic and the Second Circuit's decision in *ATSI*.  In fact, Plaintiff dismisses *ATSI* only in a footnote (Opp. at 18 n.15), failing to address that the deficient complaint in *ATSI* also rested heavily (as the Complaint does here) on mere assumptions about the defendants' alleged trading.  *See ATSI*, 493 F.3d at 103 (affirming dismissal of "speculative" allegations that allegedly manipulative "high-volume selling" must have done by defendants because they were the only ones "with large enough blocks of shares to trade at the observed volumes").

Instead of addressing this fatal flaw, Plaintiff makes two arguments that attempt to re-write the allegations of its Complaint.  ***First***, Plaintiff asks this Court to ignore the fact that the alleged spoofing activity in the Complaint "may have been entered on behalf of one or more clients" because, Plaintiff argues, "UBS cites no evidence to support this improper factual assertion." (Opp. at 3.)  But this is ***not UBS's*** factual assertion; it is an allegation of ***Plaintiff's*** Complaint:

> The spoofing activity that forms the basis of the claims in this action may have been executed by Defendant for its own account, for which it acted as a dealer, ***or for client accounts, for which it acted as a broker.***  (Compl. ¶ 19.)

Plaintiff omits any mention of this allegation, arguing instead that this Court should just assume that "the trading at issue was done ***by UBS for UBS's own proprietary account***, not at the direction of some unidentified (and non-pleaded) 'broker-dealer customers.'"  (Opp. at 19 (emphasis in original).)[6]  This is simply not what was pled in the Complaint, and it should be disregarded.[7]

---

[6] Plaintiff asks this Court to make this assumption because, it now claims, deanonymized Nasdaq data like the data on which Plaintiff bases its claim "is ***only*** available to the public when the entity is acting as a market maker" in its own proprietary account.  (Opp. at 19 (citing Compl. ¶¶ 91–98) (emphasis in original).)  This distorts both the Complaint and Nasdaq rules, neither of which state (nor could state) that a market maker's deanonymized (or "attributable") trades are limited to trades made by a market maker for its own principal account.  And, as Nasdaq further recognizes, "[a] market maker is a Nasdaq member firm that buys and sells securities at prices it displays in Nasdaq for its own account (principal trades) ***and for customer accounts (agency trades)***."  *See* The Nasdaq Stock Market, Form 1 – Exhibit E, at 1, https://www.sec.gov/pdf/nasd1/systems.pdf.

[7] *See, e.g., O'Brien* v. *Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[A] Complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

*Second*, Plaintiff suggests—for the first time in its Opposition—that some unidentified customer or customers of UBS may have engaged in spoofing and that UBS can be held accountable for the conduct of such customers.  (Opp. at 20.)  This theory appears nowhere in the Complaint.[8]  Moreover, it mischaracterizes UBS's argument.  UBS is not asserting a purported "broker immunity defense." (Opp. at 3, 20.)  Rather, as set out above, UBS argues that because the Complaint is premised on an aggregation of the disparate trading of numerous independent market participants, it has not adequately pled that any entity—UBS or any of its clients—engaged in an unusual trading pattern suggestive of spoofing.  *Cf.  SEC* v. *US Environmental Inc.*, 155 F.3d 107, 109 (2d Cir. 1998) (cited in Opp. at 20–21) (finding market manipulation adequately pled where SEC alleged a specific stock promoter had engaged in manipulative trading and that defendant followed promoter's directions to execute trades defendant knew were manipulative).

B.     **The Complaint Fails to Adequately Allege a Strong Inference Of Scienter**

Plaintiff's Opposition does not change the conclusion that the Complaint fails to plead facts demonstrating either a "motive and opportunity" to commit fraud or "strong circumstantial evidence of conscious misbehavior or recklessness." (Def. Br. at 15–23.)

1.     **The Complaint Does Not Plead Motive and Opportunity**

As set out in Defendant's opening brief, it defies economic reason to assume UBS would be motivated to manipulate the market to save $10,000 over two years.  (Def. Br. at 16–18.)

In its Opposition, Plaintiff takes issue with the fact that UBS added up the "savings" that Plaintiff alleges across the "1,021 distinct Executing Purchases" listed in Exhibit 1 of Plaintiff's

---

[8] Plaintiff cites the later opinion in *Harrington II* in support of its argument, omitting that, in *Harrington II*, plaintiffs affirmatively elected to amend their Complaint specifically to allege, *inter alia*, that it "seeks to hold Defendants primarily liable for their own conduct in . . . following the directions of their customers to disseminate and/or effect Baiting Orders."  Second Amended Complaint ¶ 4, *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets*, No. 21-cv-00761 (S.D.N.Y. Nov. 16, 2022), ECF No. 125-1.  No such allegation is made here.

Complaint (which aggregates to less than $10,000).  (Opp. at 26; Def. Br. at 17.)  Plaintiff claims

such math is a matter "for expert analysis after discovery."  (Opp. at 27.)  But there is no legitimate

basis to ask this Court to ignore what is obvious from the face of Plaintiff's own Complaint.  UBS

did not do expert calculations or make assumptions; it simply added up the numbers in Plaintiff's

own Exhibit.[9]

Citing *Harrington*, Plaintiff next argues that, in addition to this "savings," one must also

factor in the "profit that UBS made from selling its Executing Purchases at later periods for gain."

(Opp. at 26.)  Such an argument not only requires multiple levels of improper speculation (*see* Def.

Br. at 17 n.11) but it also double-counts any purported benefit.   Nonetheless, even accepting

Plaintiff's argument that such later sales are relevant to a motive analysis, simply doing the math

again on Plaintiff's Exhibit 1 reveals that these subsequent sales led to supposed additional

"profits" of ***less than $150,000*** over the two-year period[10]—an amount that still falls far short of

pleading a plausible motive for a large global bank.  *See* Def. Br. at 17–18; *In re Duane Reade Inc.*

*Sec. Litig.* 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003) (holding motive allegations

insufficient where "it would have been illogical" for large drug store chain to commit fraud to save

---

[9] For each alleged Executing Purchase in Exhibit 1, Plaintiff sets out an alleged per share savings
(*i.e.,* "Best Offer" minus Executing Purchase "Price") and an alleged volume purchased.  One need
only multiply the per share savings by the volume, and then aggregate the savings across the "1,021
distinct Executing Purchases," to calculate a total savings of $9,287.38, *i.e.,* less than $10,000.

[10] For each Executing Purchase for which UBS purportedly purchased Phunware shares at a
discount, in the last columns of its Exhibit 1, Plaintiff then pleads two alternative sales in which
UBS allegedly further profited.  UBS (1) multiplied the volume of the allegedly discounted shares
and the purported later price difference; and (2) took the ***highest*** of each of Plaintiff's alternatives
to calculate further purported maximum "profits" of $147,110.25, *i.e.*, less than $150,000.  Again,
in calculating this number, UBS made no assumptions.  The amounts on which UBS relies are the
total numbers across ***all*** at-issue transactions pled in the Complaint using the numbers in Plaintiff's
own exhibit.  In this regard, this case stands in contrast with *Northwest*, where the defendants'
motive arguments relied on calculations using only a portion of the at-issue transactions and annual
discount averages, and did not calculate the purported profits associated with the subsequent sales
of securities purchased at allegedly discounted prices.  *Northwest* Slip Op., at 56.

money on acquisitions totaling $4.7 million"), *aff'd*, 107 F. App'x 250 (2d Cir. 2004).

Notably, while Plaintiff asks this Court to refrain from relying on the actual numbers pled in its Complaint, Plaintiff continues to assert—without support—that UBS made "hundreds of millions of dollars" through its purchases of Phunware stock.  (Opp. at 10.)  As explained in Defendant's opening brief (*see* Def. Br. at 16), simple math contradicts Plaintiff's number.

To bolster the meagre profit allegations in the Complaint, in its Opposition, Plaintiff attempts to borrow from the *Harrington* complaint, quoting *Harrington*'s reference to "paid transaction fees" and "hundreds of thousands of dollars in saved execution costs" (Opp. at 25)—two alleged motives that appear **nowhere** in the Complaint **in this case**.  Moreover, such new allegations are not only procedurally improper, they are futile as "[m]otives that are common to most corporate officers" do not properly plead scienter.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

Finally, in a last attempt to manufacture a motive, Plaintiff argues—for the first time and without a single factual allegation in support—that this Court should simply assume that UBS was using the same alleged "spoofing" algorithms "across all securities and markets" in which it traded. (Opp at 26–27.)  Such brand-new and, in any event, unsupported claims should be disregarded.

### 2.      The Complaint Does Not Plead Conscious Misconduct or Recklessness

The far more plausible inference from the alleged trading activity in the Complaint is that UBS was engaged in routine, lawful market activity as a broker-dealer, executing orders, trades and cancellations at the direction of its customers.  (Def. Br. at 18–23.)

Nonetheless, in its Opposition, Plaintiff claims that it has met its high burden to plead conscious misconduct or recklessness because the Complaint is drafted to echo a handful of cases where courts have found that the requisite wrongful intent of an individual trader could be inferred

6

from that trader's purportedly unusual "pattern of trading."[11]   However, Plaintiff offers no meaningful response to Defendant's argument that these cases simply say nothing about whether one can glean anything at all about the intent of a broker-dealer based on the aggregated trading of its various customers.  (Def. Br. at 19.)  Plaintiff's only attempt to explain its pleading tactic of aggregating trades is to argue that "shares are fungible" (Opp. at 24 n.24)—which offers nothing to support the inferential leap Plaintiff asks this Court to make about intent.[12]

Plaintiff also mischaracterizes several of Defendant's arguments.  For example, UBS does not argue that Plaintiff must "identify the clients" who engaged in the trading activity pled in the Complaint.  (Opp. at 24 n.24.)  But Plaintiff does have to offer some factual support to assume that *someone* (either UBS or one or more of its clients) acted in a manner that is suggestive of scienter. Similarly, UBS did not argue that the Seventh Circuit held in *United States* v. *Coscia* that "all baiting orders must be cancelled within milliseconds." (Opp. at 23.)  But *Coscia* is instructive in that it recognized that a trader "risk[s] extremely large amounts of money" by keeping a bid in the market for more than mere milliseconds.  866 F.3d at 787.  Thus, where, as here, an order is left in the market for longer than mere milliseconds, a competing nonculpable inference may be that the trader did intend to trade.  (Def. Br. at 20–21.)

---

[11] *See* Opp. at 7–10, 16 (citing *CFTC* v. *Skudder*, 2022 WL 17752392 (spoofing claims pled against individual trader); *CP Stone Fort Holdings, LLC* v. *Doe(s)*), 2017 WL 1093166 (spoofing claims pled against various John Doe Defendants); *United States* v. *Coscia*, 866 F.3d 782, 797 (7th Cir. 2017) (individual trader); *CFTC* v. *Oystacher*, 203 F.Supp.3d at 942 (individual trader)).

[12] In *Northwest*, in analyzing the manipulative act element, the court found it could not accept the broker-dealer defendants' "version of the facts" that at-issue trades were executed at the direction of their customers, notwithstanding allegations that these trades may have been executed for client accounts.  (*Northwest* Slip Op., at 39–40).  In a scienter analysis, however, this Court is required to consider competing inferences based on the facts alleged.  (Def. Br. at 15.)  The far more compelling inference from the aggregated trading activity of a broker-dealer is that most, if not all, trades were in fact conducted at the direction of its customers.  Indeed, it is not a reasonable inference at all to assume aggregated trading activity reflects *only* the decisions and intent of the broker-dealer, let alone that it pleads that anyone traded with an intent to manipulate the market.

Finally, UBS does not argue, as Plaintiff suggests, that caselaw requires that "parking . . . be alleged in every spoofing instance." (Opp. at 24.) Rather, UBS argues that Plaintiff's parking allegations—on which Plaintiff places great emphasis—contradict Plaintiff's own theory of spoofing because the alleged "Baiting Orders" include offered prices that were in some instances **lower than** the alleged "*bona fide*" orders that Plaintiff claims UBS was "parked" behind. (Def. Br. at 21–22.) And again Plaintiff misrepresents its own Complaint by arguing—without citation—that it has alleged "thousands of repeated instances of parking Baiting Orders." (Opp. at 21.) In fact, the Complaint offers only *four* purported instances of parking across the purportedly "82 million Baiting Orders" alleged in the Complaint (Compl. ¶ 9).[13] (*See* Def. Br. at 21.)

For the reasons set forth above and in Defendant's opening brief, Plaintiff simply has not met its burden to plead facts sufficient to plead a strong inference of scienter that is at least as compelling as any opposing inference one could draw from the facts alleged.

### C.  Plaintiff Fails To Adequately Allege Loss Causation

Plaintiff was required to plead a plausible connection between its sales of "over 34 million shares of PHUN stock . . . [at allegedly] artificially depressed" prices (Compl. ¶ 117) and "[Defendant's alleged spoofing], and that [Plaintiff was] harmed as a result." *Gamma Traders - I LLC* v. *Merrill Lynch Commods., Inc.*, 41 F.4th 71, 81 (2d Cir. 2022); Def. Br. at 23–24. For the multiple reasons set out in Defendant's opening brief, and below, Plaintiff has not done so.

*First*, in its Opposition, Plaintiff does not even attempt to respond to Defendant's argument that more than one-third of the alleged "depressed" sales at issue occurred before the alleged

---

[13] Plaintiff argues that UBS "attempt[s] to manufacture a dispute over" the number of alleged Baiting Orders because UBS pointed out that the Complaint is internally inconsistent on this allegation as well. (Def. Br. at 8.) But even accepting Plaintiff's correction in its Opposition that the 82 million number refers to "shares of Baiting Orders to sell" (Opp. at 17 n.14), Plaintiff still does not address UBS's argument that this number is grossly overstated on the face of Plaintiff's Exhibit 1 because it is the result of adding up numerous duplicative rows. (Def. Br. at 8.)

manipulation began.  (Def. Br. at 24.)  Plaintiff's silence concedes that such sales are not part of

this case.  *See, e.g., Felske* v. *Hirschmann*, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A

plaintiff effectively concedes a defendant's arguments by his failure to respond to them.").

***Second***, in defending its claims as to the remaining allegedly damaged sales, Plaintiff yet

again misrepresents its own allegations.  Plaintiff claims that it pled "detail demonstrating that

Phunware sold millions of shares of stock ***on the same day*** as Defendant UBS engaged in spoofing

. . . ***often just seconds and minutes after***."  (Opp. at 27–28 (citing Compl. ¶ 118).)  This again

distorts Plaintiff's allegations.  The Complaint pleads that there was only ***one*** **day**—October 21,

2021—where Plaintiff sold shares on the same day on which spoofing activity allegedly occurred.

Even then, there was nearly a two hour gap between the time of the alleged spoofing and Plaintiff's

sale of shares, and a great many unrelated forces will have impacted the share price during that

interval.  And in nearly all other instances, there were days, weeks and even months between the

alleged spoofing incident and Plaintiff's sales of shares, yet Plaintiff does not even attempt to plead

an adequate connection between the spoofing and the eventual sale of shares.  (Def. Br. at 27.)[14]

Plaintiff's citation to *Harrington I* only further highlights that Plaintiff's Complaint falls

far short of the types of loss causation allegations sometimes accepted by other courts.  As

described by Plaintiff, in *Harrington I*, plaintiff alleged that it "traded on ***twenty-seven***" days on

which alleged spoofing incidents had occurred and had further alleged that "the spoofing depressed

the price ***for up to fifteen minutes***."  (Opp. at 27 n.32.)  Here, the Complaint identifies only a

---

[14] Plaintiff's internally inconsistent allegations about two additional days on which it may have traded on days of alleged spoofing incidents should be disregarded, particularly since Plaintiff declined to amend its Complaint to correct these inconsistencies identified by Defendant in its opening brief.  Def. Br. at 27 n.21; *see, e.g., In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 424 n.1 (S.D.N.Y. 2021) ("[A] court is neither obligated to reconcile nor accept . . . contradictory allegations in . . . pleadings as true in deciding a motion to dismiss.").

single day where trading occurred on the day of alleged spoofing (albeit hours later), and makes

no attempt at all to plead "how long it takes for the market price to return to a non-artificial level

after a spoof," *Gamma Traders*, 41 F.4th at 80, as the plaintiffs in *Harrington I* did.[15]

      ***Third***, Plaintiff does not respond at all to Defendant's argument that, in each of the six

alleged "Example Episodes" of spoofing (*i.e.,* the only instances that Plaintiff even tries to plead

with particularity), Plaintiff's purportedly "depressed" sale occurred ***months*** after the alleged

spoofing activity.  (Def. Br. at 7–8, 26.)  Nor does Plaintiff respond to Defendant's argument about

the Complaint's conflicting allegations that (1) Defendant (or one of its customers) benefited from

the purported scheme by allegedly selling shares ***the day of or the day following*** alleged spoofing

activity after the alleged artificial impact on the price had dissipated; and yet (2) Plaintiff was

allegedly damaged when it sold shares ***months after*** the same purported incidents.  (Def. Br. at

25–26.)  Again, Plaintiff's failure to respond to these points effectively concedes them.

## II.      PLAINTIFF'S REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED

      The Court should reject Plaintiff's footnote request for leave to amend.  (Opp. at 29 n.36.)

Plaintiff offers no explanation as to how an amendment could address the deficiencies in its claims.

*See, e.g., F5 Capital, a Cayman Islands Corp.* v. *Pappas*, 2016 WL 900389, at *11 (S.D.N.Y. Feb.

17, 2016) ("Absent any identification of how a further amendment would improve upon the

[c]omplaint, leave to amend must be denied as futile.").  Moreover, Plaintiff had the opportunity

to amend its Complaint in response to Defendant's motion to dismiss and affirmatively declined

to do so.  (ECF No. 23.)  Under such circumstances, dismissal should be with prejudice.

---

[15] In the absence of factual allegations of "how long it takes for the market price to return to a non-artificial level after a spoof," a court cannot "reasonably infer that spoofing effects last throughout the day." *Gamma Traders*, 41 F.4th at 80. *See also Northwest* Slip Op., at 71–73 (finding loss causation not pled in spoofing case where allegedly damaged sales did not occur within the hour of an alleged spoofing episode and plaintiff failed to plead sufficient facts to support its theory that the alleged spoofing affected the market for a longer time period).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed it its entirety with prejudice.


Dated: January 4, 2024                                    **CAHILL GORDON & REINDEL LLP**
       New York, New York

                                      By: /s/ *Herbert S. Washer*
                                         Herbert S. Washer
                                         Tammy L. Roy
                                         Vishwani Singh
                                 32 Old Slip
                                 New York, New York 10005
                                 Telephone: (212) 701-3000
                                 Facsimile: (212) 269-5420
                                 hwasher@cahill.com
                                 troy@cahill.com
                                 vsingh@cahill.com

                                 *Attorneys for UBS Securities LLC*

11