UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHUNWARE, INC., <br><br>                Plaintiff, <br><br>        v. <br><br> UBS SECURITIES LLC, <br><br>                Defendant. | 23 Civ. 6426 (DEH) <br><br> **OPINION <br> AND ORDER** |

DALE E. HO, United States District Judge:

In this action, Plaintiff Phunware, Inc. brings claims under Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and New York common law against Defendant UBS Securities LLC, a broker-dealer. Plaintiff alleges that Defendant engaged in "spoofing" of Plaintiff's stock, a practice in which a market participant first places numerous false orders to artificially inflate or depress a security's price, then takes advantage of the impact to transact at the affected price, and finally cancels the initial false orders. Defendant moves to dismiss. *See* ECF No. 21. For the reasons given below, Defendant's motion is **GRANTED**, though Plaintiff may seek leave to amend the Complaint.

**BACKGROUND**

The following facts are taken from the Complaint and are assumed to be true solely for purposes of adjudicating Defendant's motion. *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

Plaintiff is a publicly traded company whose shares are publicly traded on the Nasdaq under the symbol "PHUN." Compl. ¶ 14, ECF No. 1. Defendant is a registered broker-dealer that executes securities transactions. *Id.* ¶ 15.

From January 5, 2021, to March 15, 2023, Defendant engaged in spoofing, a form of market manipulation, of PHUN. *Id.* ¶ 1. Defendant's spoofing consisted of, first, placing a large

quantity of orders to sell PHUN, which induced the entry of sell orders from other market

participants and drove the price of PHUN downward; second, purchasing a much smaller

quantity of PHUN shares at the depressed price; and third, cancelling the initial batch of sell

orders.  The Complaint describes six examples of Defendant engaging in this behavior:

> **Example 1: April 27, 2021, 9:30:36 A.M.**[1]  PHUN was trading at $1.63 (bid) -
> $1.64 (ask) per share.  From 9:30:00 to 9:30:36, Defendant placed orders to sell
> 404,486 shares of PHUN, at prices of at least $1.70 per share, depressing the
> share price.  In the following two minutes, Defendant did not execute any sell-
> side orders for PHUN.  However, after placing the orders, Defendant purchased
> 100 shares at the depressed price of $1.63 and then began to cancel orders to sell
> within 365 microseconds of the executed purchases, eliminating its sell-side
> imbalance within two minutes.  *See id.* ¶¶ 49-55.

> **Example 2: October 26, 2021, 9:30:04 A.M.**  PHUN was trading at $6.25 (bid) -
> $6.26 (ask) per share.  From 9:28:04 to 9:30:04, Defendant placed orders to sell
> 13,288 shares of PHUN, at prices of at least $6.75 per share, depressing the share
> price.  In the subsequent two minutes, Defendant executed less than 10% of these
> orders.  After placing the orders, Defendant purchased 50 shares at the depressed
> price of $6.25, and began cancelling the unfulfilled orders within 3.6 seconds,
> eliminating its sell-side imbalance within two minutes.  *See id.* ¶¶ 56-61.

> **Example 3: October 27, 2021, 9:30:36 A.M.**  PHUN was trading at $4.85 (bid) -
> $4.87 (ask) per share.  From 9:28:36 to 9:30:36, Defendant placed orders to sell
> 19,820 shares of PHUN, at prices of at least $5.09 per share, depressing the share
> price.  In the subsequent two minutes, Defendant only executed around 22% of
> these orders.  After placing the orders, Defendant purchased 824 shares at a price
> of $4.85, and then began cancelling the unfulfilled orders within 25 seconds,
> eliminating its sell-side imbalance within two minutes.  *See id.* ¶¶ 62-68.

> **Example 4: October 28, 2021, 9:31:30 A.M.**  PHUN was trading at $4.70 (bid) -
> $4.72 (ask) per share.  From 9:29:30 to 9:31:30, Defendant placed orders to sell
> 1,320,303 shares of PHUN, at prices of at least $4.95 per share, depressing the
> share price.  In the subsequent two minutes, Defendant did not execute any sell-
> side orders for PHUN.  After placing the orders, Defendant purchased 100 shares
> at the depressed price of $4.70 per share, and then began cancelling orders within
> 399 microseconds of the purchases, eliminating its sell-side imbalance within two
> minutes.  *See id.* ¶¶ 69-74.

> **Example 5: November 8, 2021, at 9:31:11 A.M.**  PHUN was trading at $4.10
> (bid) - $4.11 (ask) per share.  From 9:29:11 to 9:31:11, Defendant placed orders

---

[1] Timestamps are presented rounded to the nearest second for the ease of the reader.

to sell 1,312,327 shares of PHUN, at prices of at least $4.16 per share, depressing the share price. In the subsequent two minutes, Defendant did not execute any sell-side orders for PHUN. Defendant then purchased 440 shares at $4.10 per share, and then began cancelling orders within 167 microseconds of the purchases, eliminating its sell-side imbalance within two minutes. *See id.* ¶¶ 75-81.

**Example 6: March 15, 2023, at 9:30:21 A.M.** PHUN was trading at $0.77 (bid) - $0.771 (ask) per share. From 9:28:21 to 9:30:21, Defendant placed orders to sell 82,549 shares of PHUN, at prices of at least $0.771 per share. In the subsequent two minutes, Defendant did not execute any sell-side orders for PHUN. Defendant then purchased 167 shares at $0.77 per share, and then began cancelling orders within one minute of the purchases, eliminating its sell-side imbalance within two minutes. *See id.* ¶¶ 82-88.

During the period of the spoofing scheme, Defendant's behavior with respect to PHUN differed from that of other market participants. Defendant's ratio of submitted sell-side orders to actual purchases of PHUN was more than four times higher than other market participants, *id.* ¶ 44, its proportion of cancelled sell-side orders of PHUN was much higher than that of other market participants, *id.* ¶ 45, and it left its orders open for a shorter period of time than other market participants, *see id.* ¶¶ 54, 67, 80, 87. Defendant's trading with respect to PHUN also differed from what one would expect from a market maker. In the period after executing the spoofed purchases, Defendant's most aggressive sell-side orders for PHUN were, on median, 86.67% as aggressive as the most aggressive orders in the Nasdaq order book. *Id.* ¶ 97. This differs from how a *bona fide* market maker would act—trading aggressively, to help flatten its inventory after executing purchases—and from how Defendant placed sell-side orders for PHUN following non-spoofed purchases. *See id.* ¶¶ 97-98.

In total, during the relevant period of the spoofing scheme, Defendant executed purchases for 647,119 shares of PHUN at prices depressed by its activity. *Id.* ¶ 42. In addition to the temporary drop during the spoofing episodes, PHUN's share price never fully rebounded from

the dips caused by Defendant's activity. *Id.* ¶ 120. Plaintiff sold over 34 million shares of its own stock at prices depressed by Defendant's spoofing. *Id.* ¶ 117.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. New York Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[2] "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. However, the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). Rule 9(b) requires that "a party . . . state with particularity the circumstances constituting fraud or mistake." The PSLRA "expanded on the Rule 9(b) standard." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA requires that a plaintiff "(1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter—the required state of mind." *Set Cap. LLC*, 996 F.3d at 75.

---

[2] In all quotations from cases, the Court omits citations, footnotes, emphases, internal quotation marks, brackets, and ellipses, unless otherwise indicated. All references to Rules are to the Federal Rules of Civil Procedure.

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device." 15 U.S.C. § 78j(b).  To establish a claim under § 10(b), a plaintiff must plead "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022).

Section 9(a)(2) of the Exchange Act prohibits "effect[ing] . . . a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2).  To state a claim under § 9(a)(2), a plaintiff must show "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others." *SEC v. Gallagher*, No. 21 Civ. 8739, 2023 WL 6276688, at *14 (S.D.N.Y. Sept. 26, 2023).  Section 9(f), which creates a cause of action for violations of § 9(a), *see* 15 U.S.C. § 78i(f), also requires that "the price of the security that is purchased or sold be affected by the violation." *Xu v. Direxion Shares ETF Tr.*, No. 22 Civ. 5090, 2023 WL 5509151, at *6 (S.D.N.Y. Aug. 25, 2023).  "The analysis of claims under [§] 9(a) closely parallels the analysis of claims under [§] 10(b)." *Stone Family Tr. v. Credit Suisse AG*, No. 19 Civ. 5192, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022); *accord Set Cap. LLC*, 996 F.3d at 82 (articulating the elements of claims under § 9(a) and § 10(b) as identical).

The elements of New York common law fraud are "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and

damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009). "[T]he elements of claims for federal securities fraud and New York common law fraud are nearly identical[.]" *Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x 35, 38 n.2 (2d Cir. 2020); *accord Anschutz Corp.*, 690 F.3d at 110 n.15 (affirming dismissal of a common law fraud claim because it "suffer[ed] from the same deficiencies as [the] claims under § 10(b)").

## DISCUSSION

Defendant argues that the Complaint fails to adequately plead: (1) a manipulative act, (2) facts to support a strong inference of scienter, and (3) loss causation, required elements for each of Plaintiff's causes of action. Although the Complaint adequately pleads a manipulative act and scienter, Defendant's motion is granted because the Complaint fails to adequately plead loss causation.[3]

### A.   Manipulative Act

First, the Complaint adequately pleads a manipulative act. "[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). "This test will be satisfied if the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.*

The Complaint does so: it alleges that Defendant engaged in a spoofing scheme to artificially depress the price of PHUN, which had the effect of lowering PHUN's trading price.

---

[3] Because Plaintiff is given permission to seek leave to amend, the Court addresses Defendant's arguments as to the other elements of Plaintiff's claims.

*See* Compl. ¶¶ 30-32 (nature and purpose of spoofing generally), ¶ 36 (intent and effect of spoofing scheme with respect to PHUN), ¶ 41 (effect of scheme to artificially depress PHUN's share price), ¶ 43 (scope of the scheme).  It satisfies the requirement of pleading the scheme "with particularity," *ATSI Commc'ns*, 493 F.3d at 102, by providing specific examples of six episodes of Defendant engaging in spoofing behavior, as described above.  *See* Compl. ¶¶ 49-88. Together, these allegations are sufficient to "set[] forth, to the extent possible" the conduct constituting market manipulation in light of the stage of proceedings.  *Compare ATSI Commc'ns*, 493 F.3d at 102 ("A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."), *with* Compl. ¶ 36 n.8 (noting that the Complaint derives its factual allegations from "the complete stream of deanonymized order book messages on the Nasdaq market," which represents "only a fraction of order flow in PHUN's shares").

Defendant's arguments to the contrary fail.  First, it argues that the Complaint improperly combines the conduct of different market participants, namely Defendant and its clients, and that no pattern of behavior can be inferred from Defendant's trades, as they were placed by different actors.  However, it is not the case, as Defendant argues, that the Complaint "acknowledges" the trades "may have been executed at the direction of one or more of [Defendant's] many customers."  Mem. of L. in Supp. of Def.'s Mot. to Dismiss the Compl. ("MTD Br.") 13, ECF No. 22.  The Complaint states only that the trading "may have been executed by Defendant . . . for client accounts, for which [Defendant] acted as a broker," Compl. ¶ 19, which is distinct from executing the trades on a client's orders.  In any event, the thrust of the Complaint's allegations is that Defendant "specifically designed and implemented algorithmic trading programs to execute its spoofing schemes" and substantively controlled the trading strategies alleged.  *Id.*

¶ 100.  Courts in this District have held that claims based on similar allegations adequately state

a claim, rejecting arguments akin to Defendant's, that a complaint must tie trading activity to

particular clients or accounts.  *See Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC*,

No. 22 Civ. 10185, 2023 WL 9102400, at *18 (S.D.N.Y. Dec. 29, 2023) ("[Plaintiff] need not

allege that Baiting Orders were placed and cancelled by clients, let alone the same client, . . .

[because] Plaintiff's theory of the case . . . focuses on Defendants' control over the high-speed

trading algorithms and Defendants' responsibility to monitor such algorithms."), *adopted by*

2024 WL 620648 (S.D.N.Y. Feb. 14, 2024); *Harrington Glob. Opportunity Fund, Ltd. v. CIBC

World Mkts. Corp.*, 585 F. Supp. 3d 405, 416 (S.D.N.Y. 2022) ("That the Complaint mentions

that Defendants trade for their own proprietary accounts and the accounts of their customers does

not undercut the Complaint's numerous allegations that Defendants designed and operated the

algorithms that spoofed Concordia stock.").

     Next, Defendant argues that the mere fact of cancellations, including those shortly after

an order is placed, is insufficient to plead a manipulative act.  Defendant also argues that the

Complaint circularly defines Baiting Orders as those that were cancelled after being placed.  *See*

MTD Br. 13-15.  These arguments fail because the Complaint includes allegations beyond the

mere placement of orders that were later cancelled.  The Complaint alleges that the spoofing

episodes it describes were anomalous, based on, among other things, the timing and large

increase in the number of overall sell-side orders and cancelled sell-side orders per executed

purchase, *see* Compl. ¶¶ 44-46, and Defendant's behavior following the episodes, in which it did

not aggressively price sell-side orders to flatten its inventory, *see id.* ¶ 97.  These and other

indicators of scienter, discussed *infra*, are enough to distinguish between legitimate market

activity and manipulation.  These anomalies also suggest that the Complaint is not simply

grouping sell-side orders of PHUN that were cancelled after purchases of that stock, and

arbitrarily naming them "baiting orders." *Cf. Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, No. 21 Civ. 761, 2023 WL 6316252, at *6 (S.D.N.Y. Sept. 28, 2023) ("[Plaintiff] distinguishes baiting orders from other sell orders by the fact that none of the sell orders in the illustrative examples were ever executed, and instead functioned to manipulate the market to enable Defendants' purchase of Concordia securities at lower prices."). Instead, the Complaint alleges behavior distinct enough from other market-makers (including Defendant, with respect to other securities) to adequately plead market manipulation, even if that behavior consists of otherwise lawful market activity. *See Set Cap. LLC*, 996 F.3d at 77 ("[I]t is no defense that Credit Suisse's transactions were visible to the market and reflected otherwise legal activity. Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent.").

**B.   Scienter**

Next, the Complaint adequately pleads scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To establish scienter under this standard, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap. LLC*, 996 F.3d at 78. "A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).

"Th[e] pleading requirement [of scienter] is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *ATSI Commc'ns*, 493 F.3d at 102. In the context of spoofing, which

consists of otherwise permissible market activity, courts looked to various indicia differentiating market manipulation from legitimate trading for purposes of scienter, including (1) a short period of time, often milliseconds, between placing and cancelling orders and between executing transactions and cancelling orders on the other side of the market, (2) the cancellation of orders when some orders on the same side of the market are partially or completely fulfilled, (3) "parking" baiting orders behind legitimate orders placed by other traders to ensure they are not fulfilled, (4) large disparities between volume of alleged baiting orders on one side of the market and executed orders on the other, and (5) other conduct unlike ordinary market making activity. *See Northwest Biotherapeutics, Inc.*, 2023 WL 9102400, at \*15; *Harrington Glob. Opportunity Fund, Ltd.*, 2023 WL 6316252, at \*6; *Harrington Glob. Opportunity Fund, Ltd.*, 585 F. Supp. 3d at 417; *Kessev Tov, LLC v. Doe(s)*, Nos. 20 Civ. 4947, 20 Civ. 4948, 2022 WL 2356626, at \*7-8 (N.D. Ill. June 30, 2022); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16 Civ. 4991, 2017 WL 1093166, at \*3-4 (N.D. Ill. Mar. 22, 2017).

The allegations in the Complaint are sufficient to suggest conscious or reckless misbehavior, establishing scienter. The Complaint alleges that during the spoofing episodes, Defendant's behavior trading PHUN departed from that of a *bona fide* market maker in various ways: Defendant placed orders creating a large imbalance in its order book, rather than taking advantage of the spread, *see* Compl. ¶¶ 94, 106, and placed sell-side orders as part of the initial step of the spoofing scheme that were much larger in terms of number of shares than Defendant's executed sell-side orders and executed purchases, *see id.* ¶¶ 109, 112. After executing purchases during the spoofing episodes, Defendant immediately began cancelling the large quantity of sell-side orders, often within fractions of a second, *see id.* ¶¶ 53, 60, 66, 73, 79, 86 107, 108, and this volume of cancelled orders dwarfed executed sell-side orders, *see id.* ¶ 109, as well as the executed purchases, *see id.* ¶ 111. Defendant also cancelled a noticeably larger percentage of its

sell-side orders than its buy-side orders during the baiting periods.  *See id.* ¶ 114 (81% versus 64%).  Taken together, this is enough to raise a strong inference that Defendant was consciously engaging in spoofing, rather than legitimate market activity, satisfying the element of scienter.

Defendant's arguments to the contrary fail.  First, it argues that the Complaint pleads only facts that would apply to every broker-dealer.  MTD Br. 18-19.  However, as detailed above, the Complaint alleges activity that, although accomplished through legitimate market practices, departs from ordinary behavior for market participants.  *See, e.g.*, Compl. ¶¶ 94-97 (alleging that market makers ordinarily seek to maintain a flat inventory position and would generally aggressively price sell-side orders of a stock following purchases of that stock, and that Defendant did so with respect to other securities not susceptible to spoofing but did not do so with respect to PHUN).  "Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent."  *Set Cap. LLC*, 996 F.3d at 77.  Defendant also argues that its trading activity should not be aggregated to determine a pattern from which to infer scienter.  *See* MTD Br. 19.  This fails for the reasons discussed above—namely, that the Complaint alleges a course of conduct by Defendant and does not include allegations suggesting Defendant was acting on the instructions of clients.

Defendant also argues that the baiting orders remained open for as long as two minutes, longer than the milliseconds courts have described as common to spoofing activity.  *See id*. at 20 (citing *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017)).  However, the facts alleged in the Complaint contrast Defendant's trading with that of other market participants, including with respect to the length of time that the baiting orders remained open.  *See* Compl. ¶¶ 54, 67, 80, 87. This sufficiently suggests that Defendant was not engaged in *bona fide* market activity.  More to the point, although many spoofers cancel their orders within fractions of a second of placing

them, Defendant identifies no authority that a claim based on spoofing must allege cancellations of the baiting orders within milliseconds.

Finally, Defendant argues that the Complaint's assertion that Defendant used algorithmic trading techniques to execute its spoofing scheme, standing alone, is insufficient to raise a strong inference of scienter.  MTD Br. 23.  This is true, though courts "evaluate the sufficiency of a complaint's allegations of scienter holistically, considering all of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation."  *Set Cap. LLC*, 996 F.3d at 78.  The Complaint's allegation regarding the use of algorithmic trading practices goes to the overall context of Defendant's behavior.  Their use may suggest either consciousness (i.e., the programs were designed to engage in spoofing strategies, *see Harrington Glob. Opportunity Fund*, 585 F. Supp. 3d at 416) or recklessness (i.e., the programs were designed highly unreasonably and in an extreme departure from the applicable standards of care to avoid spoofing, to the extent the risk of spoofing was known to Defendant or so obvious Defendant should have known, *see In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) with respect to the misbehavior alleged.

At this stage of proceedings, *see ATSI Commc'ns, Inc.*, 493 F.3d at 102, Plaintiff has pleaded sufficient facts that, when viewed "holistically, considering all of the facts alleged, [and] taken collectively," *Set Cap. LLC*, 996 F.3d at 78, create the required strong inference of scienter.[4]

---

[4] Because the Complaint establishes scienter through circumstantial evidence of conscious misbehavior or recklessness, it is unnecessary to address the parties' arguments as to whether the Complaint alleges that Defendant had motive and opportunity to commit fraud.

**C.     Loss Causation**

The Complaint does not adequately plead loss causation.  "Loss causation . . . is the

proximate causal link between the alleged misconduct and the plaintiff's economic harm."  *ATSI*

*Comm'ns*, 493 F.3d at 106; *accord Ret. Bd. of the Policemen's Annuity & Benefit Fund of*

*Chicago v. FXCM Inc.*, 767 F. App'x 139, 141 (2d Cir. 2019) (describing loss causation as "a

causal connection between the material misrepresentation and the loss").  The Second Circuit has

not decided whether Rule 9(b)'s heightened pleading standard applies to loss causation, *see*

*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020), but has stated that

"Plaintiff['s] burden is not a heavy one," and "[t]he complaint must simply give Defendants

some indication of the actual loss suffered and of a plausible causal link between that loss and

the alleged misrepresentations."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797

F.3d 160, 187 (2d Cir. 2015).

The Complaint alleges that Plaintiff sold shares of its stock in the immediate aftermath of

Defendant's spoofing activity at prices depressed by that activity, *see* Compl. ¶ 118, and that

PHUN's price never fully rebounded from Defendant's activity during the period of the spoofing

scheme, such that all of Plaintiff's sales during this period were at depressed prices, *see id.*

¶¶ 119-122.

As to the first theory, Plaintiff alleges it sold stock the same day as Defendant's spoofing

activity on October 21, 26, and 27, 2021.  *See id.* ¶ 118.  However, Exhibit 2 to the Complaint,

"a table listing each transaction in which Plaintiff sold shares of stock," *id.* ¶ 117, does not list

any sales on October 26th or 27th.[5]  With respect to October 21, 2021, Defendant purchased

---

[5] Although the Complaint notes that the order executions listed in the Complaint are subsumed
within the blocks of shares listed in Exhibit 2, *see* Compl. ¶ 118 n.18, those blocks of shares are

PHUN shares at artificially depressed prices around 3:56 and 3:57 P.M., and Plaintiff executed

sales approximately two hours later, around 5:44 P.M.  *Id.*  This is insufficient to establish harm

from Defendant's activity, because the Complaint does not sufficiently plead that the immediate

price impact of spoofing lasts for almost two hours.  *See Gamma Traders – I LLC v. Merrill*

*Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) (affirming dismissal of spoofing-related

market manipulation claims under the Commodities Exchange Act for failure to plead actual

damages) ("[P]leading same-day, post-spoof trades does not justify an inference of injury

without any factual allegations to support the inference that the effects of the spoof linger for the

remainder of the trading day.").  Instead, the Complaint seems to point in the opposite direction:

when describing two of the example episodes of spoofing, Defendant is said to have "convert[ed]

profits from its spoofing activity to cash" by selling shares only seconds later, suggesting a much

shorter rebound period.  Compl. ¶ 61 (seventeen seconds), ¶ 68 (thirty-one seconds).

As to the second theory, the Complaint alleges that Defendant's spoofing had a

"persistent and long-lasting" impact on PHUN, meaning essentially all of Plaintiff's stock sales

following the beginning of Defendant's scheme were negatively impacted.  *Id.* ¶¶ 119-121.  The

Court first notes this theory of injury appears at odds with the Complaint's allegations of how

Defendant profited from its spoofing activity during the episodes (i.e., by executing sales after

the alleged spoofing episodes) described above.  In any event, Plaintiff relies heavily on an

expert report from Professor Paul Milgrom in *Alaska Electrical Pension Fund v. Bank of*

*America*, No. 14 Civ. 7126 (S.D.N.Y. Jan. 22, 2018), that manipulative trading can lead to

permanent price impact.  Compl. ¶ 35.  However, as *Northwest Biotherapeutics* thoroughly

---

split up by day, and while the Exhibit lists sales for October 22, it does not list any for Tuesday,
October 26 or Wednesday, October 27.

explains, the relevance of Prof. Milgrom's report is minimal in the context of spoofing.  *See* 2023 WL 9102400, at *31-*32, *32 n.32 (noting, among other things, that *Alaska Electrical Pension Fund* was an antitrust action and the tendency of some forms of anti-competitive market manipulation to affect prices does not support an inference of the same for spoofing).  The remaining allegations of the Complaint that Plaintiff cites—*see, e.g.*, Compl. ¶ 119 ("Defendant's fraudulent trading activities had both a temporary and [a] long-term adverse effect on the market price of PHUN stock."), ¶ 120 ("The impact of this spoofing activity extended beyond the specific spoofing cycle . . . because the market neither immediately nor fully rebounded from the manipulated prices[.]"), ¶ 122 ("[T]he placement and cancellation of Baiting Orders throughout the Relevant Period had the cumulative effect of driving PHUN's share price down during the Relevant Period.")—are conclusory statements that are insufficient on a motion to dismiss.  *See Gamma Traders*, 41 F.4th at 80 (disregarding the statement that "Defendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period" as conclusory).

As noted, the Second Circuit has not decided whether Rule 9(b)'s heightened pleading standards applies to the element of loss causation.  But it is unnecessary to resolve this question, because Plaintiff's allegations fail even under Rule 8(a)(2)'s more forgiving standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See, e.g.*, *Gru v. Axsome Therapeutics, Inc.*, No. 22 Civ. 3925, 2023 WL 6214581, at *4 (S.D.N.Y. Sept. 25, 2023) (granting a motion to dismiss for failure to adequately plead loss causation under Rule 8(a)(2)'s standard).  Loss causation is a required element for each of Plaintiff's claims.  *See Noto*, 35 F.4th at 102 (Section 10(b)), *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015) (Section 9(a)), *Greentech Research LLC v. Wissman*, 961

N.Y.S.2d 406, 407 (App. Div. 2013) (New York common law).  Accordingly, the Complaint

fails to adequately allege each of these claims and is dismissed.

**D.     Leave to Amend**

In its opposition, Plaintiff seeks leave to amend.  Pl.'s Mem. of L. in Opp'n to Def.'s

Mot. to Dismiss the Compl. 29 n.36, ECF No. 25.  Defendant notes that Plaintiff previously filed

a letter stating that "it does not intend to amend its Complaint at this time and will rely on that

pleading in opposing Defendant's motion to dismiss."  Oct. 16, 2023, Letter, ECF No. 23.  Under

Rule 15(a)(2), courts "should freely give leave [to amend] when justice so requires."  The

Second Circuit has cautioned district courts not to "treat[] . . . [a] decision to stand by the

complaint after a preview of Defendants' arguments—in the critical absence of a definitive

ruling—as a forfeiture of the protections afforded by Rule 15." *Loreley Financing (Jersey) No. 3

Ltd.*, 797 F.3d at 190.  Amendment may be futile in light of the deficiencies identified above, and

futility may provide cause to deny leave to amend. *Id.*  However, Plaintiff may seek leave to

amend if it has a good faith basis to plead loss causation in accordance with the holdings given

above.

**CONCLUSION**

For the reasons given above, Defendant's motion is **GRANTED.**

By **April 17, 2024**, Plaintiff may file a letter motion, not to exceed five pages, seeking leave to amend.  If it does so, Plaintiff shall attach a proposed First Amended Complaint with all changes from the Complaint shown in redline.  The letter shall explain why the proposed changes cure the deficiencies identified.  If such a letter is filed, Defendant shall be given the opportunity to respond.  If no such letter is filed, the case will be terminated.

The Clerk of Court is respectfully directed to close the motion at ECF. No. 21.

SO ORDERED.

Dated:  April 3, 2024
        New York, New York

_____
        DALE E. HO
        United States District Judge