**COHEN**MILSTEIN

Cohen Milstein Sellers & Toll PLLC
88 Pine Street, 14th Floor
New York, NY 10005
cohenmilstein.com

Laura Posner
212.220.2925
lposner@cohenmilstein.com

April 17, 2024

*Via ECF*

Honorable Dale E. Ho
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

  Re: **<u>Phunware, Inc. v. UBS Securities LLC, No. 1:23-cv-06426</u>**

Dear Judge Ho:

  Plaintiff Phunware, Inc. ("Phunware" or "Plaintiff") respectfully submits this letter motion seeking leave to file an Amended Complaint pursuant to this Court's Order dated April 4, 2024 (ECF No. 30) (the "Order").

  In the Order, the Court held that the initial complaint sufficiently alleged that Defendant UBS Securities LLC ("UBS" or "Defendant") engaged in illegal manipulative spoofing of Phunware's stock with scienter. While the Court held that the initial complaint failed to sufficiently allege loss causation, it allowed Plaintiff to seek leave to amend its complaint. The new extensive factual allegations set forth in the attached Amended Complaint easily meet the "not [] heavy" burden of providing Defendant with "some indication of the actual loss suffered [by Phunware]" and "a plausible link between that loss and the alleged [manipulative conduct]." Order at 13. Accordingly, Plaintiff should be granted leave to file its Amended Complaint. *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

  The Amended Complaint details how UBS's manipulative spoofing of Phunware stock caused Plaintiff to sell its stock at artificially depressed prices by directly linking the negative impact caused by UBS's spoofing to Plaintiff's sales of Phunware stock thereafter. These allegations satisfy the two independently sufficient ways to plead loss causation set forth in *Gamma Traders*: (1) that a plaintiff traded "so close in time to Defendant's spoofing" as to permit the court to "infer as a matter of common sense that the market prices were artificial" when plaintiff traded (the "temporal proximity" theory), or (2) a factual basis indicating that the effects of the spoof lasted for a protracted period so as to "justify an inference that the market price was still artificial" when plaintiff traded (the "long-term price impact" theory). *See Gamma Traders I - LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80-81 (2d Cir. 2022). Plaintiff's allegations thus make it "plausible – rather than merely speculative – that [Phunware's] own trades interacted with Defendant's transactions to [Phunware's] detriment." *Id.* at 79.

COHENMILSTEIN

April 17, 2024
Page 2

I.   **The Amended Complaint Sufficiently Alleges Short-Term Price Impact**

The Amended Complaint adequately alleges "facts to support its theory about the length of time that spoofing affect[ed] the market" for Phunware stock (¶¶117-164) sufficient to meet the "temporal proximity" theory of loss causation for, at a minimum, Phunware's sales of over 29 million shares on January 26, 2021, October 21, 2021, October 26, 2021, October 27, 2021, and February 12, 2021. *Gamma Traders*, 41 F.4th at 81-82. *See also id*. at 80 (holding that "same-day post-spoof" trades could justify "an inference of injury" if the complaint provides "factual allegations to support the inference that the effects of the spoof linger" during that time).

Specifically, the Amended Complaint pleads in detail how Defendant's spoofing "caused an immediate and sustained decline in the price of [Phunware] shares." ¶121. The Amended Complaint substantiates this allegation with a detailed factual quantitative analysis comparing the price change in Phunware shares in the minutes following Spoofing Episodes to the changes in the Nasdaq Composite Index and the NASDAQ-100 Technology Index, which are standard and appropriate benchmarks for Phunware shares. ¶124 and n.21. This analysis shows that Defendant's spoofing had an immediate, persistent and statistically significant negative impact on the price of Phunware shares, notwithstanding a partial reversion that allowed Defendant to profit from its purchases. ¶¶124-125. The Amended Complaint also pleads a detailed quantitative analysis demonstrating that it was Defendant's spoofing that caused the negative price impact, not unrelated general market-wide conditions. *Id*.

The Amended Complaint then details specific dates on which Plaintiff sold shares at prices that were in "temporal proximity" to and negatively impacted by Defendant's spoofing, including how the negative impact of Defendant's spoofing persisted throughout Phunware's sales on those dates. For example, on **January 26, 2021**, Plaintiff sold a total of 1,940,000 shares, which included sale transactions that occurred *just seconds after* Defendant's spoofing activity that day. ¶139. The pre-market trading price of Phunware at 9:26am that day was $2.23 per share. Defendant began spoofing just after the opening of trading at 9:30am, causing the price of Phunware to decrease within three seconds to $2.14 (a 4% decline), at which price it made its Executing Purchase. Within the first minute of trading on this day, Plaintiff sold over 36,000 shares at prices ranging from $2.12 to $2.22 – as much as 5% lower than the pre-spoof level. Plaintiff sold an additional amount of over 1.3 million shares from between approximately 45 minutes after Defendant's spoofing began to approximately 109 minutes after Defendant's spoofing ended at depressed prices as low as $1.94 per share. ¶140. The Amended Complaint pleads, based on a detailed qualitative analysis, that Defendant's spoofing caused this immediate and persistent price decline (¶124), that the price decline cannot be explained by other unrelated company-specific or market-specific facts, circumstances or events (¶¶141-42), and that the negative impact of Defendant's spoofing persisted during all of Phunware's sales that day. ¶¶140, 143.

On **October 26, 2021**, Plaintiff sold a total of 5,394,697 shares, which included sale transactions that occurred just three minutes after Defendant's spoofing activity that day. ¶144.

COHENMILSTEIN

April 17, 2024
Page 3

The pre-market trading price of Phunware at 9:28am that day was $6.86 per share. Defendant began spoofing just after the opening of trading at 9:30am, causing the price of Phunware to decrease within five seconds to $6.25, at which point it made its first Executing Purchase. Defendant's spoofing continued to drive the price of Phunware down during the first 11 seconds of trading, when it made its final Executing Purchase at $6.11 (an 11% decline).  Beginning just three minutes later, Plaintiff sold 1,200 shares at the depressed price of $6.29 (a decline of 8.3%); within the first 15 minutes of Defendant's spoofing had sold a total of more than 1.1 million shares at prices ranging from $5.70 share to $6.49 per share; and within one hour of Defendant's spoofing had sold a total of over 3.6 million shares at prices as low as $4.51. ¶145. The Amended Complaint pleads, based on a detailed qualitative analysis, that Defendant's spoofing caused this immediate and persistent price decline (¶124), that the price decline cannot be explained by other unrelated company-specific or market-specific facts, circumstances or events (¶¶147-49), and that the negative impact of Defendant's spoofing persisted during all of Phunware's sales that day.  ¶145.[1]

On **February 12, 2021**, Plaintiff sold 11.7 million shares in a public offering (the "Offering") at prices that were negatively impacted by Defendant's spoofing. ¶160. Plaintiff announced on February 7, 2021, that it was launching a proposed public offering of securities at a price that would be "subject to market and other conditions." ¶150. Following this announcement and in just the final ten minutes of trading that day, Defendant placed Baiting Orders to sell over 107 thousand shares – over $1.6 million in value and more than 38 times the volume of sell-side orders that it placed throughout almost the entire rest of that trading day –  successfully inducing the entry of sell orders from other market participants and driving the price of PHUN shares downward by 1.7%, from a high of $2.87 to a low of $2.82 per share. ¶¶154-155. Following the close of the market, Phunware priced the Offering at $2.25 per share, reflecting a 20% discount to the closing share price of Phunware that day. ¶157. If Defendant had not spoofed Phunware's stock from 3:50pm to 4:00pm on February 11, 2021, the 4pm closing price of Phunware's shares would have been higher on February 11, 2021, and the price for the Offering would have been higher than $2.25 per share.[2] ¶161.

---

[1] Defendant also engaged in spoofing on (1) October 21, 2021, and Plaintiff sold 8 million shares of its stock that same day, and (2) October 27, 2021 and Plaintiff sold over 2.7 million shares of its stock that same day (*supra* ¶¶62-68), at prices that would have been higher, but for the negative price impact of Defendant's spoofing.  *See* Ex. 1 and 2.

[2] Should the Court determine that the specific sale examples in the Amended Complaint (¶¶139-164) are insufficient for some reason, Plaintiff requests leave to amend the complaint to include two additional examples of Spoofing Episodes – on July 10 and 13, 2023 – after which Plaintiff sold thousands of additional shares within 50 seconds to four minutes of Defendant's spoofing, respectively. Plaintiff did not include these two additional examples in the Amended Complaint because they occurred outside the operative "Relevant Period" and would, therefore,

COHENMILSTEIN

April 17, 2024
Page 4

## II. The Amended Complaint Sufficiently Alleges Long-Term Price Impact

The Amended Complaint also adequately alleges facts sufficient to plead that Defendant's spoofing – over 1,000 Spoofing Episodes over 91 trading days during the Relevant Period – had a long-term negative impact on the price of Phunware's stock sufficient to plead loss causation for all of Phunware's Relevant Period sales (Exhibit 2). *Gamma Traders*, 41 F.4th at 81-82.

Specifically, the Amended Complaint pleads in detail how the price decline caused by Defendant's extensive and constant spoofing did not fully reverse over time. ¶¶121-122. In a detailed quantitative analysis comparing the price change in PHUN shares following Spoofing Episodes to the changes in the Nasdaq Composite Index and the NASDAQ-100 Technology Index, Plaintiff pleads that "the negative price impact of Spoofing Episodes persisted for at least sixty (60) trading days following the Spoofing Episodes, during times when both NASX and NDXT were increasing in value or remaining flat." ¶¶126-127. And the Amended Complaint pleads how the gradual stabilization of the negative price impact from between twenty (20) to sixty (60) days after the Spoofing Episodes demonstrates that the price decline was not driven by negative news about Phunware stock, because such news would have resulted in a further price decline. ¶127.

Based on detailed quantitative analysis, the Amended Complaint also pleads how, following the immediate price decline caused by Defendant's spoofing, Phunware's share price *partially* reverts, providing Defendant an opportunity to profit from its purchases, including its Executing Purchases, at artificially depressed prices. ¶125. Specifically, the Amended Complaint shows how between 4 and 7 days after Spoofing Episodes, Phunware's stock partially reverts. Following the *partial* reversion, however, this quantitative analysis shows that Phunware's share price then continues to decline, ultimately gradually stabilizing between 20 and 60 days after Spoofing Episodes at a still artificially depressed price. ¶¶125-127. *Compare with Gamma Traders*, at 80 ("But Gamma does not plead, even in general terms, how long it takes for the market price to return to a non-artificial level after a spoof.").

The results of this detailed quantitative analysis are consistent with the expert report of Nobel Prize-winning economist Dr. Paul Milgrom (the "Milgrom Report") (attached as Exhibit 3)[3] and the extensive economic research it relies upon, which is also pled in detail in the Amended

---

have required modifications to certain aggregate trading figures in the Scienter section (*e.g.,* ¶¶109-114) and in Exhibit 1. Plaintiff has endeavored to amend only its allegations in the Loss Causation section, consistent with the Court's Order, to streamline any further motion practice at the pleading stage.

[3] The Report & Recommendation in *Northwest Biotherapeutics* acknowledged that it did not review the Milgrom Report itself, which was subsequently attached as an exhibit to the Second Amended Complaint in that action. No. 22-cv-10185, 2003 WL 9102400, at *32 n.31. In

COHENMILSTEIN

April 17, 2024
Page 5

Complaint. As explained in the Milgrom Report, the "unwinding" of a manipulative spoof through subsequent trading to realize profits does not eliminate the permanent price impact of that manipulation (*Compare* Order at 14 *with* Amended Complaint at ¶¶135-136). Rather, since the trader will seek to minimize the price impact during the unwinding, it will only partially reverse the impact from the manipulation, leaving a persistent effect from manipulation. ¶¶135-136. It is, thus, not contradictory to allege that UBS profited from its spoofing by selling at partially rebounded prices, and also that its spoofing caused long-lasting declines in Phunware's share price.

Relying on direct quotation and analysis from the Milgrom Report, the Amended Complaint also alleges in detail the economic basis for how and why spoofing affects markets for prolonged periods of time. ¶¶128-137. The persuasive analysis in the Milgrom Report is not limited to price fixing or other allegations unique to the facts of the case in which it was submitted, but rather discusses the extensive economic literature establishing that the price impact of any form of trade-based manipulation (like spoofing) does not typically fully reverse. ¶129.

*   *   *

Accordingly, Plaintiff's amended loss causation allegations are sufficient under *Gamma Traders,* and are even substantially more detailed than the loss causation allegations held sufficient in other spoofing cases. *See Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, No. 21-cv-761, 2023 WL 6316252, at *8 (S.D.N.Y. Sept. 28, 2023) (crediting at motion to dismiss stage plaintiff's allegation that when "spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the spoofing events."); *Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60, 103 (S.D.N.Y. 2015) (plaintiffs "pleaded enough facts evidencing a link between the alleged manipulative scheme and their damages" because they "have shown in some detail exactly how the structure of the Offerings allowed investors to manipulate and depress the price of ECD stock" and "that following the Offerings, short sales of ECD stock skyrocketed while the price of ECD stock plummeted."); *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16-cv-4991, 2017 WL 11884601, at *1 (N.D. Ill. Oct. 3, 2017) (plaintiff adequately pled loss causation where it provided defendants with "some indication of the loss"). As such, Plaintiff should be granted leave to file its Amended Complaint.

---

*Northwest Biotherapeutics*, the court permitted the plaintiff to amend its complaint to bolster its loss causation allegations, which it has subsequently done, and a motion to dismiss the Second Amended Complaint on loss causation in that action has not yet been briefed.

COHENMILSTEIN

April 17, 2024
Page 6

                        Respectfully submitted,

                        By: */s/ Laura H. Posner*
                        Laura H. Posner
                        Michael B. Eisenkraft
                        **COHEN MILSTEIN SELLERS & TOLL PLLC**
                        88 Pine Street, 14th Floor
                        New York, NY 10005
                        Tel: (212) 838-7797
                        Fax: (212) 838-7745

                        Raymond M. Sarola
                        **COHEN MILSTEIN SELLERS & TOLL PLLC**
                        Two Logan Square
                        100-120 N. 18th St., Suite 1820
                        Philadelphia, PA 19103
                        Tel: (267) 479-5700
                        Fax: (267) 479-5701

                        *Counsel for Plaintiff*

Attachments

cc:    Counsel of record (via ECF)