# CAHILL GORDON & REINDEL LLP
## 32 OLD SLIP
## NEW YORK, NY 10005

| | | | | |
|---|---|---|---|---|
| DANIEL R. ANDERSON | HELENA S. FRANCESCHI | TELEPHONE: (212) 701-3000 | JOHN MacGREGOR | ANDREW SCHWARTZ |
| PETER J. ARMENIO | JOAN MURTAGH FRANKEL | WWW.CAHILL.COM | TRISTAN E. MANLEY | DARREN SILVER |
| HELENE R. BANKS | JONATHAN J. FRANKEL | | BRIAN T. MARKLEY | JOSIAH M. SLOTNICK |
| ANIRUDH BANSAL | SESI GARIMELLA | 1990 K STREET, N.W. | MEGHAN N. McDERMOTT | RICHARD A. STIEGLITZ JR. |
| LANDIS C. BEST | ARIEL GOLDMAN | WASHINGTON, DC 20006-1181 | WILLIAM J. MILLER | SUSANNA M. SUH |
| CHRISTOPHER BEVAN | PATRICK GORDON | (202) 862-8900 | EDWARD N. MOSS | SEAN R. TIERNEY |
| BROCKTON B. BOSSON | JASON M. HALL | | JOEL MOSS | JOHN A. TRIPODORO |
| JONATHAN BROWNSON * | STEPHEN HARPER | CAHILL GORDON & REINDEL (UK) LLP | NOAH B. NEWITZ | HERBERT S. WASHER |
| DONNA M. BRYAN | CRAIG M. HOROWITZ | 20 FENCHURCH STREET | WARREN NEWTON § | FRANK WEIGAND |
| EMEKA C. CHINWUBA | TIMOTHY B. HOWELL | LONDON EC3M 3BY | JULIANA OBREGON | MICHAEL B. WEISS |
| JOYDEEP CHOUDHURI * | COLLEEN TRACY JAMES | +44 (0) 20 7920 9800 | JAVIER ORTIZ | MILES C. WILEY |
| JAMES J. CLARK | DAVID G. JANUSZEWSKI | | DAVID R. OWEN | DAVID WISHENGRAD |
| CHRISTOPHER W. CLEMENT | JAKE KEAVENY | | JOHN PAPACHRISTOS | C. ANTHONY WOLFE |
| AYANO K. CREED | BRIAN S. KELLEHER | WRITER'S DIRECT NUMBER | LUIS R. PENALVER | ELIZABETH M. YAHL |
| PRUE CRIDDLE ± | RICHARD KELLY | (212) 701-3720 | SHEILA C. RAMESH | |
| SEAN M. DAVIS | CHÉRIE R. KISER ‡ | | MICHAEL W. REDDY | * ADMITTED AS A SOLICITOR IN ENGLAND AND WALES ONLY |
| STUART G. DOWNING | JOEL KURTZBERG | | OLEG REZZY | ± ADMITTED AS A SOLICITOR IN WESTERN AUSTRALIA ONLY |
| ADAM M. DWORKIN | TED B. LACEY | | THOMAS ROCHER * | ‡ ADMITTED IN DC ONLY |
| ANASTASIA EFIMOVA | ANDREW E. LEE | | PETER J. ROONEY | § ADMITTED AS AN ATTORNEY IN THE REPUBLIC OF SOUTH AFRICA ONLY |
| SAMSON A. ENZER | ALIZA R. LEVINE | | MATTHEW E. ROSENTHAL | |
| JAMES Z. FANG | JOEL H. LEVITIN | | THORN ROSENTHAL | |
| GERALD J. FLATTMANN JR. | MARK LOFTUS | | TAMMY L. ROY | |

April 26, 2024

        Re:    *Phunware, Inc*. v. *UBS Securities LLC*, No. 1:23-cv-06426

Dear Judge Ho:

      We write on behalf of UBS Securities LLC ("UBS") in opposition to the April 17, 2024 letter motion of Plaintiff Phunware, Inc. ("Plaintiff") seeking leave to file an amended complaint (the "Motion" or "Mot.") (ECF No. 31). As explained below, the Proposed Amended Complaint ("PAC") does not remedy the deficiencies previously identified by this Court, and the Motion should be denied as futile.[1]

      In its April 4, 2024 Opinion and Order (the "Order") (ECF No. 30), this Court dismissed Plaintiff's original Complaint, finding that Plaintiff had not sufficiently pled loss causation. The Court observed that "[a]mendment may be futile in light of the deficiencies identified" but granted Plaintiff the opportunity to "seek leave to amend if it has a good faith basis to plead loss causation in accordance with [the Court's] holdings." (*Id.* at 16.)

      The PAC fails to plead loss causation as required. The fundamental and unavoidable problem with Plaintiff's position is that it is saying two contradictory things at the same time: (1) it alleges that the share price almost *immediately* rebounded after the alleged spoofing incidents, in order to show that UBS profited from its supposed scheme by quickly selling Phunware shares at the rebounded share price; and (2) it also alleges that price declines persisted for *months*, in order to claim that all of Plaintiff's sales over a two-year period were made at prices that were artificially depressed by the alleged spoofing scheme. These conflicting factual allegations cannot both be true, and should not be credited.

---

[1] To the extent this Court grants Plaintiff leave to file the PAC, UBS reserves its right under Fed. R. Civ. P. 12(b) to move to dismiss that complaint. UBS also respectfully reserves all rights as to this Court's Order with respect to the other elements of Plaintiff's claims.

CAHILL GORDON & REINDEL LLP

-2-

## I. Plaintiff Fails to Sufficiently Plead Close-in-Time Sales

In its first attempt to plead loss causation, Plaintiff alleged in the original Complaint that "[o]n **numerous occasions during the Relevant Period**, Plaintiff sold shares of PHUN stock in **intraday executions** which occurred **seconds and minutes** after Defendant's [alleged] spoofing activity[.]." (Compl. ¶ 118 (emphasis added).) Plaintiff's Motion, and accompanying exhibits, now make clear that this allegation was false.

UBS identified the apparent falsity of the allegation in its October 6, 2023 motion to dismiss, pointing out, *inter alia*, that the allegations involving **Plaintiff's own** purported "intraday executions" were "internally conflicting" and, at best, demonstrated only a single day on which Plaintiff allegedly sold shares on the date of an alleged spoofing episode and, even in that single instance, only *after* the price had admittedly rebounded. (ECF No. 22, at 27 & n.21.). Plaintiff declined the opportunity to amend its complaint and remedy these deficiencies at the time and, instead, decided to rely on its flawed pleading. (Pl.'s Oct. 16, 2023 Ltr. (ECF No. 23.).)

Now that this Court has rejected that pleading, Plaintiff belatedly attempts to submit an amended version. But in the PAC, Plaintiff no longer claims that it allegedly sold shares in intraday executions on "numerous occasions." Instead, it claims to have sold shares on only four days on which alleged spoofing activity took place: January 26, 2021; October 21, 2021; October 26, 2021; and October 27, 2021 (the "Same-Day Sales").[2] However, the allegations with respect to these dates still fail to provide a plausible causal link between UBS's alleged conduct and Plaintiff's allegedly damaged Same-Day Sales for three primary reasons.

*First*, as the Second Circuit has expressly held, pleading same-day sales alone is not sufficient. *Gamma Traders - I LLC* v. *Merrill Lynch Commods., Inc.*, 41 F.4th 71, 80 (2d Cir. 2022). Plaintiffs must also plead "factual allegations to support the inference that the effects of the [alleged] spoof linger[ed] for the remainder of the trading day." *Id*. Yet, as with Plaintiff's original Complaint, the factual allegations of the PAC do not plead that the immediate price impact of the alleged spoofing lasted long enough to have impacted Plaintiff's Same-Day Sales. Rather, again, the PAC "seems to point in the opposite direction," alleging that UBS had already profited from its purported spoofing by selling Phunware stock at an increased price that day ***before***

---

[2] Plaintiff also alleges that it sold shares on February 12, 2021 that were priced as of the close of trading on February 11, 2021. (PAC ¶¶ 119, 156.) Yet, it admits that its Exhibit 1 (which purports to be its "comprehensive list of de-anonymized Spoofing Episodes and spoofing activity by Defendant" (*id*. ¶ 48)) contains **no allegations of spoofing by UBS on February 11, 2021**. *See id.* n.35. Plaintiff purports to have identified this new spoofing episode using some unidentified "methodology" that it adopted from an unrelated case in the E.D. Illinois involving precious metals trading, and fails to provide any details with regard to the alleged number or prices of the purported newly-discovered Baiting Orders or any other purported indicia that would suggest a lack of intent to execute any of these orders. Moreover, if anything, the pleaded events of early February 2021—*i.e.*, the announcement that ***Phunware*** itself would be injecting up to $100,000,000 of new PHUN shares into the market (PAC ¶ 150)—is an obvious explanation for any decline in the stock price in February 2021 and one Plaintiff simply glosses over. *See infra*.

Plaintiff's allegedly damaged sales took place—"suggesting a much shorter rebound period." (Order at 14 (citing rebound periods of "seventeen seconds" and "thirty-one seconds" for the alleged spoofing examples on October 26 and October 27, 2021, respectively).)

The same is true of the new dates Plaintiff identifies. *See, e.g.*, PAC ¶ 139 & Ex. 1 at 2 (alleging a two second rebound period between UBS's "Executing Purchase" on January 26, 2021 at 9:30:02 and its alleged profiting trade the same day at 9:30:04); PAC ¶ 118 & Ex. 1 at 23 (alleging rebound periods of 22 to 94 seconds between UBS's Executing Purchases on October 21, 2021 between 15:55:47 and 15:56:58 and its alleged profiting trades the same day at 15:56:26 and 15:57:20). In short, even as to the Same-Day Sales, the PAC alleges a nearly immediate rebound in price and thus "provides no factual basis that would justify an inference that the market price was still artificial by the time [Plaintiff] traded." *Gamma Traders*, 41 F.4th at 80.

**Second**, Plaintiff's allegations continue to be internally conflicting and thus entitled to no weight. *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.").

One such conflict is presented by Plaintiff's allegations that UBS was ***selling*** shares during windows of time that Plaintiff also maintain that UBS had artificially (and intentionally) deflated the stock price. Such allegations make no sense. For example, on January 26, 2021 (one of the Same-Day Sales dates), Plaintiff alleges that it sold 36,157 shares of PHUN at allegedly damaged prices during the first minute of the trading day from 9:30:01 to 9:30:51. (PAC ¶ 139.) Yet, during that same brief period, Plaintiff alleges that UBS was also selling shares. (PAC, Ex. 1, p. 2 (alleging UBS sold shares at 9:30:02).) A similar situation is alleged on October 27, 2021 (another Same-Day Sale date) when UBS allegedly benefited by purchasing 825 shares at artificially deflated prices, but also sold 4,387 shares (over ***five times more*** than it purchased) during the same two-minute window when prices allegedly were artificially depressed. (PAC ¶ 64 & Ex. 1 at 42.)

Another conflict is Plaintiff's claim that the stock price was both continually declining and yet trending up on the dates of the Same-Day Sales. For example, Plaintiff repeatedly claims, based on purported "quantitative analysis," that the stock price continually declined in the hours following the alleged spoofing episodes. *See, e.g.*, PAC ¶ 124 (charting up to an approximate - 20% average price change within 350 minutes of the spoofing episode); PAC ¶ 127 (alleging that the negative price impact "persisted at least sixty (60) trading days following the Spoofing Episodes"). Yet, Plaintiff also repeatedly alleges that on days where it sold millions of its own shares throughout a given day that over 90% of those sales "were made ***at the same or higher price*** as the preceding sale." (*Id.* ¶¶ 143, 149.) In other words, the price at which Plaintiff executed its sales on those days was, on average, ***trending up***—not continually declining as Plaintiff's

CAHILL GORDON & REINDEL LLP

-4-

quantitative analysis purports to suggest.[3]

As a final example, in its effort to sweep in every sale Plaintiff executed during the Relevant Period, Plaintiff again places great weight on its conclusory allegations that the "negative price impact of Defendant's spoofing activity . . . did not dissipate immediately following the Baiting Orders." (PAC ¶ 122.) But that claim is contradicted by Plaintiff's own repeated allegations both that (1) "the market for PHUN was an efficient market" that "promptly digested current information regarding PHUN from all publicly available sources and reflected such information in the price of PHUN's shares" (*id.* ¶¶ 165-66); and (2) UBS's alleged cancellations of "Baiting Orders" immediately "cancelled the artificial supply injected by all of its Baiting Orders, eliminating the artificial sell-side imbalance that it falsely conveyed and injected into the market through its Baiting Orders" (*see, e.g.*, *id.* ¶ 53). In other words, if, as Plaintiff alleges, the market is efficient and the imbalance was removed, Phunware's share price immediately would have recovered to the correct level, and there could be no persistent price impact.

***Third***, Plaintiff has not pled a plausible causal link because it fails to provide any explanation as to why other ***pled*** events on the dates in question are not more obvious alternative causes of any price declines. Most notably, on each of the Same-Day Sales dates, Plaintiff made enormous sales of its own shares—activity that was many multiples (sometimes thousands of times) greater in volume than UBS's alleged "Baiting Order" activity that day. *Compare* PAC, Ex. 1 at 2 (alleging UBS placed 1,275 shares of Baiting Orders on January 26, 2021) *with* ¶ 139 (alleging Plaintiff sold ***1,940,000 shares*** of its stock on January 26, 2021 or ***1,521 times*** UBS's alleged order activity). Plaintiff clearly recognizes that its own conduct diluting the value of its stock is an obvious alternative explanation for its stock performance on the Same-Day Sales dates; accordingly, Plaintiff preemptively—and summarily—alleges "[t]he decline in PHUN's share price [on the relevant dates] was also not caused by the sale of shares by Plaintiff." *See, e.g.*, PAC ¶ 149. But Plaintiff's conclusory allegations on this point are entitled to no weight, particularly because they contradict Plaintiff's own statements in its public SEC filings warning investors that its "***[f]uture sales or issuances of our common stock, or the perception that such sales could occur, could depress the trading price of our common stock***."[4] [5]

---

[3] Plaintiff's quantitative analysis also purports to show "how between 4 and 7 days after Spoofing Episodes, Phunware's stock partially reverts," "providing Defendant an opportunity to profit from its purchases." (Motion at 4.) As demonstrated above, such a longer alleged rebound period is completely at odds with the PAC's allegations concerning the alleged example spoofing episodes. As this Court found in its Order (at 14), the episodes plead a rebound period of mere seconds or minutes, not "between 4 and 7 days."

[4] *See, e.g.*, Phunware Inc., Annual Report (Form 10-K) (Mar. 31, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1665300/000162828021006256/phun-20201231.htm.

[5] Plaintiff's allegations that any price decline "cannot be explained by other company-specific facts, circumstances or events" (*see, e.g.*, PAC ¶ 147) are also conclusory and contradicted by the PAC. *See id.* ¶ 148 (citing October 2021 "[m]edia reports" identified in UBS's motion to dismiss which reported huge swings in PHUN's stock price related to announcements regarding a SPAC linked to Donald Trump).

CAHILL GORDON & REINDEL LLP

-5-

## II. Plaintiff Fails to Sufficiently Plead a Long-Term Price Impact

The PAC also does not cure the deficiencies identified with respect to Plaintiff's long-term price impact theory. In fact, the bulk of Plaintiff's allegations on this point continue to rest on "conclusory statements that are insufficient on a motion to dismiss." (Order at 15.) And, as the Court found in its Order with respect to the original Complaint, Plaintiff's purportedly more specific allegations concerning an alleged "persistent and long-lasting" impact remain "at odds" with Plaintiff's "allegations of how Defendant profited from its spoofing activity" by selling shortly after each alleged spoofing episode. (Order at 14.)

Plaintiff urges that any rebound was only "partial" (*see, e.g.*, PAC ¶ 125) and that an alleged longer-term impact is confirmed by "economic literature" which purportedly recognizes "that the artificially depressed price caused by spoofing generally does not fully recover to the price that existed prior to the spoofing when spoofing events occur ***continuously throughout the day and continue without interruption*** over a protracted period of time" (*id.* at 122). Yet, on the alleged Same-Day Sales dates, UBS is not alleged to have spoofed "continuously throughout the day" but rather in most instances only during a very brief window at the open of the trading day. *See, e.g.*, PAC, Ex. 1 at 2, 42 (alleging January 26, 2021 spoofing episode complete as of 9:30:03; October 26, 2021 spoofing episodes complete as of 9:30:10). Nor is UBS alleged to have engaged in spoofing that was continuous and uninterrupted over the entire Relevant Period. Rather, Plaintiff alleges spoofing episodes on only 90 days of the over 550 trading days in the Relevant Period, and on 81 of those 90 days, the alleged episodes pled are limited to either the first or last ten minutes of trading. (*See generally* PAC, Ex. 1.)

In addition, and despite this Court ruling that its relevance was "minimal in the context of spoofing" (Order at 14-15), Plaintiff also continues to rely on an expert report from an unrelated antitrust case (the "Milgrom Report"). Plaintiff now appends the Milgrom Report to the PAC and argues that the Report "explain[s]" that "the 'unwinding' of a manipulative spoof through subsequent trading to realize profits does not eliminate the permanent price impact of that manipulation." (Motion, at 5.) But the Milgrom Report states no such thing; indeed, "spoofing" is not mentioned once in that Report.

Finally, Plaintiff's new allegations comparing the stock performance of PHUN to price changes in two benchmark indices, at best, demonstrate merely that PHUN did not perform in line with certain sections of the market. But they provide no ***causal link*** between UBS's conduct and Plaintiff's purportedly damaged sales and thus do not remedy the deficiencies identified.

*    *    *

As the Second Circuit instructed in *Gamma Traders*, "before proceeding to discovery, it is the plaintiff's burden 'to provide facts sufficient to allege a plausible connection between their trading and [Defendant's alleged spoofing].'" 41 F.4th at 81. The additional allegations of the PAC fail to plead this required connection. Plaintiff's Motion should be denied as futile.

CAHILL GORDON & REINDEL LLP

-6-

                                      Respectfully submitted,

                                      /s/ Tammy L. Roy

                                      Tammy L. Roy

Honorable Dale E. Ho  
United States District Court  
Southern District of New York  
40 Foley Square  
New York, NY 10007

<u>VIA ECF</u>

cc:    Counsel of Record (via ECF)