UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHUNWARE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> UBS SECURITIES LLC, <br><br> Defendant. | Docket No. 1:23-cv-06426 |

**DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR <u>FAILURE TO STATE A CLAIM</u>**

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Tammy L. Roy
Ivan Torres
Vishwani Singh
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com
itorres@cahill.com
vsingh@cahill.com

*Attorneys for UBS Securities LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ................................................................................................................................ 1

I.   THE FAC FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION ........................... 1

    A.   *NWBO II* Rejected Similar Long-Term Price Impact Allegations ........................... 2

    B.   Phunware's Long-Term Price Impact Theory is Even Weaker than NWBO's ....... 4

    C.   With Limited Exceptions, The FAC Fails To Plead Close-in-Time Sales .............. 5

II.  PHUNWARE'S NEW CONTRADICTORY LOSS CAUSATION ALLEGATIONS
    WARRANT RECONSIDERATION THAT A MANIPULATIVE ACT WAS PLED ...... 8

III. PHUNWARE'S NEWLY-PLED SPOOFING EPISODE IS INCONSISTENT WITH
    THE ALLEGED SCHEME AND DOES NOT PLEAD A MANIPULATIVE ACT ......... 9

CONCLUSION ........................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gamma Traders – I LLC* v. *Merrill Lynch Commodities, Inc.*,
   41 F.4th 71 (2d Cir. 2022) ....................................................................................................6, 7

*In re LaBranche Sec. Litig.*,
   333 F. Supp. 2d 178 (S.D.N.Y. 2004) ........................................................................................7n

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   332 F. Supp. 3d 885 (S.D.N.Y. 2018) ......................................................................................... 8

*Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*,
   2025 WL 368717 (S.D.N.Y. Jan. 31, 2025) ...................................................................... *passim*

*In re WorldCom, Inc. Sec. Litig.*,
   234 F. Supp. 2d 301 (S.D.N.Y. 2002) .......................................................................................7n

UBS Securities LLC ("UBS" or "Defendant") respectfully submits this reply memorandum in further support of its motion to dismiss the First Amended Complaint ("FAC").[1]

## PRELIMINARY STATEMENT

As this Court found on Defendant's first motion to dismiss, Plaintiff fails to adequately plead a plausible factual basis to infer that the spoofing scheme pled here impacted Plaintiff's sales occurring minutes, hours, days, weeks, and/or months after the alleged spoofing activity. In fact, with the FAC, Plaintiff now affirmatively pleads the absence of a price reversion—an indispensable part of any alleged spoofing scheme. (*See* Section I, *infra*.) These new allegations, which directly contradict the alleged spoofing scheme, not only preclude a finding of loss causation but warrant the reconsideration of whether Plaintiff has in fact pled a manipulative act at all. (*See* Section II, *infra*.) And the FAC's belated allegations of spoofing on February 11, 2021—which allegedly impact Plaintiff's newfound sales of over ***11.7 million shares***—are inconsistent with the alleged trading pattern this Court considered on the first motion to dismiss and do not plausibly plead manipulation. (*See* Section III, *infra*.) For these reasons, and those set forth in Defendant's opening brief, the FAC should be dismissed with prejudice.

## ARGUMENT

### I.   THE FAC FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION

Because Plaintiff only identifies a handful of sales that allegedly occurred "close-in-time" to purported spoofing activity (*see* Section I.C), the bulk of Plaintiff's claims hinge on its attempt to plead a long-term price impact that allegedly affected its sales days, weeks, and even months after the alleged spoofing. Yet, Plaintiff's new allegations do not overcome this Court's original

---

[1] Capitalized terms have the meaning ascribed in UBS's opening brief ("Mot.") (ECF No. 41). Plaintiff's Opposition (ECF No. 43) is referred to herein as "Opposition" or "Opp." Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

conclusion that Plaintiff's long-term price theory is "at odds with" the spoofing scheme it alleges. (ECF No. 30 at 14.) A recent decision in *Northwest Biotherapeutics, Inc*. v. *Canaccord Genuity LLC*, 2025 WL 368717, at *15–20 (S.D.N.Y. Jan. 31, 2025) ("*NWBO II*") rejected a similar long-term price impact theory on the same basis. (*See* Section I.A.) Plaintiff's attempt to plead long-term price impact here is even weaker than the effort in *NWBO II*. (*See* Section I.B.)

### A.     *NWBO II* Rejected Similar Long-Term Price Impact Allegations

Since Defendant's opening brief, the court in *NWBO II* rejected a virtually identical long-term price impact theory (made by the same counsel here). *See* 2025 WL 368717, at *15–20.[2] Magistrate Judge Stein found that plaintiff's long-term price impact theory had an "obvious and fatal flaw": "it completely ignores the [alleged] spoofer's other [alleged] actions to drive the market in the opposite direction following the placement of the Baiting Orders"—"an integral and indispensable part of a spoofing scheme." *Id*. at *16. The *NWBO II* court held that plaintiff's theory thus remained "fundamentally incompatible with Plaintiff's own allegations that NWBO's stock price repeatedly reverted to the pre-spoofing market level on the same day as Spoofing Episodes." *Id*. at *19. The same fundamental conflict exists here. (Mot. at 9–14.)

The *NWBO II* court also considered and rejected the same research articles Plaintiff cites here and found once again that reliance on the Milgrom Report—which "does not mention spoofing or the spoofing literature"—is "misplaced." 2025 WL 368717, at *17. It also considered and rejected price charts similar in kind to those Plaintiff offers here,[3] including a purported "60 trading day price impact chart." *Id*. at *18–20. The *NWBO II* court found such charts lacking

---

[2] Although Plaintiff references this opinion in its Opposition (*see, e.g.*, Opp. at 21 n.10), it omits any mention of the court's complete rejection of NWBO's long-term price impact allegations.

[3] As explained in Defendant's opening brief, the charts offered by Phunware in this case also purport to show long-term price impact but are different than those in the *NWBO* SAC in that the Phunware charts do not show a rebound at all. (*See* Section II, *infra*.)

because they purport only "to show a *correlation* between Spoofing Episodes and declines in NWBO's stock price," which "is not enough" to plead loss causation. *Id.* at *18. "The case law requires loss causation; loss correlation does not suffice." *Id.* (citing *In re IPO Sec. Litig.*, 297 F. Supp. 668, 672 (S.D.N.Y. 2003)). The same is true here; at best, Plaintiff's charts purport to show a correlation between alleged spoofing activity and price declines. But "in the absence of any supporting facts pled in the [FAC], no reasonable inference can be drawn from Plaintiff's price chart that [Phunware's] stock price was falling . . . *because* of the [alleged] spoofing." *Id.* at *19.

In addition, while the *NWBO II* court found plaintiff's "correlation" charts insufficient on this basis alone, it also found "another serious flaw" with plaintiff's charts: the use of averages "skew[s] the overall results." *Id.* at *19 n.22. The same is true here. Over one-third of the spoofing episodes alleged here occurred on only three consecutive trading days (October 22, 25, and 26, 2021), each of which was marked by company specific news that led to historic volatility in Phunware's trading price and volume. (ECF No. 22 at 28–29.) These unusual events, which led to Phunware's stock price surging by more than 1000% before then retreating back down (*id.* at 29 n.23), drastically skew Plaintiff's average-based analysis and obscure price movements within the Relevant Period that are completely inconsistent with Plaintiff's allegations of a spoofing scheme that allegedly drove Phunware's price down.

For example, between January 5, 2021 and February 12, 2021, Plaintiff alleges that UBS engaged in a total of 358 spoofing episodes or 13 episodes per trading day on average. (FAC, Ex. 1.) Yet, during this time period, Phunware's stock price actually *increased 120%* (compared to an increase of only 13.69% for the NDXT and an increase of only 11.28% for the NASX).[4] This substantial increase is consistent with Plaintiff's public disclosures to investors over the same time

---

[4] In the FAC, Plaintiff uses the NDXT and NASX as benchmarks for PHUN. (FAC ¶ 124 n.21.)

period that its trading price had "increased significantly" to levels not consistent with its operations and would be expected to return back to expected levels. (Mot. at 4–5.) In contrast, between June 1, 2021 through October 20, 2021, Plaintiff alleges UBS engaged in only a single spoofing episode (involving alleged baiting orders of 100 shares on August 17, 2021). Yet, during this time period Phunware's stock price **decreased 22%** (while the benchmark indices *increased*), suggesting that Phunware's stock price decline had nothing to do with UBS's trading activity.[5]

### B. Phunware's Long-Term Price Impact Theory is Even Weaker than NWBO's

In addition to the deficiencies found by the *NWBO II* court, the charts offered here also fail for another reason: they simply do not stand for the proposition Plaintiff argues and directly contradict Plaintiff's allegations of a profit-motivated spoofing scheme.

Plaintiff attempts to reconcile this contradiction by arguing that "the price of PHUN only *partially* rebounded, allowing UBS to monetize its profit from its acquisition of shares through Executing Purchases" and "then stabilized at a still artificially depressed price for at least 60 days." (Opp. at 15 (emphasis in original).) But, as explained in Defendant's opening brief (Mot. at 9–14), Plaintiff's charts do not bear this price pattern out. Indeed, they depict **no rebound whatsoever**. Plaintiff is wrong when it argues that UBS "acknowledges" that the charts show a "partial rebound." (Opp. at 16.) UBS noted only that the charts depict a slight uptick that never rises to the price at which Defendant allegedly purchased, *i.e.*, it never reaches a level at which UBS could have profited from a later sale. (Mot. at 10–11.)[6] Similarly, UBS does not argue, as

---

[5] One alternative explanation for this movement—and one of which Phunware again warned investors—is Phunware's own substantial sales, which reached a total of almost 3.5 million shares during the same time period. *See* Roy Decl. Ex. B, at 33 ("**Future sales or issuances of our common stock . . . could depress the trading price of our common stock**.").

[6] Plaintiff attempts to argue that the lack of any apparent rebound in its charts is because they portray the "average impact" or the "price path" "in the aggregate." (Opp. at 15.) But Plaintiff offers no explanation (and there is none) as to how charts that reflect *no* rebound on average

4

Plaintiff claims, that the FAC was required to "include allegations of UBS sales within [the] precise windows" depicted in Plaintiff's charts. (Opp. at 17.) That level of specificity is not needed because Plaintiff never alleges that the price "rebounded" to a level at which UBS could have profited. In other words, even if Plaintiff had alleged UBS sales within those windows, Plaintiff's own chart indicates that those sales would have been at a loss.

Finally, Plaintiff misapprehends UBS's argument with respect to Plaintiff's failure to plead continuous, uninterrupted spoofing activity. UBS does not argue that "economic literature demands literally 'uninterrupted' spoofing to find long-term price impact." (Opp. at 4.) That is *Plaintiff's allegation*. (*See* FAC ¶ 122.) UBS has simply pointed out that the circumstances that Plaintiff itself pleads are necessary to find long-term price impact are not pled here. Plaintiff rejects UBS's argument as one of "semantics" (Opp. at 20), but does not otherwise dispute UBS's data points on this issue. Specifically, Plaintiff does not dispute that (i) for more than 83% of the 550 trading days of the Relevant Period, no spoofing is alleged; (ii) on the vast majority of days spoofing is alleged, the spoofing is alleged to have been confined to the first or last ten minutes of the day, not "continuously throughout the day"; or (iii) for the vast majority of Plaintiff's sales, spoofing is alleged to have occurred on only one day within the 60 days prior to the sale. UBS has never argued that a plaintiff must show that the "spoofing literally never stops." (*Id*. at 19.) But Plaintiff's own theory as to long-term price impact requires more than what it has pled.

    **C.**    **With Limited Exceptions, The FAC Fails To Plead Close-in-Time Sales**

In granting Phunware permission to file an amended complaint, this Court found that "instances of sales *within seconds* of Defendant's [alleged] spoofing activity are sufficient to plead loss causation under the temporal proximity theory using a common-sense inference." (ECF No.

---

properly plead a partial rebound on any occasion. Any inference otherwise is mere speculation.

34 at 4.) Yet, notwithstanding that Plaintiff has only identified sales of 36,157 shares within seconds from alleged spoofing activity (Mot. at 17–21),[7] Plaintiff appears to be arguing that its claims with respect to sales of ***tens of millions of shares*** should proceed, with the "extent and amount" of damages deferred to the "merits phase." (Opp. at 8.)

Plaintiff is wrong. As the Second Circuit has made clear, "before proceeding to discovery, it is the plaintiff's burden to provide facts sufficient to allege a plausible connection between their trading and Defendants' [alleged] spoofing." *Gamma Traders – I LLC* v. *Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 81 (2d Cir. 2022). Thus, in *NWBO II*, the court found that only claims for which plaintiff had pled loss causation as to a particular sale could move forward, and otherwise dismissed "Plaintiff's claims relating to the approximately 234 million other shares of stock sold during the Relevant Period." 2025 WL 368717, at *21.

Plaintiff cites only two inapposite cases in support of its contrary view. (Opp. at 8.) Both cases involved typicality challenges to a lead plaintiff in the context of class certification, and allowed certain claims to move forward on behalf of the class notwithstanding that the lead plaintiff's own claims were more limited. Such holdings have no application outside of the class action context, and this is not a class action. Plaintiff asserts claims only on its own behalf and the vast majority of those claims fail for lack of loss causation. Moreover, beyond the absence of any legal authority for Plaintiff's position, Plaintiff could not, consistent with the PSLRA, use the existence of fatally-flawed claims as a basis to expand discovery in the hope of finding additional

---

[7] To be clear, UBS has never conceded that loss causation has been pled "with respect to four or five specific example episodes." (Opp. at 8.) UBS has only stated that it does not challenge the Court's finding that loss causation was pled as to Phunware's sales of 36,157 shares on January 26, 2021 that allegedly occurred within seconds of the alleged spoofing. (Mot. at 18 n.24.) Phunware has not pled factual allegations to support the inference that the alleged effects of Defendant's trading lasted any longer than mere seconds and thus UBS does challenge the adequacy of Plaintiff's loss causation allegations as to all other sales alleged in the FAC.

6

sustainable claims (or resurrecting dismissed claims) within the alleged Relevant Period.[8]

Plaintiff also seems to argue that, even if its claims relating to sales that occurred days, weeks, and months after the alleged spoofing are dismissed from the case, all of its Same-Day Sales plead loss causation. (*See* Opp. at 10 (arguing that there is no basis "to draw a bright line between an unspecified number of seconds and some incrementally longer period of minutes at the pleading stage").) But such an argument ignores the Second Circuit's holding in *Gamma Traders* and this Court's prior ruling in this case.

In *Gamma Traders*, the Second Circuit made clear that there is in fact a line beyond which one cannot just "infer as a matter of common sense" that prices remained artificial. 41 F.4th at 80. In the absence of "factual allegations" as to "how long it takes for the market price to return to a non-artificial level after a spoof[,]" a court "cannot reasonably infer that spoofing's effects last throughout the day." *Id.* As this Court recognized on Defendant's first motion to dismiss, and as remains the case, Plaintiff's FAC "does not sufficiently plead that the immediate price impact of spoofing lasts" beyond mere seconds. (ECF No. 30 at 13–14 (holding that Plaintiff failed to plead loss causation as to sales that occurred "almost two hours" after the alleged spoofing activity).) Again, Plaintiff offers only "correlation" charts (*see* Section I.B, *supra*), which contradict the spoofing scheme alleged (*see* Section II, *infra*), and otherwise provides no factual basis to infer that UBS's alleged spoofing impacted Phunware's stock price minutes or hours after Phunware alleges UBS's alleged cancellations of Baiting Orders pushed the stock price back up.[9]

---

[8] *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (a primary purpose of the PSLRA is to prevent plaintiffs from filing a complaint to initiate a "fishing expedition" in search of sustainable claims); *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 181 (S.D.N.Y. 2004) (the PSLRA prevents plaintiffs from filing securities claims "with the intent of using the discovery process to force a coercive settlement").

[9] Even if this Court determines that loss causation can be inferred in connection with sales alleged to have occurred on the same day of a spoofing episode, at best, Plaintiff has alleged only five days

7

## II. PHUNWARE'S NEW CONTRADICTORY LOSS CAUSATION ALLEGATIONS WARRANT RECONSIDERATION THAT A MANIPULATIVE ACT WAS PLED

As set out in Defendant's opening brief, Plaintiff's new allegations—alleging a continual price decline that persisted for ***months***—flatly contradict the spoofing scheme it alleges. (Mot. at 21–22.) Plaintiff argues that this contradiction can be ignored because "this Court has already determined [that other elements of a manipulative spoofing claim] were sufficiently pled." (Opp. at 21.) But Plaintiff's charts—which prove false any conclusory claim of a purported partial rebound—were not before the Court on Defendant's first motion. And there is no dispute that a rebound is essential to pleading a spoofing scheme. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018) ("Manipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level.").

As this Court held on Defendant's first motion to dismiss, a "theory of injury" that "essentially all of Plaintiff's stock sales" over a two-year period "were negatively impacted" is "at odds with the Complaint's allegations of how Defendant profited from its spoofing activity." (ECF No. 30 at 14; Mot. at 2.) While a temporary or partial rebound may theoretically reconcile an inconsistency like this, as described above and in Defendant's opening brief, Plaintiff's new allegations do not show a temporary or partial rebound. The charts it offers to fix its loss causation allegations do not show any price reversion at all, let alone one that would have allowed UBS to have profited from its alleged spoofing. (Mot. at 9–14.) They thus contradict the scheme alleged.

Plaintiff claims that the *NWBO II* court "rejected an analogous attempt" to argue that new loss causation allegations warranted the reconsideration of other elements of a spoofing claim. (Opp. at 21 n.11.) But the *NWBO II* court found that plaintiff's pleading was "unchanged" as to

---

on which that occurred (January 26, 2021, October 21-22, 2021, October 26-27, 2021).

other elements, 2025 WL 368717, at *20; here, Plaintiff's charts directly contradict Plaintiff's original pleading. This was not the case in *NWBO II*, where the charts offered by plaintiff are very different than the charts offered here. (Mot. at 13–14.) For example, while the charts in the *NWBO* SAC at least appear to reflect a stock price rebound that stabilizes at a depressed level, the charts offered here show only a continual decline. (*Id.*) Plaintiff's Opposition does not address this point at all.

Plaintiff is also silent, and thus fails to rebut, Defendant's argument that it is well within the discretion of this Court to reconsider its prior findings with respect to the elements of a manipulative act and scienter based on Plaintiff's new contradictory allegations. (Mot. at 21–22 (citing cases).) In short, one can either accept Plaintiff's allegations that the price of PHUN almost immediately rebounded after the alleged spoofing incidents, or accept Plaintiff's new allegations that PHUN's price declines persisted for months, with no rebound sufficient to have allowed Defendant to profit. Plaintiff cannot have it both ways.

### III. PHUNWARE'S NEWLY-PLED SPOOFING EPISODE IS INCONSISTENT WITH THE ALLEGED SCHEME AND DOES NOT PLEAD A MANIPULATIVE ACT

Plaintiff's original complaint made no mention whatsoever of the 11.7 million newly-issued shares Plaintiff sold on February 12, 2021. Claims relating to newly alleged spoofing episodes, which were not considered by this Court on any prior motion, should be dismissed for failure to plead a manipulative act or scienter.

As UBS argued in its opening brief, Plaintiff briefly references in the FAC—but does not explain—that it identified alleged "spoofing activity" on February 11, 2021 (that allegedly affected these February 12, 2021 sales) using some unspecified "methodology" it adopted from an unrelated case. (Mot. at 23–24; FAC ¶ 154 n.35.) Plaintiff's Opposition offers nothing further about this methodology or otherwise explains how this allegedly newly-discovered trading activity

9

constitutes spoofing beyond a conclusory claim that the activity on February 11, 2021 follows the same "standard three-step spoofing pattern" Plaintiff alleged previously. (Opp. at 12.)

But this is not an accurate description of what is pled in the FAC. The FAC's allegations as to the trading activity on February 11, 2021 both omit timing details necessary to plead the "three-step spoofing pattern" and directly contradict those three steps. As Plaintiff has long pled, its spoofing scheme relies on a very specific pattern or "cycle" of conduct: the placement of Baiting Orders to sell; followed by Executing Purchases; "immediately" followed by cancellations. (FAC ¶ 7.) As to February 11, 2021, Plaintiff does not plead this pattern. (Mot. at 24–25.)

Plaintiff also fails to address, and thus again fails to rebut, UBS's point that the FAC fails to offer any factual allegations distinguishing UBS's activity on February 11, 2021 from *bona fide* trading activity (Mot. at 25)—a key part of this Court's reasoning on the first motion to dismiss. (ECF No. 30 at 3, 10–11 (relying on allegations that Defendant's behavior trading PHUN departed from that of a *bona fide* market maker).) At most, Plaintiff alleges that UBS's sell-side orders were higher during the last 10 minutes of the day than during other periods. (Opp. at 11.) But Plaintiff does not allege that this uptick was inconsistent with market-wide activity that day, or that the magnitude of the increase in sell-side orders was inconsistent with UBS's buy-side order activity that day. And the FAC fails to explain why the Court should infer that cancellations at the close of trading reflect anything other than common legitimate market activity.

In short, Plaintiff's new allegations as to February 11, 2021 do not properly plead a manipulative act or scienter under the heightened pleading standards of Rule 9(b) and the PSLRA.

## CONCLUSION

Defendant respectfully requests that this Court grant its motion to dismiss.

10

| | |
|---|---|
| Dated: March 7, 2025<br>New York, New York | **CAHILL GORDON & REINDEL LLP**<br><br>By: /s/ Tammy L. Roy<br>    Herbert S. Washer<br>    Tammy L. Roy<br>    Ivan Torres<br>    Vishwani Singh<br>32 Old Slip<br>New York, New York 10005<br>Telephone: (212) 701-3000<br>Facsimile: (212) 269-5420<br>hwasher@cahill.com<br>troy@cahill.com<br>itorres@cahill.com<br>vsingh@cahill.com<br><br>*Attorneys for UBS Securities LLC* |